```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                       CHARLOTTE DIVISION




UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )   3:09CR67
                                   )   MAY 3, 2010
       vs                          )
                                   )
ANTHONY L. JINWRIGHT,              )
HARRIET P. JINWRIGHT,              )
                                   )
              Defendants.          )
_____/

                       VOLUME 18

                 TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE FRANK D. WHITNEY
                 UNITED STATES DISTRICT



APPEARANCES:

FOR THE UNITED STATES:      DAVID A. BROWN, SR., ESQ.
                            CRAIG D. RANDALL, ESQ.
                            U. S. Attorney's Office
                            227 W. Trade Street
                            Suite 1700
                            Charlotte, NC 28202


FOR DEFENDANT ANTHONY L. JINWRIGHT:

                            EDWARD T. HINSON, JR., ESQ.
                            B. FREDERIC WILLIAMS, JR., ESQ.
                            J. P. DAVIS, ESQ.
                            James, McElroy & Diehl
                            600 S. College Street
                            Charlotte, NC 28202
```

APPEARANCES CONTINUED:


FOR DEFENDANT HARRIET P. JINWRIGHT:

                              KEVIN TATE, ESQ.
                              ANGELA G. PARROTT, ESQ.
                              Federal Defenders of WNC
                              129 West Trade Street
                              Charlotte, NC 28202



         Proceedings reported and transcript prepared by:


                    JOY KELLY, RPR, CRR
               U. S. Official Court Reporter
                  Charlotte, North Carolina
                       704-350-7495

# I N D E X

JURY INSTRUCTIONS, PART ONE  ......................5181
CLOSING ARGUMENT BY MR. BROWN        ..............5255
JURY INSTRUCTIONS PART TWO  .......................5416


CERTIFICATE OF REPORTER ...........................5440

```
 1              P R O C E E D I N G S
 2    MONDAY, MAY 3, 2010
 3              (Court called to order at 8:30 a.m. and
 4    defendants present in courtroom.)
 5              THE COURT:  Good morning.  I read the defendant's
 6    brief on willful blindness.  Is the government submitting
 7    anything on willful blindness at this state?  Well, you've
 8    already --
 9              MR. BROWN:  I will add the following:  We did not
10    have the opportunity to file a responsive brief but I would
11    simply point out to the Court that the case of United States
12    v. Martin, 773 F.2d 579, is a criminal tax case out of the
13    Fourth Circuit, 1985, in which a deliberate ignorance
14    instruction was given.
15              Most recently on August 18th, 2009, in the case of
16    United States v. Whitisic, it's a District Court opinion out
17    of Western District of Virginia, the Court, citing a number
18    of Fourth Circuit cases in the context of a criminal tax
19    case, found a deliberate ignorance or willful blindness
20    instruction was appropriate.
21              So based on the case law, we submit the
22    instruction is appropriate.
23              THE COURT:  Well, first, as a matter of law, I
24    agree with the government and disagree with the defense.  In
25    a tax case willful blindness instruction would seem to be
```

1    eminently appropriate about the legal issue because the

2    parties did agree and everyone -- no one disputes that.

3           Knowledge of the actual law is critical in a tax

4    case, while in other cases it's not.  If a bank robber

5    intends to rob a bank and, in fact, robs the bank, the bank

6    robber doesn't have to know it's a crime to rob a bank; the

7    bank just -- he just needs to intend to rob a bank.

8           Here, if you want to commit tax evasion, you

9    actually have to have actual knowledge of the law.

10   Ignorance of the law is no excuse, and therefore, willful

11   blindness would be entirely appropriate as a matter of law.

12          Mr. Brown cites some cases.  I also note a case

13   that I used to cite all the time when I was making the

14   argument he's making, *United States v. Lizotte*,

15   L-I-Z-O-T-T-E, which is a First Circuit case.  That was in

16   the context of a *Klein* conspiracy.

17          But that's -- but what I've just told you

18   basically is dicta.  Because I thought about this at length

19   over the weekend, and willful blindness doesn't really apply

20   to this set of facts.  Willful blindness is deliberate

21   ignorance; here we have deliberate failure to disclose.

22          It's not that the defendants allegedly did not ask

23   Mr. Lancaster and Mr. Dawson what was taxable and what was

24   not taxable, the evidence suggests -- and I believe this

25   would be the government's argument -- that the accountants

1     and CPAs and the financial administrators on the church side

2     told the defendants, either directly or circumstantially,

3     about the taxability of all these issues, then the

4     defendants walled off their personal CPAs, Mr. Lancaster and

5     Mr. Dawson, and would not tell them that they knew already

6     what they were supposed to -- they knew the taxability of

7     certain items and they failed to disclose those items to

8     Mr. Lancaster and Mr. Dawson.

9             So it wasn't deliberate ignorance, it's a core tax

10    evasion.  It's failing to disclose, and it's failing to

11    disclose both through their CPAs who were preparing their

12    returns and, thus, to the Internal Revenue Service who

13    received those returns.

14            So I think the government is entirely permitted to

15    argue this -- the mystery of failing to disclose and the

16    gray area of learning something from the CPAs and the

17    accountants and the bookkeepers working from the church and

18    then not -- not disclosing it on the -- to their personal

19    accountants and keeping the two groups of accountants

20    separate.

21            So the government, in essence, is permitted to

22    argue virtually everything you can argue in the context of

23    ignorance and failing to disclose and things like that, but

24    is not cleanly entitled to a willful blindness instruction

25    because the defendants -- the evidence is that the

1    defendants had direct knowledge of these issues and the

2    government will show from a -- you know, the direct

3    knowledge in their argument or has shown it, and it's

4    entirely up to the jury to believe that either the defense's

5    argument that they didn't understand or the government's

6    argument that they were told over and over again.

7         So do you understand what I'm saying, Mr. Brown?

8    You can argue everything that you would probably argue under

9    deliberate ignorance but that's not the essence of your

10   case; it really doesn't fit the facts here.

11        MR. BROWN:  Well, I understand what the Court's

12   saying.  I would simply -- and I'm trying to pull it up

13   right now.  I actually think it is the *Campbell* case but I

14   could be mistaken.  I would think the Court will probably

15   know intuitively.

16        I'm confident the law in the Fourth Circuit is

17   that even when there's evidence of direct knowledge, the

18   government is entitled to a deliberate ignorance

19   instruction.

20        THE COURT:  Well, I -- that -- that is true.  But

21   I don't -- I don't think that's -- I agree with you there.

22   Actual knowledge and deliberate ignorance/willful blindness

23   instruction can go together.  But I don't see the facts here

24   really supporting deliberate ignorance; because it wasn't

25   that they didn't sit down with Mr. Lancaster -- the

```
 1    defendants didn't sit down with Mr. Lancaster or Mr. Dawson
 2    to ask them questions.  They didn't sit down with
 3    Mr. Lancaster or Mr. Dawson because they feared the two of
 4    them, Mr. Lancaster or Mr. Dawson, would ask them questions
 5    the other way back.  The questioner would be the
 6    accountants, not the defendants.  Does that make sense?
 7              MR. BROWN:  Yes, it does, and I understand what
 8    the Court's saying.  But I think there's still room to make
 9    the argument that Mr. Jinwright was deliberately ignorant,
10    particularly on the question of whether the honorariums or
11    love gifts and outside speaking engagements are income.
12              With respect to Mrs. Jinwright, because we don't
13    have as much direct evidence of knowledge, I think the
14    deliberate ignorance instruction is particularly appropriate
15    with respect to her.
16              What we have -- and I think that's what the Court
17    is relying on -- is Mr. Jinwright's as to what he did or did
18    not do.  We don't have that with respect to Mrs. Jinwright.
19              THE COURT:  All right, let me go to the defense.
20              I've rejected defense's legal argument that it
21    doesn't apply in a tax case, because it -- it -- it actually
22    seems to apply even more in a tax case where ignorance of
23    the law does not apply.  Knowledge of the law is a
24    requirement in a tax case; and when you have educated people
25    on the law -- CPAs Lancaster and Dawson -- and you have the
```

```
 1    opportunity to inquire of them and you don't.  But what

 2    Mr. Brown is adding is particularly relevant for

 3    Mrs. Jinwright; the direct evidence as to Mrs. Jinwright

 4    is -- is -- as to her knowledge is limited.  It's a lot of

 5    circumstantial evidence but limited direct evidence.

 6            Mr. Williams first and then Mr. Tate, since it's

 7    Mr. Tate's client.

 8            MR. WILLIAMS:  Let me leave the facts representing

 9    to Mr. Tate.  Simply state on the general theory level that

10    Cheek requires actual subjective knowledge.  The trouble

11    with a willful blindness instruction is that it --

12            THE COURT:  Wait.  Wait.  Wait.  Who has the

13    burden of a good faith defense in Cheek?  You do, right?

14            MR. WILLIAMS:  We've -- we've argued the

15    metaphysics of that a bit.

16            THE COURT:  Yeah.  But I mean, it's not -- the

17    government doesn't have to disprove a good faith reliance,

18    does it?  So when you rely on Chief --

19            MR. WILLIAMS:  When all -- when all is said and

20    done the government has the burden of proof beyond a

21    reasonable doubt all the elements of the offense including

22    which was done willfully.

23            THE COURT:  All right.  But who has the burden of

24    a good -- does the government have the burden of overcoming

25    a good faith allegation or does the defense have to make a
```

```
1    showing of a good faith defense?
2              MR. WILLIAMS:  I -- I think in this case we have
3    made a showing --
4              THE COURT:  I -- I know.  But that's the point.
5    You're -- you can't -- if you agree that you have the burden
6    of showing a good faith defense -- and I'm not saying you
7    haven't, I think you have made that showing -- that has --
8    Cheek has nothing to do with willful blindness because
9    willful blindness goes to the government's showing of
10   willfulness.
11             MR. WILLIAMS:  When all is said and done --
12             THE COURT:  No, I -- no, no, no, no.  Answer my
13   question.  Answer my specific question.
14             MR. WILLIAMS:  I would plead ignorance.
15             THE COURT:  No.  You are far from being an
16   ignorant individual.
17             MR. HINSON:  Your Honor, I -- I -- I hate to step
18   in here with my poor learned colleague but I'm trying to
19   remember the case.  There's a fairly well-known case, and
20   it's back in my memory banks, about shifting burden on an
21   affirmative defense.  I think the Supreme Court of the
22   United States reversed on a situation where the charge had
23   required an affirmative burden to be met by the defense,
24   and -- but this whole question is Mr. --
25             THE COURT:  But that's not -- but that's not at
```

1    issue here.  You've made -- you've made a good faith

2    showing.  You have that.  And so you've done that.

3         MR. HINSON:  Well, and that's -- that's what I'm

4    referring to.  I think as I understand the burden for

5    affirmative defenses in criminal cases based on that case

6    that I'm struggling to remember the name of, and I think it

7    had to do with self-defense; that the government basically,

8    once a -- once a good faith showing is made, the burden

9    shifts to the government.

10        THE COURT:  Yeah.  I agree with you.  I agree with

11   you.  Now you've gotten all the instructions you want with

12   regard to subjectivity of knowledge and good faith reliance.

13   But that's -- but you can't -- what I'm saying is you can't

14   use *Cheek* to keep the government from arguing its facts.

15   Because the government -- because *Cheek* -- because willful

16   blindness, willful blindness is actual knowledge as you make

17   clear in your pleading.  Willful blindness is not negligence

18   or recklessness, it is actual knowledge.

19        And I am convinced, and just -- just have to leave

20   it at this, Mr. Williams.  The government's right.  Willful

21   blindness can be applicable in a tax case particularly with

22   regard to the knowledge of the law, since the knowledge of

23   the law is a requirement of both tax evasion and falsified

24   returns.  You can't -- and -- and it's a question of why

25   this doesn't apply to this set of facts.

1          And quite honestly, I had not thought about

2    Mrs. Jinwright.  I had been thinking over the weekend about

3    Mr. Jinwright.

4          Mrs. Jinwright, because she didn't take the stand,

5    there is not the same type of issue between the jury of who

6    to believe who not to believe.  It is more your classic the

7    government has the burden of proof, has to meet the evidence

8    to sustain that burden; and failing to do that, the

9    defendant should be acquitted.  While in the case I think

10   Bishop Jinwright, the jurors have a credibility battle who

11   to believe.

12          So it really is -- it really is an issue as to

13   willful blindness for Pastor, or Mrs. Jinwright.

14          MR. TATE:  Your Honor, we formally move to adopt

15   the ALJ's motion to preclude the defense -- preclude the

16   instruction.  And additional argument would be that in order

17   to have a deliberate ignorance instruction, there should be

18   some evidence of deliberate ignorance; and our position

19   would be there's no such evidence in this case.

20          THE COURT:  What about CPA Dawson's testimony that

21   everything was delivered at the last minute and he was

22   making phone calls and -- and it just -- it was given to

23   him; he could barely get it done.  Isn't that circumstantial

24   that there was -- trying to avoid interaction between a CPA

25   and Pastor Jinwright, who was delivering all the documents.

1  MR. TATE:  No.  To me, it suggests that there was

2  two busy people at a busy tax time.

3  THE COURT:  Well, that's a good argument.  I agree

4  that's a very good argument.

5  MR. TATE:  Thank you.

6  THE COURT:  Mr. Brown, you caught me on

7  Mrs. Jinwright.  I had not -- I honestly had not thought

8  about her.  So anything -- any more facts you want to elicit

9  with regard to Mrs. Jinwright or you want to put on the

10 record?

11 MR. BROWN:  No, Your Honor.  Just -- I would add

12 this.  Again, I don't want the Court to think I'm only

13 relying on the deliberate ignorance instruction for

14 Mrs. Jinwright.

15 Again, I think it's appropriate within this

16 context, and as I understand the law in the Fourth Circuit,

17 as long as there is some basis for suggesting that the

18 defendant closed his or her eyes to what would be obvious,

19 then the instruction is appropriate.

20 With respect to the honorariums in particular,

21 there are Form W-9 and Forms 1099 out there, and yet were

22 referred to a number of witnesses --

23 THE COURT:  See, one of the problems I have with

24 the honorariums with Bishop Jinwright is he did allegedly

25 disclose some of them.  Because you look at the tax return

1    and A. L. Jinwright Ministries had some revenue.  And I

2    don't know any other source of that revenue but some of

3    those love offerings.

4           But I presume the government's offering -- I can't

5    presume -- you know, I can't say this is exactly what you're

6    going to argue; but it seems reasonable to me you were going

7    to argue that he reported $5,000 in love offerings in one

8    year but he actually had $100,000 of love offerings in one

9    year.  Isn't that -- I mean, where -- what other source of

10   revenue for A.L. Jinwright Ministries was there but love

11   offerings?  Oh, for books, I guess.

12          MR. BROWN:  I think essentially that's correct.

13   We would suggest it was just the love offerings and the

14   honorariums.

15          But again, what we've heard from a number of

16   witnesses mostly on cross-examination is that there was some

17   general confusion out there which would give rise to the

18   good faith defense.

19          That's the only point I was going to make is that

20   there's a Fifth Circuit case from 2009 that says that the

21   deliberate ignorance instruction is directly applicable to a

22   good faith defense but when the defendant asserts he didn't

23   understand the law, then evidence that challenges the

24   sincerity of that belief, including evidence that he closed

25   his eyes to what should have been obvious to him, is

1 appropriate.

2    THE COURT:  All right.  Okay.  I am convinced as

3 to Pastor Jinwright the instruction is appropriate and,

4 therefore, should be included.  There isn't a reason to

5 limit the instruction to one -- one defendant over the other

6 because I think that actually would be highly inappropriate,

7 unfair to Pastor Jinwright, to say that there's -- the

8 government has two different ways of proving knowledge

9 against her -- actual -- it is proving actual knowledge, not

10 proving negligence.

11    Now, the next step is I do agree with the defense

12 that we should have some direct affirmative language saying

13 that negligence is not deliberate ignorance.  Gross

14 recklessness or recklessness is not deliberate ignorance.

15 So let's go to the defendant's brief.

16    I would suggest we use what's taken out of the

17 *Campbell* decision for the first paragraph.  Actually, I

18 don't have -- Ms. Magee, do you have the most recent copy of

19 instructions?  I don't have what's been proposed.  Do you

20 have a hard copy there?  A hard copy of the instructions

21 right now.  Everything but the Statute of Limitations and

22 the --

23   (The Court and Ms. Magee confer.)

24    MR. BROWN:  Your Honor, with all due respect, I

25 think that any additional language is unnecessary.  The

1    deliberate ignorance instruction as drafted specifically

2    provides that:  "If you find beyond a reasonable doubt that

3    the defendant acted with or that the defendant's ignorance

4    was solely and entirely the result of a conscious purpose to

5    avoid learning the truth."

6            In other words, there's no room there for any

7    negligence or recklessness.  The jury must find beyond a

8    reasonable doubt that the defendant's conduct was solely and

9    entirely the result of a conscious purpose.

10           THE COURT:  Well, what I'd like to use is maybe

11   leave that paragraph in and then add on page 6 of the

12   defendant's brief what's been quoted from the *Campbell*

13   decision, it's the middle of the page, "a showing of

14   negligence is not sufficient to support a finding of

15   willfulness or knowledge.  Caution, the willfulness

16   blindness charge does not authorize you to find the

17   defendant acted knowingly because she wouldn't have know

18   what was a -- she would have known, which is a reasonable

19   standard, would have known what was occurring; or that in

20   hindsight she should have known what was occurring, or

21   because she was negligent and failed to recognize what was

22   occurring, or even because she was reckless or foolish or

23   failed to recognize what was occurring."

24           Because you're not -- I mean, you're going to

25   argue actual knowledge, then you shouldn't have a fear of

```
1    putting in negligence or anything like that.  Right?

2              MR. BROWN:  No, Your Honor.

3              THE COURT:  Mr. Williams, I presume -- I know

4    you're objecting to the instruction, but --

5              MR. WILLIAMS:  We reserve that exception, but

6    agree that that whole paragraph would be an appropriate

7    insert.

8              THE COURT:  All right.  Just tailoring it to these

9    facts.

10             MR. WILLIAMS:  Taking out the property at 763

11   Sundown.

12             THE COURT:  Right.

13             And finally, as to the statute of limitations,

14   five years or six years?  That shouldn't be in dispute,

15   right?  I didn't see any additional pleadings on it.

16   Statute of limitations back to 2004 or 2003?  The government

17   says 2003.

18             MR. HINSON:  Mr. Davis tells me that the

19   government's right about that; he looked it up.

20             THE COURT:  All right.  That's easy.  Mr. Tate, I

21   presume you join in on that?

22             MR. TATE:  Yes.

23             THE COURT:  All right.  Ms. Magee said yes.  Any

24   more instructions corrections?

25             MR. BROWN:  There are minor things but I wanted to
```

```
 1   make sure we did it for the Court.
 2           Page 13 in the paragraph that begins "The final
 3   element," the sentence that says "the intent required to
 4   prove a conspiracy is simply the intent to impede or impair
 5   the ability of the IRS to" actually it should be "perform
 6   its function," because this is not a substantive tax case,
 7   it is a Klein conspiracy.
 8           And what is in there now is "correctly ascertain
 9   the defendants' true incomes."
10           MS. MAGEE:  So what should it say?
11           MR. BROWN:  I would strike the words "correctly
12   ascertain the defendants' true incomes" --
13           THE COURT:  Right.
14           MR. BROWN:  -- and substitute "perform its
15   function."
16           THE COURT:  I thought it was "its lawful duties."
17           MR. BROWN:  I'm content with either one, Judge.
18           THE COURT:  Right.  What is -- I'm just trying to
19   recall United States v. Klein off the top of my head, but I
20   think it is "the lawful duties of the agency."  What is the
21   defense preference?  Or what's your suggestion?
22           MR. HINSON:  Well, I think the language here is in
23   the indictment on Count One is "defeating the lawful
24   functions."  I mean, that's what it say.
25           THE COURT:  All right.
```

1          MR. HINSON:  I think the language that's in the

2    Court's instruction is drawn from the -- from the -- perhaps

3    the overt acts.  I'm trying to find where it's --

4          THE COURT:  Well, "the lawful functions," since

5    that's what was in the indictment.

6          MR. HINSON:  That's what's in the indictment.

7          THE COURT:  All right.

8          MR. BROWN:  That's why I chose that language.

9          THE COURT:  I'm sorry.  My fault.

10         Okay.  Ms. Magee, have you got that?

11         MS. MAGEE:  Yes, sir.

12         THE COURT:  Next one, Mr. Brown?

13         MR. BROWN:  On page 18, we talked about this on

14    Friday night, about the scholarship?  I actually over the

15    weekend went back when Ms. Perkins specifically testified

16    that she provided a check for tuition payment to

17    Mrs. Jinwright.  Now, I believe the check was still made

18    payable to Mr. Jinwright, but based on her testimony that

19    would mean that we should include Mrs. Jinwright or just the

20    defendants in connection with the scholarship instruction.

21         MR. TATE:  My recollection is that she said

22    Mr. Jinwright asked her to involve the scholarship or

23    something like that.

24         THE COURT:  Well, that -- if you acknowledge at

25    least that much.  I recall what Mr. Brown said.  But if you

```
 1    acknowledge that much, that she even had interactions with

 2    regards to scholarship payments, that would mean it would

 3    apply to her.

 4              MR. TATE:  I mean we -- we -- we would object on

 5    that but we understand.

 6              THE COURT:  So noted.  Okay.  So that should be

 7    changed to reflect "defendants" rather than just

 8    "Bishop Jinwright."

 9              MS. MAGEE:  And "their daughter's tuition"?

10              THE COURT:  "Their daughter's tuition."

11              MR. BROWN:  That's all I have.

12              THE COURT:  All right.  I understand from the

13    court security officer we have 12 of the 13; we don't have

14    all 13 yet.  Nonetheless, we won't be starting until about

15    9:10 or 9:15 because I've got to have docket call.

16              MR. WILLIAMS:  I assume that the change I

17    suggested Saturday afternoon --

18              THE COURT:  Yeah, that's --

19              MR. WILLIAMS:  -- totally not required because

20    it's been included?

21              THE COURT:  -- that has been included.  Mr. Brown

22    said no objection by e-mail.

23              MS. MAGEE:  May I just read that to make sure --

24              THE COURT:  Right.  Ms. Magee is going to read

25    that into the record to make sure we incorporated the e-mail
```

1    change correctly.

2             MS. MAGEE:  I replaced that paragraph, the entire

3    paragraph on page 24, to say -- I didn't refer back to the

4    statute because the statute is not quoted immediately before

5    it like on page 27?  It says, "There is a rebuttable

6    presumption that the returns in issue -- at issue in Counts

7    Two through Seven were actually signed by each defendants.

8    In other words, you may infer and find that a tax return

9    was, in fact, signed by the person whose name appears to be

10   signed to it.  You are not required, however, to accept any

11   such inference or to make any such finding.

12            "If you find beyond a reasonable doubt from the

13   evidence in the case that the defendant under consideration

14   signed the tax return in question, then you may also draw

15   the inference and may also find, but are not required to

16   find, that the defendant under consideration knew of the

17   contents of the return that the defendant signed."

18            THE COURT:  Is that acceptable, Mr. Williams?

19            MR. WILLIAMS:  Yes, sir.

20            THE COURT:  All right.  Then the United States --

21   yes, sir, Mr. Hinson?

22            MR. HINSON:  I just wondered if we could get an

23   updated copy of the jury instructions so that --

24            THE COURT:  Absolutely.  You'll have them by the

25   time we finish the docket call.

1          So United States v. Jinwright will be recessed for
2   15 minutes until about 10 after, and I'll be back out in
3   about three or four minutes for calendar call.
4          (Recessed at 8:58 a.m. in Jinwright case and
5   resumed at 9:21 a.m. as follows:)
6          THE COURT:  I just want to inquire of counsel if
7   we should have maybe five- or ten-minute breaks between my
8   instructions and then the government's first part of its
9   closing, then the first defendant's closing?  I mean a break
10  between at each one of these for five to ten minutes?
11  Because it's a lot of instructions and argument.
12         MR. HINSON:  Your Honor, I think that's a good
13  plan because I agree with you it's a lot to say, and so I
14  would endorse that.
15         THE COURT:  Just do a ten-minute break between
16  each of those?
17         MR. HINSON:  Yes.
18         MR. TATE:  No objection.
19         MR. BROWN:  No objection, Your Honor.
20         THE COURT:  All right.  Then that's what we'll do.
21  So I will be starting on page 5 of the instructions and we
22  will bring the jurors in.
23         (Jury enters courtroom at 9:22 a.m.)
24         THE COURT:  Good morning.
25         THE JURY:  Good morning.

1          THE COURT:  I see many of you brought in cups of

2     coffee and I think that's very prudent.  I'm about to give

3     you some very lengthy jury instructions and they are very,

4     very important but they are also tedious, and it's good to

5     have a cup of coffee.

6          As I've told you through all my instructions,

7     please don't take notes.  Just read along with me; you can

8     watch your screens and read along with me.  You will have a

9     hard copy of these instructions and a digital version of

10    these instructions in the jury room that you can reference.

11    All right.

12         Members of the jury, now that you have heard the

13    evidence and soon will hear the arguments of counsel, I will

14    instruct you as to the law that applies in this case.  If

15    any difference appears to you between the law as stated by

16    the attorneys in closing arguments and that stated by me in

17    these instructions, you are to be governed by my

18    instructions.

19         I remind you that it is your duty and your

20    responsibility in this trial to judge the facts in

21    accordance with the law as I instruct you.  You may find the

22    facts only from the evidence which I've allowed to be

23    admitted during the trial.  You must not consider anything

24    which I've instructed you to disregard; and evidence which I

25    have admitted only for limited purpose you must consider

1    only for that purpose.

2          When you retire for deliberations, you should

3    recall and consider all the instructions that I gave you at

4    the beginning of the trial concerning your role and duties

5    as jurors.  In addition, I now want to give you more

6    specific instructions concerning certain testimony and

7    evidence that was received in the course of this trial.

8          At the beginning of the trial I described the

9    charges against the defendants.  At this time, the charge

10   against the defendant Anthony Jinwright of making false

11   statements to federal agents is no longer before you.  You

12   should not be concerned with or should you speculate about

13   the reason the charge is no longer a part of the trial.

14         Your decision on the facts of this case should not

15   be determined by the number of witnesses testifying for or

16   against a party.  You shall consider all the facts and

17   circumstances in evidence to determine which of the

18   witnesses you choose to believe or not believe.  You may

19   find the testimony of a smaller number of witnesses on one

20   side is more credible than the testimony of a greater number

21   of witnesses on the other side.

22         The testimony of a witness may be discredited or

23   impeached by showing that he or she previously made

24   statements which are inconsistent with his or her present

25   testimony.  The earlier contradictory statements are

1   admissible only to impeach the credibility of witnesses, not

2   to establish the truth of these statements.

3         It is the province of the jury to determine the

4   credibility, if any, to be given the testimony of a witness

5   who has been impeached.  If a witness is shown to have

6   knowingly testified falsely concerning any material matter,

7   you have a right to distrust such witness's testimony in

8   other particulars; and you may receive all the testimony --

9   excuse me.  You may reject all the testimony of that witness

10   or give it such credibility as you may think it deserves.

11         You have heard witnesses who have testified as to

12   both defendant Anthony L. Jinwright's and Harriet P.

13   Jinwright's good reputation in the community.  This

14   testimony is not to be taken by you as the witness's opinion

15   as to whether the defendants are guilty or not guilty.  That

16   question is alone for you to determine.  You should however

17   consider this character evidence together with all the other

18   facts and all the other evidence in the case in determining

19   whether defendant Mr. Jinwright or defendant Mrs. Jinwright

20   is guilty or not guilty of the charges.

21         Such character evidence alone may indicate to you

22   that it is improbable that a person of good reputation would

23   commit the offense or offenses charged.  Accordingly, if

24   after considering the question of the defendant's good

25   reputation you find that a reasonable doubt has been

1     created, you must acquit him or her of all the charges.

2          On the other hand, if after considering all the

3     evidence, including that of both defendants Mr. and

4     Mrs. Jinwright's reputation, you are satisfied beyond a

5     reasonable doubt that one or the other defendant is guilty,

6     you should not acquit him or her merely because you believe

7     he or she is of good reputation.

8          You have heard from law enforcement officers and

9     other government agents in this case.  Because a particular

10    witness may be a law enforcement officer or an employee of

11    another government agency does not mean that his or her

12    testimony is deserving of any special consideration or any

13    greater weight than that of any other witness's testimony.

14    You may judge the credibility of all the witnesses,

15    including government employees, and consider their interest,

16    if any, in determining the weight to be given to their

17    testimony.

18         Furthermore, it's quite legitimate for counsel to

19    attack or question the credibility of any government

20    employee on the grounds that his or her testimony may be

21    governed by the professional or -- personal or professional

22    interest in the outcome of this case.

23         You have heard the testimony of a witness who has

24    testified under a grant of immunity from this Court.  What

25    this means is that the testimony of the witness may not be

1   used against her in any criminal case except for a

2   prosecution for perjury, giving a false statement, or

3   otherwise failing to comply with the immunity order of this

4   Court.

5          Your are instructed that the government is

6   entitled to call as a witness a person who has been granted

7   immunity by order of this Court and that you may convict the

8   defendant on the basis of such a witness's testimony alone

9   if you find the testimony proves the defendant guilty beyond

10  a reasonable doubt.  However, the testimony of a witness who

11  has been granted immunity should be immunized by you with

12  greater care than the testimony of an ordinary witness.  You

13  should scrutinize it closely to determine whether or not it

14  is colored in such a way as to place guilt upon the

15  defendant in order to further the witness's own interest.

16  For such a witness, confronted with the realization that she

17  can win her own freedom by helping to convict another, has a

18  motive to falsify her testimony.  Such testimony should be

19  scrutinized by you with great care and you should act upon

20  it with caution.  If you believe it to be true and determine

21  to accept the testimony, you may give it such weight, if

22  any, as you believe it deserves.

23         You are instructed that you are to draw no

24  conclusions or inferences of any kind about the guilt of the

25  defendants on trial from the mere fact that the

1    prosecution -- that a prosecution witness was immunized from

2    prosecution.  Immunization may not be used by you in any way

3    as evidence against the defendants on trial here.

4         Certain charts and summaries have been introduced

5    during the trial of this case for the purpose of explaining

6    or summarizing testimony of other witnesses and other

7    documents admitted into evidence.  The summaries do not

8    independently establish proof of any of the facts.  If they

9    do not correctly reflect the facts or evidence on which they

10   are based, you should disregard these charts and summaries

11   and determine the facts from the underlying evidence.  If

12   you find, however, that the charts and summaries accurately

13   reflect the underlying evidence, you may consider them as

14   you would other evidence and give them such weight or

15   importance as you believe they deserve.

16        The defendant Harriet P. Jinwright has elected not

17   to testify in this case.  The Court instructs you she has a

18   constitutional right not to take the stand and testify and

19   not to speak at all or offer any evidence, the burden of

20   proof being entirely upon the United States, on the

21   government.  You must draw no adverse inferences of any kind

22   from her exercise of her privilege not to testify.  This

23   right is a fundamental one in America's criminal law, one

24   which cannot be disregarded by the jury at its pleasure.

25        Defendant Anthony L. Jinwright has elected to

1    testify on his own behalf.  I instruct you that you are to

2    consider his testimony as you would any other witness in

3    this case.

4         You are here to decide whether the government has

5    proven beyond a reasonable doubt that defendants are guilty

6    of the crimes charged.  A defendant is not on trial for any

7    act, conduct, or offense not alleged in the indictment.  Nor

8    are you concerned with the guilt any other person or persons

9    not on trial as a defendant in this case.

10        A separate crime is charged against one or more of

11   the defendants in each count of the indictment.  Each count

12   and the evidence pertaining to it should be considered

13   separately.  The case of each defendant should be considered

14   separately and individually as to each defendant.

15        The fact that you may find one or more of the

16   accused guilty or not guilty of any of the crimes charged

17   should not control your verdict as to any other crime or any

18   other defendant.  You must give separate consideration of

19   the evidence as to each defendant.

20        During the trial evidence was introduced

21   concerning the mortgage applications and tax returns filed

22   by defendants in years outside the dates charged in the

23   indictment.  Additionally, you have heard or received

24   evidence regarding the internal business governance of the

25   Greater Salem Church and/or Salem Baptist Church, including

1   the manner of presentation of annual budgets to its

2   congregation, preparation of budgets, its records

3   maintenance or bookkeeping, the manner in which it collects

4   offerings and how it spends its funds, as well as evidence

5   regarding how the determined salaries of the defendants and

6   how defendants personally spent their money.

7        I hereby instruct you the defendants are not on

8   trial with respect to the identified evidence introduced

9   either through documents and/or testimony or for any other

10   act, conduct or offense not alleged in the indictment.  You

11   may consider this evidence only for the limited purpose of

12   deciding:

13        1.  Whether defendants had the state of mind or

14   intent necessary to commit the crimes charged in the

15   indictment; or

16        2.  Whether the defendants had a motive or the

17   opportunity to commit the crimes charged in the indictment;

18   or

19        3.  Whether the defendants acted according to a

20   plan or in preparation for the commission of a crime; or

21        4.  Whether the defendants committed the acts he

22   or she -- whether the defendants committed the act for which

23   he or she is on trial for by accident or mistake.

24        Remember, these are the only purposes for which

25   you may consider the identified evidence.  Even if you find

1    that defendants may have committed the acts identified by

2    the identified evidence, this is not to be considered as

3    evidence of character to support an inference that the

4    defendants committed the acts charged in this case.

5         You will note that the indictment charges that the

6    offenses were committed, quote, "on or about, "close quote,

7    a certain date or dates.

8         The proof need not establish with certainty the

9    exact date of the alleged offense.  It is sufficient if the

10   evidence in the case establishes beyond a reasonable doubt

11   that the offense in question was committed on a date

12   reasonably near the date alleged.

13        Every defendant in a criminal case is presumed to

14   be innocent, and this presumption continues throughout the

15   course of trial.  This presumption will end only if you

16   arrive unanimously at the conclusion, if you do, that the

17   government has proven each of the essential elements of the

18   crimes charged in the indictment beyond a reasonable doubt.

19   The term "beyond a reasonable doubt" means just what it

20   says.  It is doubt of a defendant's guilt based on reason

21   and common sense and I will not attempt to define the term

22   further.

23        The punishment provided by law for the offenses

24   charged in the indictment should there be a verdict of

25   guilty on any of the offenses is a matter exclusively within

1    the province of the Court.  You should not consider

2    punishment in any way in arriving at an impartial verdict as

3    to the guilt or innocence of the accused.

4            I will now instruct you about the statutes and

5    other law applicable to the criminal conduct alleged in the

6    indictment.

7            Count One of the indictment charges both

8    defendants with conspiracy to defraud the United States

9    government, in violation of Title 18, United States Code,

10   Section 371.  I will now read to you Count One.  Then I'll

11   read the statute the defendants are charged with violating.

12   Finally, I will tell you the essential elements of this

13   crime.  You should keep in mind as I review this chart you

14   will have a copy of the Bill of Indictment and these jury

15   instructions with you in the jury room during deliberations.

16   It will not be necessary for you to try to memorize the

17   charge or take notes.  I remind you that the Bill of

18   Indictment is not evidence.

19           Count One reads:  Paragraphs 1 through 34 of the

20   introduction to this Bill of Indictment are realleged and

21   incorporated by reference herein.

22           From on or about October 15, 2002, through on or

23   about October 20th, 2008, in Mecklenburg County within the

24   Western District of North Carolina and elsewhere, the

25   defendants, Anthony L. Jinwright and Harriet P. Jinwright,

knowingly and willfully combined, conspired, confederated

and agreed with each other and with others both known and

unknown to the grand jury to defraud the United States of

America by impeding, impairing, obstructing and defeating

the lawful functions of the Internal Revenue Service of the

Department of Treasury of United States in the

ascertainment, computation, assessment and collection of the

revenue, to wit: income taxes.  And in furtherance thereof,

did commit or cause the commission of at least one overt act

in the Western District of North Carolina as set forth in

the paragraphs 1 through 34 above, all in violation of Title

18, United States Code, Section 371.

The relevant statute on this subject is Title 18,

United States Code, Section 371, which provides, quote:  "If

two or more persons conspire to defraud the United States or

any agency thereof in any manner or for any purpose, and one

or more of such persons do any act to effect the object of

the conspiracy, each shall be guilty of an offense against

the United States."  Close quote.

The government must prove each of the following

elements beyond a reasonable doubt in order to sustain its

burden of proving the defendant guilty.  In order for you to

find either one of the defendants guilty of the charge

contained, the government must prove each of the following

essential elements beyond a reasonable doubt as to the

defendant under consideration.

I think we just repeated ourselves there.

1.  The existence of an agreement between two or more persons to accomplish a common and unlawful plan.

2.  At some point during the existence or life of the conspiracy, agreement or understanding, one of its alleged members knowingly performed one of the overt acts charged in the indictment in order to further or advance the purpose of the agreement.

3.  At some time during the existence or life of the conspiracy, agreement or understanding, the defendant under consideration knew the purpose of the agreement and then deliberately joined the conspiracy, agreement or understanding.  And

4.  The defendant under consideration did such act knowingly, intentionally and willfully and joined the conspiracy with the intent to defraud the United States.

I shall define certain terms used in the essential elements.  Your are to apply these definitions as you consider the evidence.  If I do not define certain words, you will assign to them their ordinary, everyday meanings.

A criminal conspiracy is an agreement or a mutual understanding knowingly made or knowingly entered into by at least two people to violate the law by some joint or common plan or course of action.  Conspiracy in a very true sense

1   is a partnership in crime.

2        A conspiracy or agreement to violate the law, like

3   any other kind of agreement or understanding, need not be

4   formal, written, or even expressed in every detail.

5        To prove the existence of a conspiracy or an

6   illegal agreement, the government is not required to produce

7   a written contract between the parties or even produce

8   evidence of an expressed oral agreement spelling out all the

9   details of the understanding.  To prove that a conspiracy

10   existed, the government is not required to show that all of

11   the parties -- or, excuse me -- all of the people named in

12   the indictment as members of the conspiracy were, in fact,

13   parties to the agreement, or that all the members of the

14   alleged conspiracy were named or charged, or that all of

15   people whom the evidence shows were actually members of the

16   conspiracy agreed to all of the means or methods set out in

17   the indictment.

18        The government must prove that the defendant under

19   consideration and at least one other person knowingly and

20   deliberately arrived at some type of agreement or

21   understanding that they, and perhaps others, would defraud

22   the United States by means of some common plan or course of

23   action as alleged in Count One of the indictment.

24        Before the jury may find that a defendant became a

25   member of a conspiracy, the government must prove beyond a

1   reasonable doubt that the defendant under consideration knew

2   the purpose or goal of the agreement or understanding and

3   deliberately entered into the agreement intending in some

4   way to accomplish the goal or purpose by this common plan or

5   joint action.

6           A defendant's relationship with other members of

7   the conspiracy may be considered in determining the

8   agreement existed.  Circumstantial evidence tending to prove

9   a conspiracy may consist of the defendant's relationship

10  with other members of the conspiracy, the length of this

11  association, the defendant's attitude and conduct, and the

12  nature of the conspiracy.  And it is no defense to a

13  conspiracy that an individual's role in the conspiracy is

14  minor.

15          Once the existence of the conspiracy is

16  established, evidence establishing beyond a reasonable doubt

17  the connection of the defendant with the conspiracy, even

18  though the connection is slight, is sufficient to convict

19  him or her with knowing participation in the conspiracy.

20          It is proof of this conscious understanding and

21  deliberate agreement by the alleged members that should be

22  central to your understanding of the charge of conspiracy.

23          If the evidence establishes beyond a reasonable

24  doubt that the defendant under consideration knowingly and

25  deliberately entered into an agreement to defraud the United

States, the fact that the defendant did not join the
agreement at its beginning, did not know all of the details
of the agreement, did not participate in each act of the
agreement, or did not play a major role in accomplishing the
unlawful goal is not important to your decision regarding
membership in the conspiracy.  Merely associating with
others and discussing common goals, mere similarity of
conduct between or among such persons, merely being present
at a place where a crime takes place or discussed, or even
knowing about criminal conduct does not by itself make
someone a member of a conspiracy or a conspirator.

Evidence has been received in this case that
certain persons have done or said things during the
existence or life of the alleged conspiracy in order to
further or advance its goal.  Such acts or statements of
these other individuals may be considered by you in
determining whether the government has proven the charges in
Count One of the indictment against the defendant under
consideration.  Since these acts may have been performed,
these statements may have been made outside of the presence
of the defendants and even done or said without the
defendants' knowledge, these acts or statements should be
examined with particular care by you before considering them
against defendants who did not do the particular act or make
the particular statement.

1    In order to sustain its burden of proof on Count

2    One of the indictment, the government must prove beyond a

3    reasonable doubt that one of the members to the agreement

4    knowingly performed at least one overt act and that this

5    overt act was performed during the existence of -- excuse

6    me -- during the existence or life of the conspiracy and was

7    done to somehow further the goal of the conspiracy or

8    agreement.

9    The term "overt act" means some type of outward

10   objective action performed by one of the parties to or one

11   of the members of the agreement or conspiracy which advances

12   that agreement.

13   Although you must unanimously agree that the same

14   overt act was committed, the government is not required to

15   prove more than one of the overt acts charged.  The overt

16   act may, but for the alleged illegal agreement, appear

17   totally innocent and legal.

18   There is a limit on how much time the government

19   has to obtain an indictment.  This is called the Statute of

20   Limitations.  For you to return a guilty verdict on a

21   conspiracy charge the government must convince you beyond a

22   reasonable doubt that at least one overt act was committed

23   for the purpose of advancing or helping the conspiracy after

24   September 16, 2003.  I instruct you that as a matter of law

25   the Statute of Limitations is only relevant to your

consideration of an overt act in Count One of the
indictment, which is a conspiracy charge, and you should not
consider any statute of limitation issues for any of the
other charges in the indictment.

The final element that the government must prove
beyond a reasonable doubt is that the defendant under
consideration knowingly, intentionally, and willfully joined
the conspiracy with the intent to defraud the United States.
The intent required to prove a conspiracy is simply the
intent to impede or impair the ability of the Internal
Revenue Service to perform its lawful function.  As noted
above, proof of the requisite intent may be established
entirely by circumstantial evidence.

Now, the word "knowingly" as used in the crime
charged refers to an act done voluntarily and purposely and
not because of mistake, accident or other innocent reason.

"Willfully" means voluntary and intentional.

As to the word "intent," a person who knowingly
does an act which the law forbids intending either to
disobey or to disregard the law may be found to act with
intent.  Intent is an act or emotion of the mind seldom if
ever capable of direct or positive proof.  But in
determining intent you may consider any statement made, any
act done or admitted by the defendant, any law which
justifies the act, and all other facts and circumstances in

1    evidence which indicate his or her state of mind.  You may

2    consider it reasonable to find a person intends the natural

3    and probable consequences of acts knowingly done or

4    knowingly omitted.

5            In determining whether the defendants acted

6    knowingly, you may consider whether the defendant

7    deliberately closed his or her eyes to what would otherwise

8    have been obvious to him or her.  If you find beyond a

9    reasonable doubt that the defendant acted with or that

10   defendant's ignorance was solely and entirely the result of

11   a conscious purpose to avoid learning the truth, then this

12   element may be satisfied.

13           A person who attempts to cheat the justice system

14   by consciously preserving a lack of actual knowledge of a

15   subjectively obvious fact is just as culpable as a person

16   who has actual knowledge of that fact.

17           A showing of negligence is not sufficient to

18   support a finding of willfulness or knowledge.  I caution

19   you that the willful blindness charge does not authorize you

20   to find that the defendants acted knowingly because they

21   should have known what was occurring, or that in the

22   exercise of hindsight they should have known what was

23   occurring, or because they were negligent in failing to

24   recognize what was occurring, or even because they were

25   reckless or foolish in failing to recognize what was

1    occurring.  Instead, the government must prove beyond a

2    reasonable doubt that the defendants purposely and

3    deliberately contrived to avoid learning all of the facts.

4         If you find that the defendants were aware of a

5    high probability that a conspiracy agreement or

6    understanding to defraud existed positively or tacitly and

7    that the defendants acted with deliberate disregard to these

8    facts, you may find that the defendants acted knowingly.

9    However, if you find the defendants actually believed that

10   there was not a conspiracy agreement or understanding to

11   defraud, positively or tacitly, you may not -- he or she may

12   not be convicted.

13        It is entirely up to you whether you find that a

14   defendant deliberately closed his or her eyes and any

15   inferences to be drawn from the evidence on this issue.

16        Therefore, members of the jury, considering this

17   charge separately from the others and considering each

18   defendant separately, I charge you that if you find from the

19   evidence beyond a reasonable doubt that two or more persons

20   entered an agreement to try to accomplish a common and

21   unlawful plan, that at some time during the existence or

22   life of the conspiracy agreement or understanding one of its

23   alleged members knowingly performed one of the overt acts

24   charged in the indictment in order to further or advance the

25   purpose of the agreement, that at some time during the

1   existence or life of the conspiracy, agreement or

2   understanding the defendant under consideration knew the

3   purpose of the agreement and then deliberately joined the

4   conspiracy, agreement or understanding, and that all such

5   acts were done knowingly, intentionally and willfully with

6   the intent to defraud the United States,it will be your duty

7   to return a verdict of guilty as charged.

8           However, if you do not so find, or if you have a

9   reasonable doubt as to one or more of the essential elements

10  of the crime charged, it will be your duty to give the

11  defendant under consideration the benefit of that doubt and

12  return a verdict of not guilty.

13          Counts Two, Three, Four, Five, Six and Seven of

14  the indictment charge both defendants with six separate

15  instances of attempting to evade or defeat a large part of

16  the income tax due and owing by them for the calendar years

17  2002, 2003, 2004, 2005, 2006 and 2007, in violation of Title

18  26, United States Code, Section 7201 and Title 18,

19  United States Code, Section 2.

20          I will now read to you Count Two.  Then I will

21  read the statutes that the defendants are charged with

22  violating.  Finally, I will tell you the essential elements

23  of this crime.  I remind you, the Bill of Indictment is not

24  evidence.

25          Count Two reads:  Paragraphs 1 through 34 of the

1    introduction to the Bill of Indictment are realleged and

2    incorporated by reference herein.

3           On or about August 30th, 2004, in Mecklenburg

4    County within the Western District of North Carolina and

5    elsewhere, aided and abetted by others known and unknown to

6    grand jury, the defendants, Anthony L. Jinwright and Harriet

7    P. Jinwright, residents of Charlotte, North Carolina who

8    during the calendar year 2002 were married, did willfully

9    attempt to evade and defeat a large part of the income tax

10   due and owing by them and to the United States of America

11   for the calendar year 2002 by preparing and causing to be

12   prepared and by signing and causing to be signed a false and

13   fraudulent Joint U. S. Individual Income Tax Return, Form

14   1040, on behalf of themselves which was filed with the

15   Internal Revenue Service wherein it was stated that their

16   joint taxable income for said calendar year was a sum of

17   zero dollars when the amount of tax due and owing thereunder

18   was a sum of $16,557.

19          Whereas as they then and there well knew and

20   believed that their joint taxable income for the said

21   calendar year was $87,193, upon which joint taxable income

22   there was owing to the United States of America an income

23   tax of $38,795, all in violation of Title 26, United States

24   Code, Section 7201, and Title 18, United States Code,

25   Section 2.

1          Each of Counts Two through Seven charge the same

2     offense, attempted tax evasion, for the years 2002 through

3     2007.  The only difference between the counts are the year,

4     the amount of reported taxable income and tax, the amount of

5     alleged correct taxable income and tax.

6          I will now read the remaining counts; but you

7     should consider each of following instructions on each of

8     these counts.

9          Count Three reads:  Paragraphs 1 through 34 of the

10    introduction to this Bill of Indictment are realleged and

11    incorporated by reference herein.

12         On or about August 30th, 2004, in Mecklenburg

13    County and within the Western District of North Carolina and

14    elsewhere, aided and abetted by others known and unknown to

15    the agreement, the defendants, Anthony L. Jinwright and

16    Harriet P. -- one moment.

17         (The Court confers with the law clerk.)

18         Excuse me.  I said the defendants Anthony L.

19    Jinwright and Harriet P. Jinwright, residents of Charlotte,

20    North Carolina, who during the calendar year 2003 were

21    married, did willfully attempt to evade and defeat a large

22    part of the income tax due and owing by them to the United

23    States of America for the calendar year 2003 by preparing

24    and causing to be prepared, and by signing and causing to be

25    signed a false and fraudulent Joint U.S. Individual Income

Tax, Form 1040, on behalf of themselves which was filed with the Internal Revenue Service wherein it was stated that their joint taxable income for said calendar year was a sum of zero dollars and the amount of tax due and owing thereon was the sum of $15,921.

Whereas, they then and there well knew and believed that their joint taxable income for the said calendar year was $185,306, upon which joint taxable income there was owing to the United States of America an income tax of $70,275, all in violation of Title 26, United States Code, Section 7201, and Title 18, United States Code, Section 2.

Count Four reads -- and I know it sets the instructions out. I wasn't going to read you these but I think it's appropriate I do read them to you, even though you understand or I've already explained to you the differences in each count.

Paragraphs 1 through 34 of the introduction to this Bill of Indictment are realleged and incorporated by reference herein.

On or about October 20, 2005, in Mecklenburg County, within the Western District of North Carolina and elsewhere, aided and abetted by others known and unknown to the grand jury, the defendants, Anthony L. Jinwright and Harriet P. Jinwright, residents of Charlotte, North

1    Carolina, and during the calendar year 2004 were married,

2    did willfully attempt to evade and defeat a large part of

3    the income tax due and owing by them to the United States of

4    America for the calendar year 2004 by preparing and causing

5    to be prepared, and by signing and causing to be signed a

6    false and fraudulent Joint U.S. Individual Tax Return, Form

7    1040 on behalf of themselves which was filed with the

8    Internal Revenue Service wherein it was stated that their

9    joint taxable income for the said calendar year was the sum

10   of zero dollars, and that the amount of tax due and owing

11   thereon was the sum of $15,963.

12           Whereas, they then -- he -- it says "he then and

13   there well knew and believed," but I think we know that

14   means "they," but the word is "he," and if you consider it

15   that proper, that's your decision.  He then and there well

16   knew and believed their joint taxable income for said

17   calendar year was $232,232 upon which joint taxable income

18   there was owing to the United States of America an income

19   tax of $86,636, all in violation of Title 26,

20   United States Code, Section 7201, and Title 18, United

21   States Code, Section 2.

22           Count Five reads:  Paragraph 1 through 34 of the

23   introduction to the Bill of Indictment are realleged and

24   incorporated by reference herein.

25           On or about October 15, 2006, in Mecklenburg

County and within the Western District of North Carolina and elsewhere, aided and abetted by others known and unknown to the grand jury, the defendants, Anthony L. Jinwright and Harriet P. Jinwright, residents of Charlotte, North Carolina who during the calendar year 2005 were married, did willfully attempt to evade and defeat a large part of the income tax due and owing by them to the United States of America for the calendar year 2005 by preparing and causing to be prepared and by signing and causing to be signed a false and fraudulent Joint U.S. Individual Income Tax Return, Form 1040 on behalf of themselves, which was filed with the Internal Revenue Service, wherein it was stated that a joint taxable income for said calendar year was the sum of $125,479, and the amount of tax due and owing thereon was the sum of $47,889.

Whereas, they then and there well knew and believed their joint taxable income for the said calendar year of $435,578 upon which joint taxable income there was owing to the United States of America an income tax of $145,873, all in violation of Title 26, United States Code, Section 7201 and Title 18, United States Code, Section 2.

Count Six: Paragraph 1 through 34 of the introduction to the Bill of Indictment are realleged and incorporated by reference herein.

On or about October 8 -- excuse me. On or about

1  April 8, 2007, in Mecklenburg County within the Western

2  District of North Carolina and elsewhere, aided and abetted

3  by others known and unknown to the grand jury, the

4  defendants, Anthony L. Jinwright and Harriet P. Jinwright,

5  residents of Charlotte, North Carolina and during the

6  calendar year 2006 were married, did willfully attempt to

7  evade and defeat a large part of the income tax due and

8  owing by them to the United States of America for the

9  calendar year 2006 by preparing and causing to be prepared,

10  and by signing and causing to be signed a false and

11  fraudulent Joint U. S. Individual Income Tax Return Form

12  1040 on behalf of themselves which was filed with the

13  Internal Revenue Service wherein it was stated that their

14  joint taxable income for said calendar year was the sum of

15  $104,906, and the amount of tax due and owing thereon was

16  the sum of $43,218.

17          Whereas, they then and there well knew and

18  believed their joint taxable income for the said calendar

19  year was $548,463, upon which joint taxable incoming there

20  was owing to the United States of America an income tax of

21  $197,278, all in violation of Title 26, United States Code,

22  Section 7201, and Title 18, United States Code, Section 2.

23          Finally, Count Seven:  Paragraphs 1 through 34 of

24  the introduction to this Bill of Indictment are realleged

25  and incorporated by reference herein.

1           On or about October 15, 2008, in Mecklenburg

2   County within the Western District of North Carolina and

3   elsewhere, aided and abetted by others known and unknown to

4   the grand jury, the defendants, Anthony L. Jinwright and

5   Harriet P. Jinwright, residents of Charlotte, North Carolina

6   who during the calendar year 2007 were married, did

7   willfully attempt to evade and defeat in large part the

8   income tax due and owing by them to the United States of

9   America for the calendar year 2007 by preparing and causing

10  to be prepared, and by signing and causing to be signed a

11  false and fraudulent Joint U. S. Individual Income Tax

12  Return, Form 1040 on behalf of themselves which was filed

13  with the Internal Revenue Service wherein it was stated that

14  their joint taxable income for said calendar was the sum of

15  $199,799.  The amount of debt -- and that the amount of tax

16  owing -- due and owing thereon was the sum $64,933.

17          Whereas, they then and there well knew and

18  believed that their joint taxable income for the said

19  calendar year was $678,190 upon which joint taxable income

20  there was owing to the United States of America an income

21  tax of $239,742, all in violation of Title 26,

22  United States Code, Section 7201, and Title 18,

23  United States Code, Section 2.

24          The relevant statute on this subject is Title 26,

25  United States Code, Section 7201, which provides in certain

1    part, quote:  "Any person who willfully attempts in any

2    manner to evade or defeat any tax imposed or the payment

3    thereon shall be guilty of an offense against the United

4    States."  The language of Section 7201 is quite broad,

5    specifying it applies to the willful attempt to evade any

6    tax in any manner.

7            Section 2A of Title 18 of the United States Code

8    provides, quote:  "Whoever commits an offense against the

9    United States or aid, abets, counsels, commands, induces or

10   procures its commission is punishable as a principal," close

11   quote.

12           For you to find the defendants guilty of each of

13   these crimes, you must be convinced for each count and as to

14   each defendant the government has proven each of the

15   following elements beyond reasonable doubt as to each

16   defendant.

17           1.  An affirmative act constituting an evasion or

18   attempted evasion of the tax.  Or

19           2.  The existence of a tax deficiency.  And

20           3.  Willfulness, or

21           4.  The defendant willfully aided, abetted,

22   counseled, commanded, induced or procured the commission of

23   such conduct.

24           The first element the government must prove beyond

25   a reasonable doubt is that the defendant committed the

affirmative act constituting tax evasion described in each

count of the Bill of Indictment.  The Internal Revenue Code

makes it a crime to attempt in any manner to evade or defeat

any income tax imposed by law.  There are many different

ways in which a tax may be evaded or an attempt may be made

to evade it.  In this case, the defendant -- excuse me --

the indictment alleges that the defendants filed false and

fraudulent joint income tax returns which understated their

true income for the years charged in the indictment

resulting in additional taxes due and owing for those years.

Willful attempt may be inferred from conduct such

as keeping a double set of books, making false entries or

alterations, false invoices or documents, destruction of

books or records, concealment of assets or covering up

sources of income, handling of one's affairs to avoid making

the records usual in transactions of the kind, and any

conduct the likely effect of which would be to mislead or to

conceal.

If the tax evasion motive plays any part in such

conduct, the offense may be made out even though the conduct

may also serve other purposes, such as concealment of other

crimes -- a concealment of other crimes.

Let me give you some additional law on the

question of what income -- of what -- of what is income.

Under the Internal Revenue Code a taxpayer is

1    required to report as gross income on an annual tax return

2    all income from whatever source derived, including among

3    other things, compensation for services, including fees,

4    commissions, fringe benefits, and similar items unless

5    otherwise excluded from income.

6         I will not instruct you -- I will not instruct you

7    on different types of payments that may be excluded from

8    income under -- excuse me.  I said "not."  It's "I will now"

9    -- it says "no," and that's obviously a typo.

10        I will now instruct you on different types of

11   payments that may be excluded from income under certain

12   circumstances.

13        Any amount transferred by or for an employer to or

14   for the benefit of an employee is income.  Such payments are

15   not gifts -- that "not" is correct.  Such payments are not

16   gifts under the Internal Revenue Code and may not be

17   excluded from gross income regardless of how the payments by

18   the employer to the employee are characterized.

19        Additionally, payments by an employer to an

20   employee or on the employee's behalf as reimbursements for

21   purported business-related expenditures must be included in

22   the gross income of the employee unless the expenses are

23   ordinary and necessary business expenses, the business

24   nature of the expenses has been substantiated, and any

25   unsubstantiated payments have been returned to the employer.

1          And finally, a minister is entitled to exclude

2    from gross income an amount paid as a rental allowance as

3    part of his compensation to the extent -- part of his or her

4    compensation to the extent that the allowance is used to

5    provide a home but only if the allowance is designated as

6    such by official action taken in advance of such payment by

7    the ministers' employing church.  Expenses directly related

8    to providing a home include providing utilities such as

9    electricity, water, gas, maintenance and repairs and cable

10   television.

11          Therefore, if you find that the evidence that the

12   defendants received payments from their employer, Greater

13   Salem Church, those payments are income to the defendants as

14   a matter of law.  If you find from the evidence the

15   defendants received payments directly or on their behalf as

16   reimbursements for claimed business-related expenses, I

17   instructed you that these payments must also be included by

18   the defendants as income unless you also find the

19   requirements for exclusion of such payments have been met.

20          And finally, I instruct you that if you find the

21   defendant have received payments for rental allowance, such

22   payments may not be excluded from gross income unless you

23   further find that there has been an official designation of

24   such by Greater Salem Church in advance of any such

25   payments.

1        You have heard evidence in this case that the

2   defendants received payments from sources that have been

3   variously referred to as honoraria, donations, love

4   offerings, free will offerings, and gifts.

5        I instruct you that whether a payment other than

6   one directly from an employer to an employee constitutes a

7   gift or is taxable income is a question of fact that is left

8   for you to determine based on all the evidence.

9        To assist you in making this determination, I will

10  provide the following instructions on the difference between

11  a gift, which is excludable from income, and a payment which

12  must be included in income even though characterized as a

13  gift.

14       The statute does not use the term "gift" in the

15  common law sense but in a more colloquial sense.  A

16  voluntarily executed transfer of his property by one to

17  another, without any consideration or compensation therefor

18  through a common law gift, it is not necessarily -- is -- is

19  not necessarily a gift within the meaning of the statute.

20  And mere absence of a legal or moral obligation to make such

21  a payment does not establish that it is a gift.  If the

22  payment proceeds primarily from the constraining force of

23  any moral or legal duty or from the incentive of anticipated

24  benefit of an economic nature, it is not a gift.  And

25  conversely, where the payment is in return for services

1    rendered it is irrelevant that the donor derives no economic

2    benefit from it.

3            A gift in the statutory sense, on the other hand,

4    proceeds from a detached and disinterested generosity out of

5    affection, respect, admiration and charity or the like

6    impulses.  And in this regard the most critical

7    consideration is the transferor's intention.  What controls

8    is the intention with which payment, however voluntary, has

9    been made.

10           The donor's characterization of this action is not

11    determinative, but that there must be an objective inquiry

12    as to whether what is called a gift amounts to it in

13    reality.  It scarcely needs adding that the party's

14    expectation -- expectations or hopes as to the tax treatment

15    of their conduct in themselves have nothing to do with the

16    matter.

17           You've heard testimony that the defendants

18    received payment from Greater Salem Church designated as a

19    payment for their daughter's tuition and education expenses.

20    Gross income, and, therefore, taxable income, does not

21    include any amount received as a qualified scholarship by an

22    individual who is a candidate for a degree at an educational

23    organization.

24           A "scholarship" generally means an amount paid or

25    about to, or for the benefit of a student -- whether an

1    undergraduate or graduate -- to aid such individual in

2    pursuing his or her studies.  The term includes the value of

3    tuition, books and supplies, room, board, laundry service

4    and similar services or accommodations which are received by

5    an individual as part of a scholarship and other fees which

6    are furnished or remitted to a student to aid him or her in

7    pursuing his or her studies.  The term also includes any

8    amount received in a nature of a family allowance as part of

9    a scholarship.

10         A "qualified scholarship" means any amount

11   received by an individual as a scholarship or fellowship

12   grant including the value of contributed services and

13   accommodations to the extent that in accordance with the

14   conditions of the grant such amount was used for qualified

15   tuition and related expenses.

16         "Qualified tuition and expenses" means tuition and

17   fees for the enrollment or attendance at an educational

18   organization and fees, books, supplies and equipment

19   required for courses of instruction at such an educational

20   organization.

21         "Educational organization" means an educational

22   organization which normally maintains a regular faculty and

23   curriculum and normally has a regularly enrolled book of --

24   excuse me -- body of pupils or students in attendance at the

25   place where its educational activities are regularly carried

1   on.

2          Also, amounts received by an individual to cover

3   expenses for travel (including meals and lodging while

4   traveling and an allowance for travel of the individual's

5   family) research, clerical help, or equipment are excludable

6   from taxable income provided that such expenses are incident

7   to a scholarship or fellowship grant which is excludable

8   from taxable income as explained above.

9          To the extent that a scholarship or a fellowship

10   grant does not meet the conditions just explained to you, it

11   is includable in the gross income of the recipient

12   notwithstanding the general rules related to exclusion from

13   gross income related to gifts or to prizes or awards.

14          Additionally, a scholarship or fellowship is not

15   excludable from income to the extent to which it is paid as

16   compensation for services or primarily for the benefit of

17   the grantor. "Any amount paid or allowed to, or on behalf

18   of an individual to enable him to pursue studies or research

19   is not excludable from gross income if such an amount

20   represents either compensation for past, present or future

21   employment services or represents payment for services which

22   are subject to the direction or supervision of the grantor."

23          You have heard testimony that the defendants

24   received payments designated as reimbursements for expenses

25   they made in support of the business ministry of Greater

1    Salem Church.  When an employee incurs expenses performing

2    functions relative to his or her work and the employer

3    reimburses him for these expenses, the reimbursement can

4    either be excluded or deducted from the employee's taxable

5    income.

6         A reimbursement paid to an employee is excludable

7    from the employee's taxable income if the employer has an

8    accountable reimbursement plan in place.  In order to have

9    an accountable reimbursement plan, an employer must have a

10   reimbursement arrangement that meets the following three

11   conditions:

12        1.  The employee receives reimbursements for

13   deductible business expenses that he paid or incurred while

14   performing services as an employee.

15        2.  The employee is required to substantiate the

16   expenses to his employer within a reasonable period of time.

17   And

18        3.  The employee is required to return any excess

19   reimbursement within a reasonable period of time.

20        If these conditions are met, the reimbursement

21   arrangement is considered an "accountable plan."

22        So long as these requirements are met, there is no

23   requirement that an accountable plan be set forth in

24   writing.  Payments that are made pursuant to such

25   accountable plans are excluded from the employee's taxable

income and the employer is not required to report such

payments on the employee's W-2 form.

        For purposes of travel expense, including meals

and lodging, entertainment expenses and business gifts,

"substantiation" for purposes of an accountable

reimbursement plan means adequate records or sufficient

evidence corroborating the taxpayer's own statement

sufficient to show the amount of such expense or other

item --

        A.   The amount of such expense or other item.

        B.   The time and place of the travel,

entertainment, amusement, recreation, or the date and

description of the gift.

        C.   The business purpose of the expense or other

item.

        And D, the business relationship to the taxpayer

of persons entertained or receiving the gift.

        With respect to all other business expenses,

substantiation is sufficient if information is submitted to

the payor sufficient to enable the payor to identify the

specific nature of each expense and to conclude that the

expense is attributable -- attributable to the payor's

business activities.

        Under the accountable plan, substantiation of

expenses and return of excess reimbursements must be made

within a reason period of time.  The determination of whether a set period of time is reasonable varies depending on the facts and circumstances.  However, any advance made within 30 days of when an expense is paid or incurred, any expense substantiated within 60 days after it is paid or incurred, and any amount returned to the payor within 120 days after an expense is paid or incurred should automatically be considered to have occurred within a reasonable period of time.  These limits will not be considered reasonable, however, if a payor has the plan or practice to provide amounts to employees in excess of expenses substantiated to avoid reporting these amounts.

Reimbursement arrangements between employer and employee that do not meet the three requirements necessary to be considered pursuant on an accountable plan are considered to be made pursuant to a nonaccountable plan. Reimbursements made pursuant to nonaccountable plans may not be excluded from gross income but are deductible from the employee's taxable income provided that the employee can properly substantiate by adequate records the full amount being reimbursed.

Specifically, nonaccountable plans occur in the following circumstances:

1.  When the employee is not required to account to the employer or when the employee fails to account.

2.  When the employee's expenses exceed the total amount reimbursed and the employee claims a deduction for the amount in excess.

3.  When the employee is related to the employer. And

4.  When the reporting and substantiation of the expenses by the employer is determined to be inadequate.

In cases where the employee either is not required by the employer or fails to account to his employer for business expenses, the employee must submit a statement with his tax return stating the following:

1.  The total amounts received as advances or reimbursements for business expenses.

2.  The nature of his occupation, the number of days away from home or business.  And

3.  The total amount of business expenses paid or incurred by him broken down into expense categories.

Also, {FLUSH}certain business expenses have particular elements that must be specifically substantiated by the taxpayer in order to deduct the reimbursement.  For example, the substantiated business expense for travel away from home the taxpayer must provide:

1.  The amount of each separate expenditure for traveling away from home, such as transportation, lodging, meals and incidental expenditures.

1          2.  The dates of departure and return each trip

2     and the number of days away from home.

3          3.  The destination or locality of travel.  And

4          4.  The business reason for travel or the nature

5     of the business benefit derived as a result of travel.

6          To meet the "adequate records" requirement for

7     substantiating business expenses, a taxpayer must maintain

8     an account book, diary, log, statement of expense, trip

9     sheets or similar record and documentary evidence which in

10    combination are sufficient to establish each element of an

11    expenditure or business expense.  However, it is recognized

12    that by reason of the nature of certain expenses or the

13    circumstances under which they occurred, it is often

14    difficult for an employee to maintain detailed recordeds or

15    to preserve supporting documents for all expenses.  Detailed

16    records of small expenditures incurred in traveling or for

17    transportation, as, for example, tips, will not be required.

18         Now, you have heard testimony from defendant

19    Anthony L. Jinwright -- you heard testimony that the

20    defendant Anthony L. Jinwright received payments from

21    Greater Salem Church intended to fund a retirement account.

22    Retirement payments directly to an employee are not

23    excludable from income but may under certain circumstances

24    be deductible from income by the employee.

25         You have had heard testimony that defendant,

1    Anthony L. Jinwright, received the use of a Mercedes Benz

2    leased by Greater Salem Church.  Payments made by an

3    employer for business expenses of an employee may be

4    excluded from gross income to the extent they would be

5    deductible from the employee's gross income as business

6    expenses if made directly to the employee.  This may include

7    usage of an automobile provided to the employee by the

8    employer to the extent the automobile is used for business

9    purposes.

10           You have heard testimony that defendant, Anthony

11   L. Jinwright received payments from Greater Salem Church

12   designated as a vehicle allowance.  A cash payment made by

13   an employer to an employee does not qualify as a tax-exempt

14   working condition payment unless the employer requires the

15   employee to:

16           1.  Use the payment for expenses in connection

17   with a specific or prearranged activity or undertaking which

18   would otherwise qualify as a deductible business expense if

19   paid for by the employee himself.

20           2.  Verify that the payment is actually used for

21   such expense.  And

22           3.  Return to the employer any payment -- any part

23   of the payment not so used.

24           In regard to the categories I've just listed for

25   you, the fact that these payments are income to defendants

1    or that defendants did not include these payments on their

2    tax returns does not establish by itself that defendants

3    attempted to evade the tax due on these payments or that

4    they knowingly and intentionally filed false tax returns.

5    Unless you find that the omission of any such payments from

6    the defendants' returns was willful, you may not find them

7    guilty of any of the charges in the indictment on the basis

8    of the failure to report this income alone.

9          To prove the tax crimes charged in the indictment,

10   the government must prove that the understatement of income,

11   if any, was willful.  I will explain that term in detail in

12   a few minutes.

13         The next element of the offense the government

14   must prove beyond a reasonable doubt is that the defendants

15   owed substantially more federal income tax for the calendar

16   year charged in the Bill of Indictment than what is declared

17   due on their income tax return.  The government does not

18   have to prove the exact amount the defendants owed, nor does

19   the government have to prove that all the tax charged in the

20   indictment was evaded.  Rather, the government only needs to

21   establish a substantial tax deficiency.

22         To prove that substantial additional tax is due,

23   the government must prove beyond a reasonable doubt that:

24         A, defendants received substantial income in

25   addition to what he or she or they reported on their income

1  tax return.

2        And B, there was tax due in addition to what was

3  shown to be due on their return.

4        To prove the defendants received substantial and

5  additional income omitted from their tax return, the

6  government introduced evidence of various payments received

7  by defendants including salaries, housing allowance,

8  bonuses, credit card payments by their employer, speaking

9  fees, paid vacations, payments from book sales and a vehicle

10 allowance, among others.  If you find based on all the

11 evidence that the government has established beyond a

12 reasonable doubt the defendants received income in addition

13 to what they reported on their income tax return for the

14 year in question, then you must decide whether there was tax

15 due in addition to what was shown to be due on the return as

16 a result of defendants' additional unreported income.

17       In reaching your decision on this issue you should

18 consider, along with all the other evidence, the expert

19 testimony introduced during the trial concerning the

20 computation of the defendants' additional tax liability when

21 the alleged additional income was taken into account.

22       If you find beyond -- excuse me.  If you find

23 based on all the evidence that the government -- that the

24 government has established beyond a reasonable doubt that

25 the defendants received substantial additional income, and

1    that there was tax due in addition to what was shown to be

2    due on their income tax return as a result of this

3    additional income, then this element has been satisfied.

4            "Aiding and abetting" means willfully to cause an

5    act to be done; to assist, counsel, command, induce,

6    procure the commission of an act.  In order to aid and abet

7    another to commit a crime, it is necessary that the

8    defendant willfully associated himself or herself in some

9    way with the criminal venture and willfully participate in

10    it as he or she would in something he or she wished to bring

11    about.  That is to say, that he or she willfully seeks by

12    some act or omission to make the criminal venture succeed.

13    An act willfully done is done voluntarily and intentionally

14    and with specific intent to do something the law forbids.

15            The guilt of an accused in a criminal case may be

16    established without proof that the accused personally did

17    every act constituting the offense alleged.  The law

18    recognizes ordinarily anything a person can do for himself

19    or herself may also be accomplished by him or her through

20    the direction of another person as his or her agent or by

21    acting in concert with or under the direction of another

22    person or persons in a joint effort or enterprise.

23            Whoever willfully causes an act to be done which,

24    if directly performed by him or another would be an offense

25    against the United States, is punishable as a principal.  So

1    if the acts of conduct of an agent, an employee or other

2    associate of a defendant are willfully directed or

3    authorized by him, or if the defendant aids and abets

4    another person in the commission of a crime then the law

5    holds the defendant responsible for the acts or conduct of

6    such other person just as though he committed the acts or

7    conduct himself.

8            Before any defendant may be held criminally

9    responsible for the acts of another, it is necessary that

10   the accused willfully associate himself in some way with a

11   criminal venture and willfully participate in it as he would

12   in something he wishes to bring about.  That is to say, that

13   he willfully sought by some act or omission of his to make

14   the criminal venture succeed.

15           Of course, mere presence at the scene of a crime

16   and knowledge the crime is being committed are not

17   sufficient to establish the defendant either directed or

18   aided and abetted the crime unless you find that beyond a

19   reasonable doubt the defendant was a participant and not

20   merely a knowing speculator.

21           In order to find -- excuse me.

22           In order to be found guilty of aiding and abetting

23   the commission of the crimes charged in the Bill of

24   Indictment, the government must prove beyond a reasonable

25   doubt that each defendant:

1    1. Knew that the crime charged was to be

2 committed or was being committed.

3    2. Knowingly did some act for the purpose of

4 aiding, commanding, or encouraging the commission of that

5 crime. And

6    3. Acted with the intention of causing the crime

7 charged to be committed.

8    Finally, the government must prove beyond a

9 reasonable doubt that the defendants acted willfully.

10    As I already told you, willfulness means a

11 voluntary and intentionally violation of a known legal duty.

12 In this context, willfulness means that the defendants knew

13 that they had a duty to report such income and voluntarily

14 and intentionally did not report that the income. The

15 government need only prove that the defendants knew that

16 they should have reported more income than they did. The

17 government need not prove the defendants knew exactly how

18 much income they should have reported, nor that they knew

19 they should have reported all the income that they did not

20 report.

21    Whether the defendant had this knowledge is a

22 question of fact to be determined by you on the basis of all

23 the evidence. Of course, an act is done knowingly only if

24 it is done purposely and deliberately and not because of

25 mistake, accident, negligence or other innocent reason.

There is a rebuttable presumption that the returns in issue in Counts Two through Seven were actually signed by each defendant. In other words, you may infer and find that a tax return was, in fact, signed by the person whose name appears to be signed to it. You are not required, however, to accept any such inference or to make any such finding.

If you find beyond a reasonable doubt from the evidence in the case that the defendant under consideration signed the tax return in question then you may also draw the inference and may also find, but are not required to find, that the defendant under consideration knew of the contents of the return that the defendant signed.

The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution does not apply with regards to criminal tax offenses. To satisfy the element the defendants acted willfully, the government must prove beyond a reasonable doubt that the defendants knew that he or she owed substantially more federal income tax for the calendar year at issue than was declared on his or her or their joint income tax return. Whether or not either defendant has this knowledge is a question of fact to be determined by you on the basis of all the evidence. Of course, an act is done knowingly only if it is purposefully and deliberately and not because of mistake, accident, negligence, or other innocent reason.

Willfulness in the context of a criminal act in income tax cases requires the government to prove that a law impose a duty on each of the defendants, that each defendant knew of this duty, and that he or she voluntarily and intentionally violated that duty.  Thus, the government must prove beyond a reasonable doubt that each defendant possessed the specific intent to defeat or evade the payment of taxes which each defendant knew that it was his or her duty to pay.

Mistakes regarding the tax treatment of an item of taxable income are not willful, nor is negligence, even gross negligence, in attempting -- in attending to the tax preparation or in the keeping of books and records.

A defendant does not act willfully if he believes in good faith that his actions comply with the law. Therefore, if the defendant actually believed that what he was doing was in accord with the tax statutes, and that he paid all the taxes he owed, he cannot be said to have had the criminal intent to willfully evade taxes.

Thus, if you find that the defendant honestly believed that he owed no taxes, even if that belief was unreasonable or irrational, then you should find him not guilty.  However, you may consider whether the defendant's belief was actually reasonable as a factor in deciding whether he held that belief in good faith.

1          It should also be pointed that neither the

2     defendant's disagreement with the law or his own belief that

3     the law is unconstitutional, no matter how earnestly that

4     belief is held, constitutes a defense of good faith.  It is

5     the duty of all citizens to obey the law regardless of

6     whether they agree with it.

7          You have hear evidence showing that the defendants

8     consulted with an accountant prior to the preparation of the

9     tax returns in question and that the return was prepared

10    pursuant to that advice.  If you find the defendants sought

11    the advice of an accountant whom they considered competent

12    and made a full and accurate report to that account -- to

13    that accountant of all the material facts available to him,

14    and acted strictly in accordance with the accountant's

15    advice without having a reasonable basis to believe that the

16    advice was incorrect, then you must find the defendants not

17    guilty.

18         Therefore, members of the jury, as to Counts Two

19    through Seven, considering each charge separately as to each

20    defendant, I charge you that if you find from the evidence

21    beyond a reasonable doubt that in the time and place

22    described in the indictment that the defendants owed

23    substantially more federal income tax for the calendar year

24    charged in the Bill of Indictment than was declared due on

25    his or her joint income tax return, that the defendants

1    committed the affirmative acts constituting tax evasion

2    described in the indictment, and that the defendants aided

3    and abetted, counseled, commanded, induced or procured the

4    commission of these acts, and that the defendants acted

5    willfully, then it would be your duty to return a verdict of

6    guilty as charged in the count of the indictment under the

7    consideration.

8              However, if you do not so find, or if you have a

9    reasonable doubt as to one or more of the essential elements

10   of the crime charged in that count, it will be your duty to

11   give the defendant or the defendants the benefit of doubt --

12   of that doubt and return a verdict of not guilty.

13             Counts Eight, Nine, Ten, Eleven, Twelve and

14   Thirteen of the indictment charges both defendants with

15   filing false tax returns by them for the calendar years

16   2002, 2003, 2004, 2005, 2006, and 2007 in violation of Title

17   26, United States Code, Section 7206(1), and Title 18,

18   United States Code, Section 2.

19             Each of Counts Eight through Thirteen charge the

20   same offense -- I'm going to read them to you in a moment --

21   filing false tax returns for the years 2002 through 2007.

22   The only difference between the counts is the year, the

23   amount of reported adjusted gross income, the alleged

24   correct adjusted gross income.

25             I will read each of the counts.  But you should

1    consider each of the following instructions on each of these

2    counts.  These counts are being grouped together to simplify

3    these instructions.  You are to remember the instructions

4    previously given to you as they may apply to these counts

5    and you must consider each count and evidence pertaining

6    thereto and each defendant separately.

7            Count Eight reads:  Paragraphs 1 through 34 of the

8    introduction to the Bill of Indictment are realleged and

9    incorporated by reference herein.

10           On or about August 30th, 2004, in Mecklenburg

11   County within the Western District of North Carolina and

12   elsewhere, the defendants, Anthony L. Jinwright and Harriet

13   P. Jinwright, residents in Charlotte, North Carolina, aided

14   and abetted by others known and unknown to the grand jury,

15   did willfully make and subscribe a Joint U. S. Individual

16   Income Tax Return for the calendar year 2002, which was

17   verified by a written declaration that was made under the

18   penalties of perjury and which they did not believe to be

19   true and correct as to every material matter.

20           That income tax return, which was filed with the

21   Internal Revenue Service, reported an adjusted gross income

22   of $63,597, whereas they then and -- then -- whereas they

23   then and there well knew and believed that they received

24   adjusted income of approximately $320,020, all in violation

25   of Title 26 United States Code, Section 7206(1) and Title

1    18, United States Code, Section 2.

2         I'll read you Count Nine. Paragraphs 1 through 34

3    of the introduction to the Bill of Indictment are realleged

4    and incorporated by reference herein.

5         On or about August 30, 2004, in Mecklenburg County

6    within the Western District of North Carolina and elsewhere,

7    defendants, Anthony L. Jinwright and Harriet P. Jinwright,

8    residents of Charlotte, North Carolina, aided and abetted by

9    others known and unknown to the grand jury, did willfully

10   make and subscribe a Joint U.S. Individual Income Tax Return

11   for the calendar year 2003 which was verified by a written

12   declaration that it was made under penalties of perjury and

13   which they did not believe to be true and correct as to

14   every material matter.

15        That income tax return, which was filed with the

16   Internal Revenue Service, reported an adjusted gross income

17   of $85,190, whereas they then and there well knew and

18   believed their -- they received adjusted gross income of

19   approximately $412,372, all in violation of Title 26, United

20   States Code, Section 7206(1), and Title 18, United States

21   Code, Section 2.

22        I will now read you Count Ten. Paragraphs 1

23   through 34 of the introduction to the Bill of Indictment is

24   realleged and incorporated by reference herein.

25        On or about October 24, 2005, in Mecklenburg

1    County within the Western District of North Carolina and

2    elsewhere, the defendants, Anthony L. Jinwright and Harriet

3    P. Jinwright, residents of Charlotte, North Carolina, aided

4    and abetted by others known and unknown to the grand jury,

5    did willfully make and subscribe a Joint U. S. Individual

6    Income Tax Return for the calendar year 2004 which was

7    verified by a written declaration that was made under the

8    penalties of perjury and which they did not believe to be

9    true and correct as to every material matter.

10           That income tax return which was filed with the

11   Internal Revenue Service reported an adjusted gross income

12   of $222,454, whereas they then and there well knew and

13   believed they received an addition of -- excuse me --

14   received an adjusted income of approximately $461,060, all

15   in violation of Title 26, United States Code, Section

16   7206(1), and Title 18, United States Code, Section 2.

17           I will now read you Count Eleven.  Paragraphs 1

18   through 34 of the introduction of this Bill of Indictment

19   are realleged and incorporated by reference herein.

20           On or about October 15, 2006, in Mecklenburg

21   County within the Western District of North Carolina, the

22   defendants, Anthony L. Jinwright and Harriet P. Jinwright,

23   residents of Charlotte, North Carolina, aided and abetted by

24   others known and unknown to the grand jury, did willfully

25   make and subscribe a Joint U. S. Individual Income Tax

1    Return for calendar year 2005 which was verified by written

2    declaration that was made under the penalties of perjury and

3    which they did not believe to be true and correct as to

4    every material matter.

5              That income tax return, which was filed with the

6    Internal Revenue Service, reported adjusted gross income of

7    $362,421, whereas they then and there well knew and believed

8    they received adjusted income of approximately $617,781, all

9    in violation of Title 26, United States Code, Section

10   7206(1), and Title 18, United States Code, Section 2.

11             I'll now read to you Count Twelve.  Paragraphs 1

12   through 34 of the introduction to this Bill of Indictment

13   are alleged and incorporated by reference herein.

14             On or about April, 18, 2007, in Mecklenburg County

15   within the Western District of North Carolina and elsewhere,

16   the defendants, Anthony L. Jinwright and Harriet P.

17   Jinwright, residents of Charlotte, North Carolina, aided and

18   abetted by others known and unknown to the grand jury, did

19   willfully make and subscribe a Joint U. S. Individual Income

20   Tax Return for the calendar year 2006 which was verified by

21   written declaration that was made under penalties of perjury

22   which they did not believe to be true and correct as to

23   every material matter.

24             That income tax return, which was filed with the

25   Internal Revenue Service, reported an adjusted gross income

1    of $398,804, whereas they then and there well knew and

2    believed they received an adjusted income of approximately

3    $785,299, all in violation of Title 26, United States Code,

4    Section 7206(1), and Title 18, United States Code, Section

5    2.

6            I will now read to you Count Thirteen.  Paragraphs

7    1 through 34 of the introduction of this Bill of Indictment

8    are realleged and incorporated by reference herein.

9            On or about October 15, 2008, in Mecklenburg

10   County within the Western District of North Carolina and

11   elsewhere, the defendants, Anthony L. Jinwright and Harriet

12   P. Jinwright, residents of Charlotte, North Carolina, aided

13   and abetted by others known and unknown to the grand jury,

14   did willfully make and subscribe a Joint U.S. Individual

15   Income Tax Return for the calendar year 2007 which was

16   verified by a written declaration that was made under

17   penalties of perjury and which they did not believe to be

18   true and correct as to every material matter.  That income

19   tax return, which was filed with the Internal Revenue

20   Service, reported an adjusted gross income of $554,460,

21   whereas they then and there well knew and believed they

22   received an adjusted income of approximately $884,131, all

23   in violation of Title 26, United States Code, Section

24   7206(1) and Title 18, United States Code, Section 2.

25           The defendants are charged in Counts Eight through

1    Thirteen with violating Title; 26, United States Code,

2    Section 7206(1) which reads in pertinent part, quote:  "Any

3    person who willfully makes and subscribes to any return,

4    statement or other document which contains or is verified by

5    a written declaration that is made under the penalties of

6    perjury and which he does not believe to be true and correct

7    as to every material matter is guilty of an offense against

8    the United States."  Close quote.

9           Section 2 of Title 8, the aiding and abetting

10   statute, was read to you previously in connection with the

11   charges contained in Counts Two through Seven and I will not

12   repeat it again here.

13          In order for you to find either of the defendants

14   or both guilty of the charges contained in Counts Eight

15   through Thirteen, the government must prove each of the

16   following essential elements as to each count as to the

17   defendant under consideration beyond a reasonable doubt.

18          1.  The defendant made and subscribed to a tax

19   return containing a written declaration.

20          2.  The tax return was made under penalties of

21   perjury.

22          3.  The defendant did not believe the return to be

23   true and correct as to every material matter.  And

24          4.  The defendant acted willfully.  Or

25          5.  The defendant under consideration willfully

aided, abetted, counseled commanded, induced, or procured the commission of such conduct.

The first element the government must prove beyond a reasonable doubt is that the defendant subscribed and filed a tax return.  A tax return is subscribed to at the time it is signed.  A tax return is filed at the time it is delivered to the Internal Revenue Service.

Section 6064 of Title 26 of the United States Code provides in part that, quote:  "The fact that an individual's name is signed to a return shall be prima facie evidence for all purposes that the return was actually signed by him."  Close quote.

Thus, there is a rebuttable presumption by virtue of this provision that the returns issue -- in issue in Counts Eight through Thirteen were actually signed by each defendant.  In other words, you may infer and find that a tax return was, in fact, signed by the person whose name appears to be signed to it.  You are not required, however, to accept any such inference or to make any such finding.

If you find beyond a reasonable doubt from the evidence in the case that the defendant under consideration signed the tax return in question, then you may also draw the inference and may also find, but are not required to find, that the defendant under consideration knew of the contents of the return that the defendant signed.

1    Section 7206(1) requires that the return be made

2    "under the penalties of perjury."  This element applies if

3    you find the tax returns in question contained -- this

4    element applies if you find that the tax returns in question

5    contained a declaration that they were signed under the

6    penalties of perjury.  The signature plus the declaration is

7    sufficient and the document need not be witnessed or

8    notarized.

9         The third element the government must prove beyond

10   a reasonable doubt is that the defendant did not believe the

11   return to be true and correct as to every material matter.

12   The test of materiality is whether a particular item must be

13   reported in order that a taxpayer estimates and computes his

14   tax correctly.  The purpose of Section 7206(1) is not simply

15   to ensure that the taxpayer pay the proper amount of taxes,

16   though that is surely one of its goals.  Rather, that

17   section is intended to ensure also the taxpayer not make

18   misstatements that could hinder the Internal Revenue Service

19   in carrying out such functions as to the verification of the

20   accuracy of that return or related tax return.

21        The government must also prove the defendants knew

22   the statement was false.  As I have previously instructed

23   you, a person acts knowingly when he acts intentionally and

24   voluntarily and not because of ignorance, mistake, accident,

25   or carelessness.  Whether the defendant acted knowingly may

1    be proven by the defendant's conduct and by all of the facts

2    and circumstances surrounding the case.

3           I've already defined for you the terms "aiding and

4    abetting," "knowingly", intentionally," and "willfully"

5    previously in these instructions.  I've also given you

6    instructions concerning the proof of signing a return is

7    proof of knowledge of its contents and reliance on

8    accountant's -- and reliance on the accountant's advice.  I

9    will not repeat these definitions again here.  However, you

10   are to remember their meanings and use them in your

11   deliberations as to Counts Eight through Thirteen.

12          Therefore, members of the jury, as to Counts Eight

13   through Thirteen, considering each charge separately as to

14   the defendant under consideration, I charge you that if you

15   find from the evidence beyond a reasonable doubt that the

16   defendant under consideration made or caused to be made and

17   signed a Federal Income Tax Return for the year or years in

18   question, or of the -- the return for the year in question

19   contained false information as to a material matter as

20   detailed in the indictment, the defendant under

21   consideration knew that this information was false, the

22   return contained a written declaration that was being signed

23   subject to the penalties of perjury, and filing the tax

24   return the defendant under consideration acted willfully or

25   the defendant under consideration willfully aided, abetted,

1    counseled, commanded, induced or procured the commission of

2    such conduct, it will be your duty to return a verdict of

3    guilty as charged.

4         However, if you do not so find or if you have any

5    reasonable doubt as to one or more of the essential elements

6    of the crime charged, it will be your duty to give the

7    defendant under consideration the benefit of that doubt and

8    return a verdict of not guilty.

9         Counts Fifteen, Sixteen, Seventeen, Eighteen and

10   Nineteen of the indictment charge defendant, Anthony L.

11   Jinwright, with five separate instances of mail fraud of

12   affecting a financial institution in violation of Title 18,

13   United States Code, Section 1341, and Title 18,

14   United States Code, Section 2.  Each of Counts Fifteen

15   through Nineteen charge the same offense; mail fraud for the

16   year 2001, 2002, 2006.  The only difference between the

17   counts is the year and the make and model of the

18   automobiles.

19        I will read all the counts but you should consider

20   each of the instructions on each of these counts.

21        Count Fifteen.  Paragraphs 1 through 34 of the

22   introduction to the Bill of Indictment are realleged and

23   incorporated by reference herein.

24        On or about November 1, 2001, in Mecklenburg

25   County, within the Western District of North Carolina and

1    elsewhere, the defendant, Anthony L. Jinwright, aided and

2    abetted by others known and unknown to the grand jury,

3    having devised and intending to devise a scheme and artifice

4    affecting a financial institution as described in paragraph

5    34 above, to defraud and to obtain money and property by

6    means of false and fraudulent pretenses and representations

7    for the purpose of executing and in order to effect the

8    scheme or artifice, did knowingly cause to be sent,

9    delivered and moved by the United States Postal Service as

10   well as through private commercial mail carriers according

11   to the directions thereon, certain matters or things to

12   various persons and locations, to-wit, a false and

13   fraudulent loan application in connection with the lease of

14   a 2002 Lexus LX470, all in violation of Title 18, United

15   States Code, Section 1341.

16          Count Sixteen:  Paragraphs 1 through 34 of the

17   introduction of this Bill of Indictment are realleged and

18   incorporated by reference herein.

19          On or about May 27, 2002, in Mecklenburg County

20   within the Western District of North Carolina and elsewhere,

21   the defendant, Anthony L. Jinwright, aided and abetted by

22   others known and unknown to the grand jury, having devised

23   and intended to devise a scheme and artifice effecting a

24   financial institution as described in paragraph 34 above, to

25   defraud and to obtain money and property by means of false

and fraudulent pretenses and representations for the purpose

of executing and in order to effect the scheme and artifice

did knowingly cause to be sent, delivered and moved by the

United States Postal Service, as well as through private

commercial mail carriers according to the directions

thereon, certain matters or things to various persons and

locations, to-wit, a false and fraudulent loan application

in connection with the lease of 2002 Lexus SC430, all in

violation of Title 18, United States Code, Section 1341.

I will now read you Count Seventeen. Paragraphs 1

through 34 in the introduction of this Bill of Indictment

are realleged and incorporated by reference herein.

On or about August 7, 2006, in Mecklenburg County

within the Western District of North Carolina and elsewhere,

the defendant, Anthony L. Jinwright, aided and abetted by

others known and unknown to the grand jury, having devised

and intended to devise a scheme and artifice effecting a

financial institution as described in paragraph 34 above, to

defraud and to obtain money and property by making false and

fraudulent pretenses and representations for the purpose of

executing in order to effect the scheme and artifice did

knowing cause to be sent, delivered and moved by the United

States Postal Service, as well as through private commercial

mail carriers according to the directions thereon, certain

matters or things to various persons and locations, to-wit,

a false and fraudulent loan application in connection with

the lease of a 2006 Lexus SC430, all in violation of Title

18, United States Code, Section 1341.

I'll now read you Count Eighteen.  Paragraphs 1

through 34 of the introduction of this Bill of Indictment

are realleged and incorporated by reference herein.

On or about August 7th, 2006, in Mecklenburg

County within the Western District of North Carolina and

elsewhere, the defendant, Anthony L. Jinwright, aided and

abetted by those known and unknown to the grand jury, having

devised and intended to devise a scheme and artifice

affecting a financial institution as described in paragraph

34 above, to defraud and to obtain money and property by

means of false and fraudulent pretenses and representations

for the purpose of executing and in order to effect the

scheme and artifice did knowingly cause to be sent,

delivered and moved by the United States Postal Service as

well as through private commercial mail carriers according

to directions thereon, certain matters or things to various

persons and locations, to-wit, a false and fraudulent loan

application in connection with the lease of a 2006 Lexus

LX470, all in violation of Title 18, United States Code,

Section 1341.

Now I will read you Count Nineteen.  Paragraphs 1

through 34 of the introduction of this Bill of Indictment

1    are realleged and incorporated by reference herein.

2           On or about December 21st, 2006, in Mecklenburg

3    County, within the Western District of North Carolina and

4    elsewhere, the defendant, Anthony L. Jinwright, aided and

5    abetted by others known and unknown to the grand jury,

6    having devised and intended to devise a scheme or artifice

7    affecting a financial institution as described in paragraph

8    34 above, to defraud and to obtain money and property by

9    means of false or fraudulent pretenses and representations

10   for the purposes of -- for the purpose of executing and in

11   order to effect the scheme and artifice, did knowingly cause

12   to be sent, delivered and moved by the United States Postal

13   Service as well as private commercial mail carriers,

14   according to directions thereon, certain matters or things

15   to various persons and locations, to-wit, a false and

16   fraudulent loan application in connection with the lease of

17   a 2007 BMW 650I for his daughter, all in violation of Title

18   18, United States Code, Section 1341.

19          Title 18, United States Code, Section 1341

20   provides in pertinent part:  "Whoever, having devised or

21   intended to devise any scheme or artifice affecting a

22   financial institution to defraud or for obtaining money or

23   property by means of false or fraudulent pretenses,

24   representations or promises, and for the purpose of

25   executing such scheme or artifice or attempting so to do,

1   places in any post office or authorized depository for mail

2   matter any matter or thing whatever to be sent or delivered

3   by the postal service, or takes or receives therefrom, or

4   knowingly causes to be delivered by mail according to the

5   directions thereon, shall be guilty of an offense against

6   the United States."

7          I've already read to you the pertinent part of

8   Title 18, United States Code, Section 2.

9          In order to sustain this burden of proof, the

10   crime of using the mails to further a scheme or plan to

11   defraud or to obtain many or property by means of false or

12   fraudulent pretenses, representations or promises as charged

13   in Counts Fifteen through Nineteen of the indictment, the

14   government must prove the following essential elements

15   beyond a reasonable doubt:

16          1.  The defendant did knowingly devised or

17   knowingly participated in a scheme or artifice to defraud or

18   to obtain money or property by means of false or fraudulent

19   pretenses, representations or promises as detailed in these

20   counts -- in those counts.

21          2.  The false pretenses, representations or

22   promises were material; that is, it would reasonably

23   influence a person to part with money or property.

24          3.  The defendant executed the scheme or attempted

25   to do so with the intent to defraud.  And

1          4.   In advancing or furthering or carrying out

2     this scheme the defendant used the mails or a private

3     interstate carrier or caused such to be used.

4          The word "scheme" or "artifice" as used in the

5     mail fraud statute means any plan or course of action

6     intended to defraud others, or to obtain money or property

7     by means of false or fraudulent pretenses, representations

8     or promises.

9          A scheme to defraud within the meaning of the

10    statute may be defined as the intentional use of false or

11    fraudulent representations for the purpose of gaining a

12    valuable undue advantage or working some injury to something

13    of value held by another.  It is not necessary for the

14    government to prove that the defendant was actually

15    successful in defrauding anyone.  An unsuccessful scheme is

16    as illegal as a scheme or plan that is ultimately

17    successful.

18         A statement or representation is false or

19    fraudulent within the meaning of this statute if known to be

20    untrue or made with reckless indifference as to its truth or

21    falsity and made or caused to be made with the intent to

22    deceive.  A false or fraudulent representation may be made

23    by statements or half truths or the concealment of a

24    material fact, as well as by affirmative statements or acts.

25    The mail fraud statute prohibits any scheme utilizing the

1   mails that is reasonably calculated to deceive persons of

2   ordinary prudence and comprehension.

3           The term "false or fraudulent pretenses,

4   representations or promises" means a statement or assertion

5   which concerns a material or important fact or a material or

6   important aspect of the matter in question and that was

7   either known to be untrue at the time that it was made or

8   used, or that was made or used with reckless indifference as

9   to whether it was, in fact, true or false, and made or used

10  with the intent to defraud.  And the near -- a material fact

11  is a fact that would be of importance to a reasonable person

12  in making a decision about a particular matter or

13  transaction.

14          The term "false or fraudulent pretenses,

15  representations or promises" includes actual direct false

16  statements as well as half truths, and includes the knowing

17  concealment of facts that are material to -- that are

18  material or important to the matter in question and that

19  were made or used with the intent to defraud.

20          To act with an intent to defraud means to act

21  knowingly and with the intention or purpose to deceive or to

22  cheat.  An intent to defraud is ordinarily accompanied by a

23  purpose to bring about some gain or benefit to one's self or

24  a loss to some other purpose.  The intent to defraud may be

25  inferred from the totally of the circumstances and need not

1  be proven by direct evidence.

2         It is not necessary that anyone actually be

3  deceived or cheated.  The government need not prove that

4  anyone suffered a monetary loss because of the alleged

5  fraud.

6         The good faith of the defendant under

7  consideration is a complete defense to the charges of mail

8  fraud contained in Counts Fifteen through Nineteen of the

9  indictment because good faith on his part is simply

10  inconsistent with the intent to defraud alleged in these --

11  in those counts for those charges.

12         A person who acts or a causes another person to

13  act on a belief or an opinion honestly held is not

14  punishable under this statute merely because the belief or

15  opinion turns out to be inaccurate, incorrect or wrong.  An

16  honest mistake in judgment on an error in management does

17  not rise to the level of intent to defraud.

18         A defendant does not act in "good faith" if, even

19  though he honestly holds a certain opinion or belief, that

20  defendant also knowingly makes false or fraudulent

21  pretenses, representations or promises to others.

22         The mail fraud statute is written to subject to

23  criminal punishment only those people who knowingly defraud

24  or attempt to defraud.  While the term "good faith" has no

25  precise definition, it means, among other things, a belief

1    or opinion honestly held, an absence of malice or of ill

2    will, and an intention to avoid taking unfair advantage of

3    another.

4            In determining whether or not the government has

5    proven that the defendant acted with intent to defraud or

6    whether the defendant acted in good faith the jury must

7    consider all the evidence in the case bearing on the

8    defendant's state of mind.

9            The burden of proving good faith does not rest

10   with defendant because the defendant does not have any

11   obligation to prove anything this case.  It is the

12   government's burden to prove to you beyond a reasonable

13   doubt that the defendant under consideration acted with the

14   intent to defraud.

15           If the evidence in the case leaves the jury with a

16   reasonable doubt as to whether the defendant acted with an

17   intent to defraud or in good faith, the jury must acquit.

18           The use of the United States mails or an

19   interstate carrier is an essential element of the offense of

20   mail fraud as charged in Counts Fifteen through Nineteen of

21   the indictment.  The government is not required to prove

22   that the defendant actually mailed anything or that the

23   defendant even intended that the mails be used to further or

24   to advance or to carry out the scheme or plan to obtain

25   money or property by false or fraudulent pretenses or

1    representations or promises.

2          The government must prove beyond a reasonable

3    doubt, however, that the mails or interstate carrier were in

4    fact used in some manner to further or to advance or to

5    carry out the scheme to obtain money or property by false or

6    fraudulent pretenses, representations or promises.  The

7    government must also prove that the use of the mails or the

8    interstate carrier would follow in the ordinary course of

9    business or events, or that the use of the mails or the

10   interstate carrier by someone was reasonably foreseeable.

11         It's not necessary for the government to prove

12   that the item itself -- that the item itself mailed was

13   false or fraudulent or contained any false or fraudulent

14   statement, representation or promise or contained any

15   request for money or thing of value.

16         The government must prove beyond a reasonable

17   doubt, however, that the use of the mails or the use of the

18   interstate carrier further advanced or carried out in some

19   way the scheme or plan to obtain money or property by means

20   of false or fraudulent pretenses, representations or

21   promises.

22         Therefore, members of the jury, as to Counts

23   Fifteen through Nineteen, considering each charge separately

24   as to the defendant under consideration, I charge you that

25   if you find from the evidence beyond a reasonable doubt that

1    the defendant under consideration knowingly devised or

2    knowingly participated in a scheme or artifice to defraud or

3    to obtain money or property by means of false or fraudulent

4    pretenses, representations or promises as detailed in those

5    counts, that the false pretenses, representations or

6    promises were material, that is, that -- that is, it would

7    reasonably influence a person to part with money or

8    property; that the defendant under consideration executed

9    the scheme or attempted to do so with the intent to defraud;

10   and that in advancing, furthering or carrying out this

11   scheme the defendant used the mails or private interstate

12   carrier or caused such to be used, it would be your duty to

13   return a verdict of guilty as charged.

14          However, if you do not so find or if you have

15   reasonable doubt as to one or more of the essential elements

16   of the crime charged, it will be your duty to give the

17   defendant under consideration the benefit of that doubt and

18   to return a verdict of not guilty.

19          All right.  We will now take a ten-minute recess

20   until 11:05.  Remember, you have not heard argument yet and

21   I have two more pages of instruction to give you after

22   you've heard argument.  Only then can you start discussing

23   this case.  During this break and any other break until this

24   case is committed to you, you still cannot discuss this case

25   among yourselves.  All right.  We'll take a ten-minute

1    recess.

2                  (Jury leaves courtroom at 10:55 a.m.)

3                  THE COURT:  In reading an hour-and-a-half of

4    instructions, I'm sure I made some mistakes.  Are there any

5    corrections counsel wants me to make?

6                  MR. BROWN:  One, Your Honor.  On page 15 -- and I

7    don't think this is the Court's mistake -- it probably was a

8    typo in the government's proposed instruction.  But in the

9    elements of tax evasion, the Court lists:  "1. Affirmative

10   act," and then it says, "or the existence of a tax" --

11                 THE COURT:  Oh.  That should --

12                 MR. BROWN:  -- be an "and."

13                 THE COURT:  -- be an "and."

14                 MR. BROWN:  You properly instructed them those are

15   separate elements but that needs to be an "and".

16                 THE COURT:  Absolutely.  All right.  And there was

17   one "no" that I said was "not" and then I came back and

18   corrected it was "now."  Do I need to say that again?  They

19   caught that one, right?

20                 MR. BROWN:  Yes, sir.

21                 THE COURT:  Okay.  This one, as soon as they come

22   back, I will read this to them correctly and point out the

23   "or" should be "and."  Anything from the defense?

24                 MR. TATE:  Nothing.

25                 THE COURT:  So you all agree I read them correctly

1  or close thereto?

2          MR. HINSON:  Your Honor, I don't think it was a

3  material misstatement --

4          THE COURT:  I put in "he or shes" or a few things

5  like that.  I put in where it said "his return" and it was a

6  joint return, I made some minor changes like that; but they

7  were not material.  They were just to correct the facts.  So

8  there are no problems with those minor things?

9          MR. HINSON:  No problems with the instructions as

10 read.  We, of course, you know, renew our objections we made

11 before --

12         THE COURT:  Oh, sure.  Absolutely.  No, I

13 understand that.  I just want to make sure I read them

14 correctly.  All right, I will fix this --

15         MR. TATE:  Just for the record, we take the same

16 position.

17         THE COURT:  Certainly.  So I'll fix this when they

18 come out.

19         Mr. Brown, you've got two hours.  How do you want

20 to divide it?

21         MR. BROWN:  My hope is, Your Honor, an

22 hour-and-a-half or less in opening, a half an hour for

23 rebuttal.

24         THE COURT:  Do you want warnings from me or do you

25 need to get them from your table?

```
 1          MR. BROWN:  I've got my colleagues out there
 2    flagging for me.
 3          THE COURT:  All right.  That's fine.  Then we'll
 4    be -- well, we need more time.  Make it ten after; tell the
 5    jurors they have until ten after.  Thank you.
 6          (Recess until 11:10 a.m.)
 7          THE COURT:  We've corrected page 15 both for
 8    re-reading to the jurors and for the hard copy that goes
 9    back to them, and also for the electronic version to go on
10    JERS.  So that correction from "or" to "and" will be in ever
11    record of the instructions.
12          All right.  So let's bring the jurors in.
13          (Jury enters courtroom at 11:12 a.m.)
14          THE COURT:  All right.  Mrs. Cochran, would you
15    bring the instructions back up on the screen.
16          Ladies and gentlemen of the jury, you might have
17    noticed as I was reading through these instructions that I
18    made a few corrections to typos and some minor corrections.
19    All of those were minor, and counsel and I have discussed
20    them while you were on recess.
21          There was one, though, that was an error I didn't
22    catch, and it's a very important error, and I'm going to
23    re-read you that one paragraph and explain where the
24    typographical error was so you know exactly what the
25    elements of the charge is.
```

1          I'm referring to the charge of tax evasion which

2    begins on Count Fourteen, and I think directly to the middle

3    of page 15.  And let me re-read to you the subject

4    paragraph.  It begins "For you."  Do you see it there on

5    your screen?

6          For you to find the defendants guilty of each of

7    these crimes you must be convinced that for each count the

8    government has proven each of the following elements beyond

9    a reasonable doubt as to each defendant:

10          1.  An affirmative act constituting an evasion or

11    attempted evasion of the tax, and -- the word "and."

12    Previously the word "or" was there.  Now you see how

13    important this change is.

14          So where I read to you "or" before, the word "and"

15    is now at the end of subparagraph 1.  And

16          2.  The existence of a tax deficiency.  And

17          3.  Willfulness.  Or -- and "or" does apply in

18    that case, it's correct.  Or

19          4.  Defendant willfully aided, abetted, counseled,

20    commanded, induced or procured the commission of such

21    conduct.

22          That is the correct instruction.

23          With that said, it's time for counsel to argue.

24          The United States.

25          MR. BROWN:  Thank you, Your Honor.  May it please

1    the Court.  Counsel, ladies and gentlemen of the jury.

2              After all this time you probably know about as

3    much about me as I can remember about myself; but for

4    purposes of formality, I will reintroduce myself and tell

5    you that I'm David Brown.  I'm an Assistant United States

6    Attorney.  I am here in the Western District of North

7    Carolina and have been for about 15 years.

8              I want to tell you a couple of things before we

9    get to the heart of what it is I really want to talk to you

10   about during my limited amount of time.

11             This has been a long trial, perhaps longer than we

12   anticipated and certainly longer than you had hoped.  We've

13   seen a lot of witnesses and we've certainly provided you

14   with plenty of opportunities to see documents.  Some of them

15   we spent a lot of on time and some of them probably flashed

16   so quickly in the front of your eyes it made you dizzy.  But

17   we were trying to expedite the case.  I think I can speak on

18   behalf of my colleagues; I think that we have tried to

19   present our cases in the most efficient way that we could,

20   even if you think we could have done a better job.

21             Shortly, it will be your turn to do your job,

22   which is the most important function.  You get to determine

23   whether the government has proven to you that Mr. and

24   Mrs. Jinwright are guilty of the charges in the indictment

25   beyond a reasonable doubt.

1           Let me make a couple of what I refer to as

2      disclaimers.

3           If you haven't noticed, we lawyers in this

4      courtroom are passionate about our cause and our defense of

5      our respective clients.  I think I can speak for my

6      colleagues on the other side of the room and tell you that

7      trial work is no tea and crumpets affair.  It's not for the

8      faint of heart.  We are aggressive; we're tenacious, and I

9      hope we have been within the bounds of propriety.  And if

10     we've overstepped, I think you've seen the judge bring us

11     back into line.

12          But I tell you that, folks, to say to you this

13     case isn't about the lawyers, this case is about United

14     States of America v. Anthony and Harriet Jinwright.  And so,

15     if in our zeal to represent our respective clients if we

16     have somehow offended you, stepped on your toes, or if you

17     wish we had done our jobs differently, all I can say to you

18     is I think the lawyers here did the best they could for our

19     clients.

20          And what I would ask is this:  That you not hold

21     any misgivings about the way we conducted ourselves against

22     either the United States or against Mr. and Mrs. Jinwright.

23     That's what the case is really all about.

24          Let me tell you a couple of other things this case

25     is not about before we start to the talk about what the case

1    is about, and this is important that you understand this;

2    and I hope you understood this throughout this trial, but I

3    want to be sure I emphasize it.

4           This case is not about religion.  You've heard no

5    challenge from the United States in this courtroom of the

6    sincerity of either Mr. or Mrs. Jinwright's theological

7    beliefs.  There has been no attack to their religious

8    practices, and there has been absolutely no criticism of

9    Greater Salem Church.

10          This case is not about Mr. and Mrs. Jinwright's

11   occupation except to the extent that, because they were

12   employed as ministers to Greater Salem Church, we

13   necessarily had to present evidence about that employment,

14   about the money that they received from their church and

15   about the tax ramifications of that employment.  But they

16   are not being prosecuted, folks, because they are ministers.

17          But I also want to tell you the flip side of that:

18   Being a minister does not provide an excuse or an exemption

19   from complying with the laws of this country.  They are

20   equally responsible to pay their taxes and that's what this

21   prosecution is about.

22          This case is also not about civil remedies.  I

23   want to be very clear on this.  We represent -- my office

24   represents the United States in the prosecution of crimes.

25   All kind of crimes.  This happens to be a tax and mail fraud

1    case.  We are not an arm of the Internal Revenue Service.
2    This is not a tax collection case.
3          And finally I think it probably doesn't need to be
4    said but I'm going to say it:  This case is not about the
5    race, the ethnic background or the sex of the defendants.
6    These folks were not selected based on any of those
7    criteria; they were investigated and prosecuted because of
8    the crime they committed.
9          The witnesses who you heard in this courtroom were
10   presented based on their knowledge of the facts and the
11   evidence that was introduced during the trial of this case
12   was based on the facts.
13         Consideration of any of those factors that I've
14   just discussed would be wholly improper by you, it would be
15   a violation of your oath, and the Judge will tell you or the
16   Judge has already told you that neither bias nor sympathy or
17   prejudice for or against either the United States or for or
18   against Mr. and Mrs. Jinwright is not proper and it would
19   not be a fair consideration by you.
20         Now, let me tell you what this case is about.  And
21   I have to tell you, folks, I may switch back and forth here.
22   This is my first privilege of trying a case in front of
23   Judge Whitney and he gives his jury instructions before
24   closing argument.  That has not been my typical experience,
25   and so ordinarily I will refer to the fact, "The Judge will

tell you."  Well, he's already told you; and so if I slip
and says he's going to tell you, just remember he already
has.

He already told you this case is about fraud.
He's read you the indictment.  You can see this case is
about tax fraud generally and about mail fraud.  There are
six counts of tax evasion in the indictment; there are six
counts of filing false tax returns in the indictment; five
counts of mail fraud in the indictment, and one count of
conspiracy to defraud the United States in violation of 18
United States Code, Section 371.

This case is about documents.  You can't have this
much money involved in a fraud prosecution without having a
lot of documents.  You can't have this many financial crimes
without having a lot of documents.  But while you may have
thought, "Oh, my gosh, they're going to show us another
document," I want to tell you a couple things about
documents based on my experience at least as a federal
prosecutor.

Documents don't have memories.  Unlike witnesses
who come in and testify to the best of their ability and
tell you what they recall to the best of their ability,
documents don't have that problem.  They don't have
memories.

They don't have biases for or against either

1    party.  They may contain true or false statements, but

2    whatever statements they contain stays the same.  In other

3    words, documents don't lie to suit their own purposes.  And

4    so the documents in this case are extremely important.

5              Now, what I want to do is work backwards through

6    the indictment.  I'm going to talk to you about the mail

7    fraud counts, then the false return charges, the tax evasion

8    counts, and the conspiracy counts last -- or as least as

9    part of the evasion counts.

10             The reason I want to do that is, as you've

11   probably already noted from the Judge's instructions, there

12   are some overlapping elements in the tax counts.  So what I

13   want to do is try to talk about the elements that are

14   different, and then I will talk about of the common elements

15   all at one time.

16             Let me start with the mail fraud counts and remind

17   you what the Judge has already told you, which are the

18   elements of mail fraud.  That is, that Mr. Jinwright -- and

19   keep in mind, folks, that Mr. Jinwright alone is charged in

20   the mail fraud counts.  Mrs. Jinwright is not charged as a

21   defendant in those counts.

22             The elements of the mail fraud charges are that

23   Mr. Jinwright knowingly devised a scheme or artifice to

24   defraud or to obtain money or property by false statements

25   or pretenses.  That the false statement or pretense was

1   material.  Judge Whitney has already told you that simply

2   means that it would reasonably influence a person to part

3   with money or property.  That Mr. Jinwright executed that

4   scheme or attempted to do so with the intent to defraud.

5   And finally, that in advancing the scheme the mails were

6   used.

7           Let me again, as Judge Whitney has already done,

8   briefly explain some of those terms to you.  Scheme and

9   artifice is simply a legal way of saying it's a plan or

10  course of action which is intended to defraud or obtain

11  money from someone.  The use of a false representation for

12  the purpose of gaining some undue advantage over another.

13          A false statement, it can be false if it is known

14  to be untrue or made with reckless indifference as to its

15  truth or falsity.  And it must be made with the intent to

16  deceive.

17          The intent to defraud means to knowingly and with

18  purpose to deceive or cheat.  It ordinarily is accompanied

19  by a desire to obtain some gain, and it may be inferred from

20  the totality of the circumstances.  And that's an important

21  point for me to make at this point in time.

22          As Judge Whitney has already told you, there are

23  two types of evidence, both direct evidence and

24  circumstantial evidence.  They are equally persuasive for

25  your purposes.  One is not better nor worse than the other.

And the reason why that's important is because it is rare that you have direct evidence of what someone intended, and that is true in the mail fraud counts. I want to talk to you a little bit about that when we get to the tax counts because I think the evidence here is somewhat unique and different.

But as to the mail fraud counts, what we know is from the testimony of Mr. Jackson, Mr. Gallagher and Mr. Howell, that Mr. Jinwright didn't walk in there and say, "By the way, fellows, I'm going to lie to you about my income." He didn't say it. And so you have to look at the circumstances surrounding what was put on those credit applications to determine whether Mr. Jinwright knowingly and with intent to defraud made a false statement.

The last element of mail fraud is simply that the mails have to be used. I can actually cover this one perhaps en masse for all of the mail fraud counts.

Do you remember the testimony of Mr. Howell? He said it was a normal course of business for the car dealership to overnight express, to FedEx, to UPS, to somehow get the package, the credit application to the financial institution. Why? The sooner they get the package up there, the sooner the money comes back. In the car dealership, as Mr. Hinson pointed out, they are in business of making money. And so they would overnight their

1     packages.

2              As Judge Whitney already told you, the use of a

3     private or a commercial mail carrier falls within the

4     definition of the use of the mails.  So mails were used in

5     every instance, and it must simply be reasonably foreseeable

6     to Mr. Jinwright that the mails would be used.

7              Which is, if you recall, why I was asking how he

8     ran his business, A. L. Jinwright Funeral Services.  Did you

9     courier your bills out to people?  Did you get your checks

10    by hand delivery?  And he said no, when we needed to do

11    something, we sent mail out.  We get mail at the office,

12    because everybody can understand that the use of the mails

13    is a normal business practice.  So that satisfies that

14    element of the mail fraud count.

15             Let me talk to you about the specific charges.

16    Count Fifteen charges that in November of 2001 Mr. Jinwright

17    wanted to lease a 2002 Lexus LX470.  We have the application

18    in front of you.  You can see that he signed the

19    application; and on the very same page that he signed the

20    application, the income is reported as $60,000 per month.

21    That application, folks, is unquestionably false.  In fact,

22    you heard Mr. Jinwright's three days of testimony; at no

23    time did he ever say, "Yeah, I actually made $60,000 of

24    income."

25             We know that return -- we know that amount is

1  false as well because on Mr. Jinwright's 2001 tax return he

2  only reported $284,000. And even Ms. Polk, or Agent Nixon,

3  through her investigation -- if we could have the next

4  slide, please? There you go.

5          Even Ms. Polk testified that based on all the

6  evidence in this courtroom the total amount of income

7  reported from Mr. Jinwright was far less for 2000 -- was far

8  less than $720,000 even in 2002.

9          So again, the evidence establishes that that

10 credit application is false.

11          Now, the real question for you is: How do we know

12 that Mr. Jinwright knew it was false? Well, because of what

13 he put on his tax return for one thing.

14          Mr. Howell, as you recall, told you that he got

15 that number, he got that amount, directly from

16 Mr. Jinwright. On this loan app -- this credit application

17 in particular, Mr. Howell said that number came directly

18 from Mr. Jinwright.

19          On the next application that we see you'll recall

20 the testimony of Mr. Howell. He said, "I'm sure I carried

21 over that amount of money to the next application based on

22 discussions with Mr. Jinwright because he told me his income

23 hadn't changed." So Mr. Jinwright is still responsible for

24 causing that amount to be placed on the second application.

25          But on this first one Mr. Howell was explicit:

"He gave me that amount of money and I put it on the return -- or I put it on the credit application."

He also told you they don't keep -- at Hendrick Motors they don't keep amounts of income for their clients in their computer systems.  Keep lots of information on clients; and Mr. Howell said he and Mr. Jinwright had a long relationship dating back to the mid '90s.  But what he said he didn't have in the computer and he wouldn't have had anywhere else is the amount of income Mr. Jinwright was earning that ended up on this credit application.

And this is where you get to do your jobs, folks, because you are the sole arbiters, the final arbiters of the credibility of witnesses.

Again, if you remember Mr. Howell's testimony, he said," I would not have made that number up and just stuck it on there."  He said he wouldn't do it.  And we submit to you that that was a -- that was a credible statement based on all the other facts and circumstances that you are entitled to consider in this courtroom.  Mr. Howell also told you, by the way, that that amount of income was material.

I fully expect my colleagues will say to you, "Well, nobody lost any money.  All the lease payments were made."  That's not -- that's not what the charge is about. The charge is not about whether or not the car had to be

1    repossessed.  The charge is not about whether or not the

2    financial institution lost money.  The charge is whether a

3    credit application was submitted which bore false

4    information which was relied on by a financial institution.

5    And the evidence again from Mr. Howell was, of course, the

6    finance companies want to know that; and, of course, it's a

7    material fact for them.  If it weren't material, they

8    wouldn't ask for that information.

9         It's like, again, you're entitled to use your own

10   common sense here.  If you have a home mortgage, you know

11   one of the things the finance company wants to know is how

12   much do you make.  That's why they wanted that information.

13   So that was material to the determination of whether or not

14   they would issue that credit for that Lexus.

15        The best evidence I submit to you, though, ladies

16   and gentlemen, that Mr. Jinwright knew that that information

17   was false and that he intended to defraud, he didn't take

18   the stand and say to you, "Well, it was a guess on my part,"

19   or, "It was the best of my ability at the time," or, "We

20   were in a hurry and I wasn't thinking."  He didn't say any

21   of those things.

22        What he said was, "When Gantt Howell said he got

23   that $60,000 income figure from me, he lied to you."  And so

24   it's an easy call:  If Gantt Howell is lying, Mr. Jinwright

25   is telling the truth, then you ought to acquit him of that

count.  If Mr. Jinwright is lying and Gantt Howell told you

the truth, then Mr. Jinwright is guilty of that count.

Count Sixteen.  This was a credit application for

a 2002 Lexus SC340 in May of 2002.  Again, you see it's got

$60,000 of income on there.  Again, Mr. Howell's testimony

was, "I got that information from Mr. Jinwright.  I got it

originally back in November but our computer system doesn't

have it.  What I did was I asked him, "Has your income

changed?"  And Mr. Jinwright said "No."  And so that's how

we have the $60,000 figure on there.

Again, if you look on the application -- and we'll

hear, I'm sure, the argument, "Well, he signed a lot of

papers; he just didn't read it."

There's not a whole lot of space between that

material term on the application, $60,000 a month of income,

and the signature which Mr. Jinwright admitted he put on

that document.  Mr. Howell told you everything else on that

document he handwrote.  What Mr. Howell told you as well is

he would not have put that number on there without knowing

that number directly from his client, Mr. Jinwright.

Mr. Jinwright signed the application knowing that

number was on there and knowing that that number was false.

Again, we know it was false because if we look at

Mr. Jinwright's 2002 tax return he only reported $371,000 on

there, a far cry from the $720,000 of annual income that

would have been earned if he was making $60,000 a month.

And again, even Special Agent Nixon in her investigation or Revenue Agent Polk through her analysis of the evidence didn't come up with $720,000 of income for Mr. Jinwright in 2002.

Once again the mails were used. It was a material statement. And the best evidence, I submit to you again, Mr. Jinwright intended to defraud and knew this statement was false because he offered no explanation for that amount other than to say he didn't provide it; and when Gantt Howell said the opposite, Mr. Jinwright said Gantt Howell lied.

Count Seventeen is the credit application for the 2006 SC430. Again, this credit application was signed by Mr. Jinwright. It reports now $100,000 per month for income, or $1.2 million in annual income. We know the statement is false because if we look at Mr. Jinwright's 2006 tax return he reported 642,000 on that tax return, a far cry from the $1.2 million on the credit application.

And again, even considering all the evidence of unreported income that was discussed and analyzed here in this courtroom, Revenue Agent Polk could not find $1.2 million of income for Mr. Jinwright for 2006.

Now, this document is a little bit unique. If you remember the testimony of Jackie Johnson, he said he

couldn't remember where that $100,000 came from for sure.  A

couple things he told you.  Hendrick Motors does not keep

income information of their clients in their computer so he

was confident it didn't come from there.  He also said to

you, "I would not have made that up.  I would not have put

$100,000 a month for a client on a credit application unless

that's what the client told."

But try as he might, he couldn't remember

specifically talking to Mr. Jinwright about that.  He was

very, very candid in his lack of memory.  What he was clear

on is, "There are only two places I would have gotten that

figure:  Gantt Howell, because Gantt Howell had this long

relationship with Mr. Jinwright, or Mr. Jinwright."  So

according to Jackie Johnson, two sources for that $100,000

amount on the credit application, Gantt Howell or

Mr. Jinwright.

If you recall, I asked Gantt Howell, "Did you

provide that amount to Mr. Jinwright?"  Mr. Howell said,

"No."  And he corroborated Mr. Johnson by saying he only

could have gotten that information based on Mr. Howell's

knowledge of the car industry from Mr. Jinwright.

But I submit to you again, if you take

Mr. Johnson's testimony as it is, it came from either

Mr. Jinwright or Mr. Howell; and if it didn't come from

Mr. Howell, it came from Mr. Jinwright.

1          What did Mr. Jinwright say when he took the stand

2     in this courtroom about Mr. Johnson?  Mr. Johnson said if

3     there was any possibility that that $100,000 figure came

4     from him, that is, Mr. Jinwright.  And once again

5     Mr. Johnson lied.  Those will not be the last witnesses that

6     Mr. Jinwright called liars in this courtroom.

7          Count Eighteen is a credit application for the

8     2006 Lexus LX470.  Again on the same date, the same evidence

9     applies.  Mr. Howell prepared most of the application.

10    Mr. Johnson finalized the application.  It was a hand off.

11         If you recall their testimony, Mr. Howell again

12    said he didn't provide the $100,000 per month income figure.

13    Mr. Johnson said that figure only came from either

14    Mr. Howell or Mr. Jinwright.  Common sense tells you folks

15    that that amount came from Mr. Jinwright.  And again,

16    according to Mr. Jinwright, Jackie Johnson just came in here

17    and lied to you.

18         Count Nineteen.  Count Nineteen was the credit

19    application for the 2007 BMW 650I for Mr. and

20    Mrs. Jinwright's daughter in December 2006.  Again, the

21    credit application is signed by Mr. Jinwright.

22         Now, this application and this lease is a little

23    unique because the testimony of Mr. Gallagher was

24    Mr. Jinwright came in intending to purchase this vehicle --

25    lease this vehicle for his daughter as a gift; but he

decided somewhere during the process that this would be a

good opportunity for him to help his daughter build up her

credit history. So what he said is, "I want my daughter to

be a co-applicant on this application."

Mr. Gallagher said, "Fine. I need some -- I need

some financial information about your daughter. I need her

name and I need what she makes and where she works."

According to Mr. Gallagher, again Mr. Jinwright provided the

amount of Anthonae Jinwright, that is Mr. and

Mrs. Jinwright's daughter, provided the amount of income

that she earned of $66,000. And again Mr. Jinwright signed

the application.

And we know that the amount of $66,000 reportedly

earned by Mr. and Mrs. Jinwright's daughter is false. We

know it's false because Ms. Jinwright, Anthonae Jinwright,

did not even file a tax return for 2006. She had zero

income for 2006. Even in 2007, when she became an employee

of A. L. Jinwright Funeral Services, she only earned 22,500.

And that's important. Because what we have here,

we had some questions of Mr. Gallagher and then we had some

testimony from Mr. Jinwright, who said, "Well, that $66,000

figure we put on there, you know, that was really just a

projection. That's the anticipated earnings that Anthonae

was going to receive."

Well, you can look at the application all day

long, folks, you won't find the word "projection" anywhere
on there.  The finance company that gets the credit
application and has to make the final decision about whether
to grant the credit or not would not have known that this
was a projected number.  They would have thought that
Anthonae Jinwright earned $66,000 as the vice president of
A. L. Jinwright Funeral Services in 2006.

But even more important?  The reason why that
story falls apart, the reason why we know Mr. Jinwright
falsified that information, is it was not that Anthonae
Jinwright was going to be working at some unrelated company.
What Mr. Jinwright told Mr. Gallagher is, "She's going to be
vice president of my company making $66,000 a year."  And
the following year she was employed by Mr. Jinwright's
company, but she didn't make anywhere near $66,000.  She
made 22,500.

And even in 2008, two years after this application
was filed, Mr. Jinwright only paid his daughter $47,000.  In
other words, back in December of 2006, call it a projection
or otherwise, there was no way that he intended to pay his
just-graduated-from-college daughter $66,000 a year; and the
proof is, he didn't do it.

So, folks, I submit to you that, notwithstanding
all the argument about whether this was a projection or not,
the application is false on its face and Mr. Jinwright

1    intended to defraud.  He intended to defraud both that

2    finance company and he intended to create a false credit

3    record for his daughter which would be relied on by

4    financial institutions in the future.

5          Those are the mail fraud counts.  And I submit to

6    you, ladies and gentlemen, that unless you believe -- oh,

7    and by the way, when push came to shove, Mr. Jinwright

8    surprisingly, but he did, he called Mr. Gallagher a liar

9    too.

10          So if you believe Mr. Jinwright, then you have to

11   disbelieve Mr. Gallagher, Mr. Howell and Mr. Johnson.  But

12   worse, you have to believe that they walked into this

13   courtroom, put their left land on the Bible, raised their

14   right hand, took that stand, looked you in the eye and lied.

15   If you believe that, you should acquit Mr. Jinwright as to

16   those mail fraud counts.

17          Let me talk to you about the false return counts,

18   that's Counts Eight through Thirteen of the indictment.

19   Now, both Mr. and Mrs. Jinwright are charged in those

20   counts.  The elements are slightly different from the tax

21   evasion counts and so I will go over them separately but the

22   proof of the elements will be essentially the same.

23          The elements of the false return charges are that

24   Mr. and Mrs. Jinwright signed the tax return under the

25   penalties of perjury which they did not believe to be true

and correct as to every material matter and their conduct in
so doing was willful or -- and here's a big "or" -- or one
or the other willfully aided and abetted the other in filing
that false tax return.

The reason that's important, folks, and I want
pause for just a moment, is because there isn't any question
based on the evidence in this courtroom that Mr. Jinwright
earned the bulk of the money in that family.  And similarly,
there isn't any question that most -- but not all -- that
most of the unreported income in this case was earned by
Mr. Jinwright in his capacity as the Senior Pastor at
Greater Salem Church.

But Mr. and Mrs. Jinwright filed a joint tax
return.  And as I talk about the evidence, I believe you
will find -- the government submits that you will find based
on the evidence that Mrs. Jinwright was well-aware that the
tax return failed to report all of Mr. Jinwright's income
and failed to report all of her own income, and she aided
and abetted in the underreporting of Mr. Jinwright's income
as well as her own.  And that's why that "or" is important.

I want to briefly just mention because we're going
to see this.  One of the elements is that the return was
signed under the penalty of perjury.  But on the modern tax
returns -- I'd have to look, I guess, at some of the most
recent ones -- I'm not even sure that that phrase even

1  appears anymore.  That's what the status says and the Judge

2  has given you the instruction on it:  That the penalties of

3  perjury is simply that certification above of the signature

4  line.

5         It tells you that everything you put on this tax

6  return has to be true and correct and you're responsible not

7  just for your signature, and they've tried to parse that a

8  little bit.  You have heard some questions about the fact

9  that Mrs. Jinwright wasn't the -- wasn't the owner of

10 A. L. Jinwright Funeral Services and her name is not on that

11 Schedule C.  True enough.  But that Schedule C in those

12 early years was attached to the return that she signed.

13 She's responsible for the truth and accuracy of the return

14 in its entirety.

15        Signing a return, that simply means that the

16 individuals' names are on there.  I don't believe there's

17 any dispute at all, let alone a serious dispute, that both

18 Mr. and Mrs. Jinwright signed each of the returns in

19 question.  And again, those are the tax returns for the

20 years 2002 through 2007.

21        Knowledge of the contents of the returns.  You

22 need to find -- or the law allows, rather, that you draw

23 inferences from certain facts.  And again, circumstantial

24 evidence may be used by you in determining whether the

25 defendants understood those returns were not true and

accurate.

One of those inferences that you may draw is the inference from the fact that they signed the tax returns. If you find, for example, and as the Judge has already told you, that they put their names on the tax return, you may also find that they knew the contents of the return.

And the last -- the last question that you have to address before we get to willfulness is whether the returns are true as to every material matter. Again, the test for materiality, as the Judge has told you, is whether an item must be reported in order to correctly compute the amount of tax.

This is an important distinction between the false return charges and the evasion charges. You don't have to find that there was a tax deficiency. And I will tell you folks the reason why that becomes important is if you look at the Schedule A's that we talked about on all these returns, the one area that we focused on consistently was the amount of charitable contribution. And I want to pause just for a moment and talk about that.

I submit to you that the evidence in this courtroom establishes that it was Mrs. Jinwright who was responsible for taking the information to the tax return preparer. We heard that in clear terms from Mr. Dawson, we sort of heard that from Mr. Lancaster, and we heard it

1    unequivocally from Mr. Jinwright that she took -- gathered

2    up the information at the end of the year.  She took the

3    information to the return preparer both for their personal

4    finances and also for A. L. Jinwright Funeral Services.

5    That she was essentially the bookkeeper for that company.

6    She is the individual who provided these summary sheets that

7    Mr. Dawson received and Mr. Lancaster.

8          If you look at those, folks, those are the

9    documents that the return preparers relied on in filling out

10   various forms on the tax return for Mr. and Mrs. Jinwright;

11   but one in particular that they relied on was the amount of

12   claimed charitable contributions.

13         Now, the evidence in this courtroom is that every

14   year Mr. and Mrs. Jinwright received, just as every other

15   parishioner at Greater Salem Church received, a statement of

16   charitable contributions.  And we examined those.  And in

17   the early years, in 2002 -- 2001, 2002 and 2003, for one

18   year they matched -- their charitable contributions on their

19   tax returned matched almost to the penny what Chitwood &

20   Chitwood said that they had actually contributed.

21         In the earliest year I think they were off by

22   about $10,000 in their statements.  But then as you look at

23   the tax returns, if you're so inclined, the amount of

24   charitable contributions claimed on the tax returns started

25   to exceed by larger and larger amounts what was on the

charitable contribution letters you see from the church.

And I submit to you that what happened here is somewhere along the way as their income increased, Mrs. Jinwright was looking for ways to find deductions to decrease the tax liability and that was an easy one. Because they are pastors of the church. Who is going to question the pastors of the church making charitable contributions to their own church? The return preparer certainly didn't. He took whatever number Mrs. Jinwright put on these schedules and he put it on the Schedule A.

But we submit to you, ladies and gentlemen, that the true evidence came from the church's internal records which reflected how much money they actually contributed; and Mrs. Jinwright is responsible for the falsification of those tax returns, at least as to the amount of the overstated charitable contributions.

The last element of filing a false tax return is willfulness. Judge Whitney has already told you that willfulness is an voluntary and intentional violation of a known legal duty. In other words, the government has to prove the defendants knew they had an obligation to report certain amounts of income and that they voluntarily, as opposed to accidentally, that they voluntarily and intentionally omitted income from their return or overstated charitable contributions in this case. And I am going to

1    tell you about that as well.

2         We looked at -- and again, if you're inclined, but

3    you don't need to for this case -- if you're inclined, you

4    will find that there are plenty of other things on these

5    summary schedules that could be called into question.  And

6    we've identified them for you:  $100,000 worth of robes in a

7    six-year period.  Car washes, $5,000 a year.  Landscaping.

8    They are full of items, ladies and gentlemen, I submit to

9    you that are suspect.

10         But I want to save you some time and tell you that

11   Ms. Polk's summaries do not include any of those suspect

12   deductions for any year or any part of the return.  They are

13   not part of our allegation of unreported income or

14   overstated expenses in this criminal case.

15         Remember Ms. Polk's testimony.  What she said is,

16   "As a revenue agent, I have plenty of reason to challenge

17   some of those other deductions, but Mr. Brown said, 'Don't

18   bother; there's enough unreported income in the charitable

19   contributions that are overstated.'"  That all makes up her

20   summary schedules.

21         What I submit to you, that gives you reason to

22   believe that Mrs. Jinwright again was actively involved in

23   the filing of false tax returns because of the suspect

24   deductions that are on those summary schedules.

25         Again, willfulness is a common element with both

1    the tax evasion charges and the false return charges.  And I

2    believe Judge Whitney is going to actually instruct you that

3    willfulness is an element of the conspiracy charge as well.

4    So I will consider that issue after I finish going through

5    the remaining elements of two remaining charges.  Let me

6    move on to the tax evasion charges.

7          Proof of a tax evasion or attempted tax evasion

8    requires unnifying that there was an affirmative act

9    constituting an evasion or an attempted evasion of the tax

10   and the existence of a tax deficiency and willfulness or

11   willfully aiding and abetting.

12         Judge Whitney has explained the law on aiding and

13   abetting to you.  I'm not going to spend much more time on

14   aiding and abetting, I simply want to highlight it for your

15   attention.  Let me deal with the other elements that make up

16   the tax evasion, again setting the element of willfulness

17   apart for the moment.

18         Most of the evidence which pertains to these

19   charges also again provides proof that the tax returns are

20   false as charged in the 7206(1) counts.  There's some

21   evidence which only pertains to -- well, and, in fact,

22   pertains to the conspiracy count as well.  However, there is

23   some evidence that is only applicable to the conspiracy

24   count.

25         And so I want to talk about the conspiracy count

next and talk about those specific items of evidence which

you should only apply to Count One of the indictment; and

then I will talk about the remaining evidence which applies

to all of the tax fraud counts, that is, the conspiracy, the

evasion charges and the false returns charges.

Now very quickly, the elements of the conspiracy

count are an agreement between two or more people to

accomplish an unlawful plan, an overt act in furtherance of

the conspiracy, and that the defendant under

consideration -- and you must consider both Mr. and

Mrs. Jinwright separately in determining their involvement

in a conspiracy -- is that the defendant under consideration

deliberately joined the conspiracy understanding what the

purpose of it was.

Let me go through those elements very quickly and

give some explanation.

Conspiracy, ladies and gentlemen, is simply a

partnership in crime. Now, there's no contract in this

courtroom anywhere. You can look through all the thousands

of pages of documents we introduced and you won't find a

document signed by Mr. and Mrs. Jinwright that says, "We,

undersigned parties, hereby agree to conspire to defraud the

United States." That's not how it works. It is a tacit

understanding; it is an agreement usually only proveable by

the circumstantial evidence.

1          One of the things that Judge Whitney told you

2    which is important to remind you of is determining whether

3    there was a conspiracy, determining the existence of a

4    conspiracy is often available when you look at the

5    relationship between the co-conspirators.  If you look at

6    the length of that relationship between the co-conspirators,

7    what do we have here?  We've got a husband and wife.

8          Oh, and the third factor that Judge Whitney

9    mentioned, what's the nature of the conspiracy?

10          And I don't want to dwell on hypotheticals; but

11    again, if you can think of unrelated parties in your own

12    mind who have only a very brief relationship and they are

13    involved in some wide-ranging activity, maybe then it would

14    be difficult to find that they were conspiring to do

15    something.

16          But here, working backwards through those factors

17    that Judge Whitney has already told you about, the

18    conspiracy here is to defraud the Internal Revenue Service.

19    Which you can find -- you can find them guilty of if you

20    find that they conspired to file false tax returns.

21          We're talking about a husband and a wife here who

22    filed joint tax returns.  So the unique -- the unique nature

23    of the conspiracy charge, and the relationship between

24    Mr. and Mrs. Jinwright as husband and wife, and that

25    relationship to the charge itself, provides you evidence

1    that what they did individually was part of a joint

2    agreement.

3            The other factor that you need to consider or the

4    other element is that they intended to defraud the United

5    States.  In fact, what they intended to do was impede or

6    impair the ability of the Internal Revenue Service to carry

7    out its lawful function.

8            And that's important to remember, folks.  It is

9    not simply an agreement to cheat on their taxes.  It's not

10   simply an agreement to file false tax returns.  And that's

11   why there are some pieces of evidence in this case that

12   demonstrate, I submit to you, an agreement to defraud the

13   United States.  An agreement to impair the Internal Revenue

14   Service's ability to carry out its lawful functions, which

15   are unrelated to Mr. and Mrs. Jinwright's personal tax

16   liabilities.

17           Let me go through those particular items of

18   evidence and those particular types of evidence which we

19   submit to you demonstrate an intent to defraud the IRS.

20           One is that the defendants filed a false Tax

21   Exempt Application with the Internal Revenue Service.  That

22   has nothing to do with their personal tax liabilities.  But

23   as you will -- but as we will talk, you will find that that

24   had the ability to impede the Internal Revenue Service in

25   carrying out its lawful function.

1          Second one is Mr. and Mrs. Jinwright blocked

2    repeated efforts to have Addie Porter, Mrs. Jinwright's

3    mother, to receive a Form 1099.  That had nothing to go with

4    Mr. and Mrs. Jinwright's personal tax liabilities, but that

5    conduct impeded the Internal Revenue Service in carrying out

6    its lawful functions.

7          The defendants filed false amended tax returns

8    through Tiari-El & Associates that had sort of a

9    relationship with their personal tax liabilities, but really

10   the evidence shows that they were looking for a false and

11   fraudulent tax refund of about $160,000.

12         And the defendants repeatedly facilitated or

13   caused the creation of and submission of false financial

14   reports to the congregation of Greater Salem Church.

15         And again, this investigation and prosecution is

16   not about Greater Salem Church.  But by submitting those

17   financial reports which were false to the congregation,

18   Mr. and Mrs. Jinwright necessarily would impede the Internal

19   Revenue Service from carrying out its lawful functions.  Let

20   me talk to you about those very quickly in order.

21         A false tax exempt application.  If you can read

22   it on the screen, the first line of that letter which is

23   approving the tax-exempt status for Greater Salem Church,

24   says, "Based on information supplied, and assuming

25   operations are as stated," and then it goes on to say, "we

1   authorize Greater Salem Church to be tax-exempt."

2          In other words, that tells you the Internal

3   Revenue Service was relying on the information that was

4   provided in that document.

5          That document contained false information.  If we

6   look at one particular page of it, it shows that

7   Mr. Jinwright's income was $245,000; when you look at his

8   tax return in a moment, you'll see that his wages were far

9   in excess of -- were $200,000 alone plus a housing allowance

10  of $130,000 more.

11         But more importantly, if you look on there it

12  shows that Mrs. Jinwright's income was zero.  But, in fact,

13  Mrs. Jinwright was receiving about $128,000 of income at the

14  time -- from Greater Salem Church, no less, at the time this

15  application was filed.

16         Why is that important?  As you recall the

17  testimony, there had been two failed efforts for Greater

18  Salem Church to get tax-exempt status.  They had tried and

19  the IRS rejected it, and they rejected it on the basis of

20  excessive compensation to Mr. and Mrs. Jinwright.

21         The IRS was not going to grant tax-exempt status

22  under 501(c)(3) to a charitable organization when the bulk

23  of the net earnings of that organization was going to

24  private individuals, and the IRS told them that.  They tried

25  a second time.  That is, Greater Salem Church tried a second

1    time to get tax-exempt status; and, again, the IRS rejected

2    it on the theory that it was private inurement, excessive

3    compensation.  They were getting too much of the net

4    proceeds from this charitable organization.

5          So what do the defendants need to do?  They needed

6    to show that they were making less money from this church

7    than they actually were.  And the IRS would not -- as we

8    looked at page 1 of the document, if they had known the true

9    amount of income that Mr. and Mrs. Jinwright were taking

10   from Greater Salem Church they wouldn't have approved the

11   application for the third time.

12         So it was important for Mr. and Mr. Jinwright to

13   lie about how much money they were getting.

14         Now, remember, there was a lot of talk in this

15   courtroom about, "Well, they didn't even come up with the

16   idea to get a tax-exempt status until they started

17   considering the faith-based issues under the Bush

18   administration."  That wasn't true.  We showed you the board

19   minutes all the way back in the Clinton administration when

20   Mr. Jinwright, for whatever reason, had a desire to have his

21   church declared a tax-exempt organization.  And he had been

22   working methodically from 1998 until finally succeeding in

23   2004 to obtain that tax-exempt status.

24         So he knew very well what the problems were in

25   getting tax-exempt status.  He and his wife were making too

much money from the charitable organization.  So what they

did here, they simply falsified the amount of money they

were given and submitted that document to the Internal

Revenue Service.

If we go back to another portion of the document,

at one point the IRS, apparently they scrutinized this --

this slide shows you amounts of money Mr. and Mrs. Jinwright

were making compared to what they were reporting on the

tax-exempt status.  Again, Mrs. Jinwright had $128,000 worth

of income and Mr. Jinwright had wages of over $200,000 and a

housing allowance of 130 on top of that.  So again, both of

those amounts were false.

The Internal Revenue Service apparently

scrutinized all the pieces of paper that they got and they

recognized that there were inconsistencies in what they were

being told.  If you remember, there was a letter where they

said, "Well, one time you told us Mr. Jinwright was

receiving $275,000.  Now you're telling us he's getting

$245,000.  But if we look at this other document that you

sent us, it shows that he's getting $600,000.  What's the

truth?"  The IRS wanted to know.

So Mr. Howze tried to reconcile all this

information, as he told you.  He went back to the finance

people and he said, "What's the deal?  How much is

Mr. Jinwright actually getting in compensation from Greater

1   Salem Church?"  And he said he was provided the information

2   that is on that fax back to the Internal Revenue Service

3   designed to explain the inconsistent amounts of

4   compensation.

5           But the one thing that Mr. Howze put on there is

6   that the $600,000 figure represented a portion of money that

7   was earned by Greater -- by A. L. Jinwright Funeral

8   Services.  And as I've shown repeatedly in this courtroom, I

9   can't do math.  And so I kept looking at the $600,000 and

10  Mr. Hinson eventually pointed out to me, "No, it's 600,000

11  minus the 245 or 250," whatever it is.

12          So, in fact, what that fax says is $300,000-plus

13  of income in that $600,000 figure is attributable to

14  A. L. Jinwright Funeral Services.  That's what Mr. Howze

15  told the IRS.

16          Mr. Howze told you he didn't just make that number

17  up either.  He got that information from the finance people

18  at Greater Salem Church.  But there's a problem with that.

19          As Mr. Jinwright admitted to you -- and that's why

20  I was asking him all the questions about who at Greater

21  Salem Church has anything to do with A. L. Jinwright Funeral

22  Services?  And what he said repeatedly is, nobody.  Nobody

23  but him, or Mrs. Jinwright.

24          So while it may be that Mr. Howze talked to

25  Jennell Barnett or one of the other folks, Jacqueline

1    Joyner, about that $600,000 figure and may have gotten

2    information that some part of that $600,000 figure came from

3    the A. L. Jinwright Funeral Services, they would not have

4    known that. They only would have been able to report what

5    they were told. And who would have told them that false

6    information? Mr. or Mrs. Jinwright.

7         You heard what Mr. Jinwright said, "It wasn't me."

8    You get to decide whether he's telling the truth or not; but

9    if he's truthful on that point, if it wasn't him, then what

10    he's saying is, "I guess my wife gave them that."

11         One of the two of them for sure provided the false

12    information about A. L. Jinwright Funeral Services making up

13    any part of that $600,000 figure; one or both of them did.

14    What we know for sure is nobody else at Greater Salem Church

15    could have; and we know that that amount is false because

16    when you look at the tax returns for A. L. Jinwright Funeral

17    Services, it reported a loss, not $300,000 of income.

18         Now, Mr. Tate spent several minutes trying to get

19    you to look up at the gross receipts line of that business.

20    And again, folks, Judge Whitney has already told you and I

21    want to repeat it: You're entitled to use your common

22    sense. The gross receipts line is simply the amount on the

23    top of that document that states the total amount of money

24    that came into that business. But we've walked down through

25    those returns long enough for you all to understand, if you

don't have your own personal understanding of how the

business returns are filed, that it's only the bottom line

that tells you whether there is income or a loss.

So if you want to go back up and look at the gross

receipts, then you have to read through the cost of goods

sold and all of the deductions and the expenses that were

taken.  The bottom line is that A. L. Jinwright Funeral

Services reported a loss of $25,000, not $300,000 of income.

And the evidence you've seen in this courtroom is that

A. L. Jinwright Funeral Services only one time ever reported

any income, $5,000 in one of the later years.  But

consistently year after year after year that company

reported a loss so Mr. and Mrs. Jinwright would have known

that no income they said was attributable to that company on

that tax exempt application could have come from

A. L. Jinwright Funeral Services.

On the basis of that conduct alone you can convict

Mr. and Mrs. Jinwright of Count One.

Let me talk to you about the Forms 1099 to Addie

Porter.  Darlene Perkins came in and testified that she told

both Mr. and Mrs. Jinwright that Mrs. Porter should be

receiving a 1099 for her employment in the afterschool

program at Greater Salem Church.  Mrs. Jinwright said, "No

way."  Mrs. Porter was collecting a Social Security benefit;

and I believe what Ms. Perkins told you is, "If we reported

1    income for her, that would reduce her Social Security

2    benefit.  We don't want the IRS to know Mrs. Porter is

3    earning income."  So she said no.

4          Ms. Perkins went to Mr. Jinwright about it, he was

5    little less adamant.  He said, "Well, I think my accountant

6    said we don't have to do that."

7          We heard a lot about his accountant telling him he

8    didn't have to do certain things in this courtroom.  But in

9    any event, no 1099 was filed for Addie Porter while Darlene

10   Perkins was there.

11         Now, Nelson Adesegha came on board the next year

12   with his finance background; and he discovered, just like

13   Ms. Perkins did, that Addie Porter is receiving income from

14   Greater Salem Church.  And he said she needs to get a Form

15   1099.

16         He went to Mr. Jinwright and talked to him about

17   it.  Mr. Jinwright said, "No, I don't think we need to do

18   that."  He went to Mrs. Jinwright and she was furious.

19   "There is no way you're issuing a 1099 to my mother which

20   would reduce her Social Security payments."

21         Nelson Adesegha did some research.  He went back

22   and he said, "Look, this is what the law requires."

23   Mrs. Jinwright said "No."

24         He kept waiting for this call from an accountant

25   that was going to explain to him why he was wrong and he

1   never got it, and he wasn't going to get it. He did a

2   little more research and he did a little more thinking about

3   it, and then he went back -- he didn't issue the 1099, by

4   the way, in 2004, which was his first year there.

5        But he went back the next year and he made it

6   clear to Mrs. Jinwright, "I'm the finance administrator

7   here. I'm responsible for the finances of the church.

8   Mrs. Porter needs a 1099 and I'm issuing one."

9        What happened to Mr. Adesegha? Mr. and

10   Mrs. Jinwright went out of town. Mrs. Jinwright calls back

11   and told Travis Mauney, "You fire him. I want him gone when

12   I get back."

13        Nelson Adesegha didn't get a chance to file that

14   1099 for Mrs. Porter and she didn't get one in 2005.

15        Even the Board of Directors identified on their

16   own through their examination of the financial information

17   of the church that Mrs. Porter was being paid as if she were

18   earning an honorarium. Now, that still should have

19   generated a 1099. But what even the Board of Directors

20   determined -- that is, Mr. Gandy and Ms. Chiles -- said that

21   this is illegal. She needs to get a 1099.

22        The evidence in this courtroom, folks, is

23   Mrs. Porter did not get a 1099 when Darlene Perkins was

24   there, she didn't get a 1099 when Nelson Adesegha was there,

25   and she didn't get a 1099 when Travis Mauney was there in

'05 or '06. And that's because Mrs. Jinwright put her foot

down and said, "My mother doesn't get a 1099," and

Mr. Jinwright backed her up.

If you find that the evidence is as I just

outlined it for you, that conduct alone is sufficient for

you to convict Mr. and Mrs. Jinwright on Count One of the

indictment.

Let me talk to you about those false amended tax

returns. Very quickly, you remember Mr. Lancaster had been

their tax return preparer since the mid '80s. These

documents were filed in 2003. And if you hear Mr. -- if you

listen to Mr. Jinwright's testimony, what he said is "We had

this individual at our church who prevailed on us to go to

see this seminar." He didn't even tell us what it was

about.

This busy man -- who is going from to church to

church to church for speaking engagements and trying to take

care of his own flock at his own church and his personal

life -- found time to go to a seminar that he had absolutely

no idea what it was about. I submit to you, ladies and

gentlemen, that's not a truthful statement.

He and Mrs. Jinwright were thinking about taxes.

They knew what this was about. They went to meet with

Tiera-El and Company so they could figure out if they would

be eligible to get $160,000 in false and fraudulent tax

refunds.

Mr. Jinwright said, well, about a week after they went to this meeting they got cold feet and they called Ms. Tiera-El up and they said, "No, don't file those documents on our behalf.  We don't really want -- want to get involved in this and we don't want you to do it."

The only evidence to support that in this courtroom is the testimony of Anthony Jinwright.  Because a couple of things happened.  If you recall Mr. Jinwright's testimony, and I asked him specifically, "Did you get cold feet after you learned a couple weeks after you visited with Ms. Tiari-El in February, did you cold feet when you heard and when you and read the newspapers about the search warrants that were executed by the Internal Revenue Service at the business premises of Tiari-El and Company?"

"Well, Mr. Brown, I heard about those search warrants but we had already decided to get out of this before this happened."

You're the judges of the credibility on that.  The fact of the matter he never went and talked -- they never -- I say "he."  They went to that seminar, Mr. and Mrs. Jinwright went to that seminar with Tiari-El and Company.  They never talked to their return preparer, Mr. Lancaster, about this before they went, after they went, at all.

1          They didn't call him up and say, "Terry, we have

2     been doing business with you ten or 15 years now.  We have

3     just been to a seminar where they tell us that there is this

4     program for indigenous people that entitles us to $160,000

5     of tax refunds.  What do you think, Terry?"

6          Of course, they didn't call Terry Lancaster and

7     ask him that because he'd have said, "That's a fraud.

8     That's a scam.  If you're involved in it, you can go to

9     jail."

10          They didn't call because let those things get

11     filed and wait to see if they get their tax refund.  Well,

12     the next notice they got from the IRS was not a tax refund;

13     almost two years later they get letter from the IRS that

14     says, "You all filed a fraudulent tax return with us and

15     we're going to give you an opportunity to get out from under

16     this mess that you're in."

17          And sure, by then they knew search warrants had

18     been executed.  By then there were public reports of

19     Tiari-El and Company being put out of business.  In fact, by

20     then Tiari-El and Company had been indicted in a publicly

21     filed indictment.

22          They signed those forms and sent them back to the

23     IRS.  They probably held their breath and said, "Gee, I hope

24     they don't call us about that stuff again."

25          But you know what they also didn't do?  They

1  didn't call Terry Lancaster.  They didn't say, "Terry, we

2  got involved in something here.  What do you think, what's

3  your advice?"  They were just hoping it went away, and

4  that's where they hoped it would stay until they found

5  themselves in the context of this case.

6          Now, one other thing it's important to talk to you

7  about; remember again the testimony of Mr. Jinwright.  I

8  asked him again on recross-examination, I said, "Are you

9  telling this jury" -- and you can see the check.  The first

10  story -- in fact, I want to back up a step.

11          The first story he told was, you know, they really

12  didn't even know anything about that.  These tax returns,

13  they seemed to have their name and address on it and their

14  Social Security numbers, but those weren't their signatures.

15  Those signatures were forged by somebody.  We don't know

16  anything about this.

17          Then we brought the check out.  They're like now

18  they had a problem.  He had to say he knew a little bit

19  about something.  Of course, it says right on there "1040X

20  Amended," and so he knew quite a bit about the something.

21          But when he took the stand, what he told you was,

22  "Yeah, again, we went to this meeting.  I wrote them a

23  check.  We were going to do it.  Then we got cold feet and

24  we bailed out."

25          And I said, "Well, Mr. Jinwright, are you telling

1    this the jury that after you called Tiari-El up and said,

2    'We don't want to file these,' that she went ahead and

3    forged your signature and Mrs. Jinwright's signature to

4    those tax returns and filed them anyway?"

5            "Yeah, that's -- those signatures are forged.  We

6    didn't authorize that.  We didn't approve it.  We were

7    already done with this mess and so I have no idea how those

8    got filed."

9            Then we brought out the power of attorney.  They

10   authorized Tiari-El and Company to file those tax returns on

11   their behalf.  They were seeking $160,000 in fraudulent

12   claims and they would have been successful except that the

13   whole scam came apart.  Tiari-El and Company ended up having

14   their premises searched and so the defendants didn't get

15   their tax returned.

16           But if you find that they were responsible for the

17   filing of those fraudulent -- false and fraudulent claims

18   for refund then you may find them guilty on that basis alone

19   on Count One of the indictment as well.

20           The fourth piece of evidence I want to talk to you

21   about pertaining only to the conspiracy count is the false

22   financial reports that were submitted to Greater Salem

23   Church.

24           Now, you heard testimony and you heard a lot of

25   questions about the fact that churches don't have to obtain

a tax-exempt status.  They are a charitable organization as
a matter of right and the IRS doesn't involve itself with
churches unless -- unless that church seeks tax-exempt
status and seeks to get the benefits and assumes the
responsibilities of becoming a 501(c)(3) tax-exempt
organization.  And that, at Mr. Jinwright's urging, is what
Greater Salem Church did finally in early 2004.

        Once they did that, however, the Internal Revenue
Service now has an interest in the church.  They have the
right to come in and audit and determine whether there is
private inurement or excessive compensation being paid.
They have the right to look at the financial records of the
church.  So it would be important to the Internal Revenue
Service whether the financial reports that are being
prepared at Greater Salem Church are truthful and accurate.
And we know they weren't.

        Darlene Perkins told you that in December of 2003,
even though Greater Salem Church was in financial disarray,
the financial report submitted to the Greater Salem Church
congregation showed that the church was operating in the
black.

        She told you that anybody on the budget committee
knew the church was in dire financial straits.  Who sat on
the budget committee?  Mr. and Mrs. Jinwright.

        She told you that anybody who sat on the Board of

1   Directors would have known the church was in financial

2   trouble.  Who sat on the Board of Directors?  Mr. and

3   Mrs. Jinwright.

4          And they orchestrated the falsification of

5   financial reports to the congregation of Greater Salem

6   Church to conceal from their own parishioners the fact that

7   they were taking all this money out of the church and, at

8   least in part as a result of that, the church was in

9   financial disarray.

10         As Mr. Jinwright said at one point to someone, "If

11  we tell them the truth, they will stop giving."  So he and

12  Mrs. Jinwright, including Darlene Perkins for 2003,

13  Mrs. Jinwright specifically manipulated the financial data

14  on the report, either reduced amount of expenses or

15  improperly increase the amount of income to falsify the

16  information presented to the congregation for that year for

17  the purpose of deceiving the congregation.  But the

18  corollary to what they did is that false financial data

19  would also impede the Internal Revenue Service in fulfilling

20  its lawful functions.

21         Mr. Adesegha said he came on in 2004.  When he

22  came on in October, his word was the church was bankrupt.

23  He told the Board of Directors, "The church is insolvent."

24  Yet he saw the financial report submitted to the church

25  congregation.  He didn't go to that meeting because he

1    wasn't a member of the church; but he saw the report that

2    was submitted.  It wasn't the same one that he gave the

3    Board of Directors.  It wasn't the same one he discussed

4    with Mr. and Mrs. Jinwright.

5           His report showed the church was upside down in

6    the red.  The one that went to the congregation falsely said

7    the church was operating in the black.

8           He wasn't around for the 2005 report, but you can

9    see it up there.  By that time Travis Mauney was on board.

10   Mr. Mauney told him the same thing happened under his watch.

11   When he came in, the church was in financial crisis.  What

12   was the congregation told?  That they had a net operating

13   revenue.  And the reason was because Mr. and Mrs. Jinwright

14   didn't want the congregation to appreciate or to know how

15   far in the hole the church was in part, I submit to you,

16   because then the church might have taken some drastic steps

17   to curtail the amount of money they were receiving.  And as

18   Mr. Jinwright said, that would impede his standard of

19   living.  As Mrs. Jinwright said, she could make more money

20   on the outside if they were going to cut her salary.  And so

21   they lied to their own congregation.

22          Again, the corollary to that is they necessarily

23   also created false documents that impeded the Internal

24   Revenue Service.  And on the basis of those false documents

25   alone, you can find Mr. and Mrs. Jinwright guilty of Count

One of the indictment.

Let me now talk to you about the two remaining elements that are sort of common to the conspiracy, the evasion, and the false return charges, unreported income, the tax deficiency, and then willfulness.

Ms. Polk came into the courtroom and provided you with a summary which reflects that for every year charged in the indictment Mr. and Mrs. Jinwright had underreported income. I'm not going to go through all the numbers. We went through her subschedules.

What you would be able to see is as we did when she was on the stand that the bulk of the unreported income is attributable to Mr. Jinwright, but Mrs. Jinwright omitted her own income as well. That for each of those years there was a tax deficiency.

Remember, the amount of tax deficiency is not important. It's the fact that there is an additional tax due and owing for each of the years. That's an element of the evasion counts; you just walk across that bottom line on that schedule, you can see there's a tax deficiency.

But with respect to the false return charges, with respect to the conspiracy charge, and with the respect to the evasion charges, the first consideration is: Was there income which Mr. and Mrs. Jinwright earned and did not report on their tax returns?

1          Folks, we've spent a lot of time talking about

2    what is and isn't income in this courtroom.  Did you hear

3    the cross-examination of Ms. Polk when she was on the stand?

4    There was no serious challenge on any number on her

5    schedules.

6          Those schedules are based on the evidence in this

7    courtroom.  Those schedules reflect unreported income and

8    tax deficiencies.  There is no contrary evidence in this

9    courtroom.  So when my colleagues come up here and start to

10   talk with you, keep in mind that is the only evidence in

11   this courtroom about unreported income.  It is the only

12   evidence in this courtroom about tax deficiencies.

13          The time to challenge that one was when Ms. Polk

14   was on the stand.  It -- it was then, it is now

15   unchallenged.  So unless you find that Ms. Polk simply is

16   incredible and she made those numbers out of whole cloth,

17   that they are not based on the evidence as she told you,

18   then whether there was unreported income in this case is now

19   a conclusion, not a question.  And the tax deficiency as she

20   told you simply flows from that fact.

21          And that gives me an opportunity to remind you of

22   some of the Judge's instructions that he has already given

23   you.

24          The evidence in this case, folks, is the testimony

25   from the witnesses who took the stand.  It is documents we

1    have shown you throughout this trial.  What is not evidence,

2    however, as the Judge has already told you -- he gets to

3    give you the law.  In other words, whatever we argue to you

4    now about what we think the law is, it ought to at this

5    point in time be consistent with what the Judge has already

6    said; because if it isn't, I'm sure he will correct our

7    misstatements.  And you will be bound by what he says, not

8    what we -- not what we say.

9         But the other instructions I want you to remember

10   that the Judge provided is that, again, the evidence in this

11   case are the documents and the testimony.  It's not the

12   argument of us lawyers.  It's not the questions of us

13   lawyers, you know, where the answers seems to be built into

14   the question.  That isn't the evidence.  It's what the

15   witness says in response to the question.

16        And so, in terms of whether there was unreported

17   income in this case and whether love offerings constitute

18   income and whether there's spiritual value from the speaking

19   engagements that Mr. and Mrs. Jinwright went to, those are

20   all good questions.  But the evidence in this courtroom came

21   from Ms. Polk's summary that's also income.

22        Let me talk to you about the unreported income in

23   this case.

24        There are really three categories of unreported

25   income.  There are the payments from the employer to the

1    employee; that is, all the money that Mr. and Mrs. Jinwright

2    received from Greater Salem Church.

3         There is the income which might be excluded or

4    deducted but for the failure to comply with regulations.  In

5    other words, as you've heard, you may be able to exclude

6    certain travel payments, you may be able to exclude or

7    deduct certain business expenses; but you don't get to

8    exclude or deduct those just because you want to.  You have

9    to substantiate them.

10        In other words, those payments, just like a

11   salary, are income unless the rules are met; in which case,

12   they can be excluded from income or deducted from income.

13   But you start with the premise that they are income.

14        And what has been the repeated theme in this

15   courtroom?  No substantiation.  Perkins told you that.

16   Joyner told you that with a couple of exceptions; and I will

17   tell you that those exceptions that she told you about are a

18   couple of checks to Mrs. Jinwright from the Women of Faith

19   checking account, Ms. Polk took those out of her summary

20   schedule.

21        So there is no evidence, there is no amount of

22   income in Ms. Polk's schedule based on her testimony for

23   which there is any substantiation or discussion of

24   substantiation.  But every payment that Mr. and

25   Mrs. Jinwright received for which there was no

1    substantiation is properly included in Ms. Polk's schedule;

2    and there been no other evidence of substantiation and there

3    is no evidence of substantiation in this courtroom.  And

4    again, the evidence is to the contrary.

5           Ms. Perkins, Mr. Adesegha, Mr. Gandy and others,

6    Mr. Mauney, all said that they never received any

7    substantiation for the so-called business-related expenses

8    that the defendants received.

9           The third categories of unreported income are the

10   fees for services rendered.  Those were the -- those were

11   the payments that we talked about at some length with

12   various members of various churches who came in here and

13   told you they had given an honorarium or love gift to

14   Mr. and Mrs. Jinwright.

15          Those are -- those are the ones I suppose I want

16   to talk to you for just a couple of minutes.  There were a

17   lot of questions again if you recall -- in fact, probably

18   after we called, oh, maybe ten back from the last witness we

19   brought in from the church, you all probably could have

20   recited by heart the questions Mr. Randall and I were going

21   to ask and then probably recited by heart the questions that

22   were going to get asked by our colleagues.  But with the

23   same colloquy every time.

24          But if you listened to the answers carefully you

25   heard a common theme from those church witnesses.  And

1    remember, you heard not just from accountants or CPAs or

2    bank examiners, you heard from witnesses with no formal

3    accounting training, you heard from fellow pastors, you

4    heard from members of the families of Mr. and

5    Mrs. Jinwright's spiritual family, like John McCullough.

6              There was a common theme in what they said.  They

7    all told you all payments were for speaking at spiritual

8    events.  They all told you that those were considered to be

9    love offerings to a man and woman of God because it's hard

10   to characterize a payment to a minister as income.

11             Thank you.

12             They also told you, however, that those were all

13   fees for services rendered, and that all checks were in

14   their opinion income.  We saw Forms W-9 that were routinely

15   submitted by Mr. and Mrs. Jinwright.  We saw Forms 1099 that

16   was sometimes issued by the churches.  Those are examples of

17   the evidence that shows that Mr. and Mrs. Jinwright knew it

18   was income.

19             In fact, Mr. Jinwright said they always send out

20   Form W-9.  The only reason you send out Form W-9 is because

21   you anticipate receiving income.  And they received Forms

22   1099 because they received income.  But whether there was a

23   spiritual value to those speaking engagements is not an

24   issue before you.  Whether or not the people that gave them

25   that money intended it to be from the love of their heart is

1    not an issue; because, to a witness, every witness said two

2    things that are critical to your determination as to whether

3    that's income:  They were all fees for services rendered and

4    not one witness said, "We would have paid that money if the

5    defendants hadn't come to our church and spoken."

6              That tells you, without trying to minimize the

7    spiritual value of their participation in the spiritual

8    event, they got paid for doing their job.  And that's

9    income.

10             I intended to, but my time is slipping away.  I

11   intended to go line-by-line through a number of these

12   witnesses; but again, you heard them all.  I submit to you

13   that if your recollection is different than mine, you should

14   rely on yours.

15             But I submit to you that there wasn't one person

16   who came in here who said, "We would have paid them this

17   gift if they hadn't spoken at our church."  It was a fee for

18   services rendered.

19             And the one thing I'll show you.  When we started

20   this, you all thought, "What in the world is he doing, that

21   kindergarten chicken scratch?"  Honorariums, love offerings,

22   love gifts are income.

23             And let's look at whose initials are on here real

24   quick.  We had Pastor Pierce, who came in and told you, "I

25   have always considered love gifts, love offerings and

honorariums to be income."

We had Pastor McCullough, spiritual son of Anthony Jinwright, who came in and said, "From 2001 forward I have understood that whether it's called an honorarium or a love offering or a love gift that it's income, which is why we issued Form 1099."

You had Mr. Dawson come in and tell you the same from an accounting perspective. It doesn't matter what the label you put on it; if it's a fee for services, it's income.

And we had Pastor Mickens come in and say, you know, "Was it intended to reward Mr. and Mrs. Jinwright for the spiritual value? Sure. Was it intended to be a gift? Absolutely. Were we gratified to have him come to our church? Surely. Would I have him back? Absolutely. Did I consider it income? Of course I did."

"Weren't you confused about that, Pastor Mickens?" He wasn't confused for 20 years, he told you. His board was not a rubber stamp. They set compensation guidelines for his church of how much they would pay outside speakers. And said, "We have been doing it that way for 20 years. This isn't confusing. Just because we want it to be a gift doesn't mean the government doesn't think it's income, and so we issued 1099s."

Even Mr. Jinwright -- even Mr. Jinwright, as much

1    as he wanted to talk about all the confusion, when he was

2    forced to recognize that his own church was issuing 1099s

3    back in 2001 that he was receiving 1099s from his spiritual

4    son, Mr. McCullough, when he said he was receiving 1099s

5    from his spiritual father, Mr. Dennis, had to say, "Well, as

6    some point I was somewhat less confused, yes."

7         Let me tell you what I think this case is really

8    all about.  This is -- the case is not really about whether

9    this was unreported income.  That's clear from Ms. Polk's

10   schedule, which is unchallenged.  It's not about whether

11   they were receiving income for going -- Mr. and

12   Mrs. Jinwright were receiving income for going out on

13   speaking engagements.  Despite the fact that they want you

14   to believe that this was somehow a confusing issue, it

15   really isn't.  And again, Ms. Polk's schedule demonstrates

16   that that is reportable income which the defendants failed.

17        What this case boils down to, folks, I submit to

18   you after four weeks, is one issue:  Willfulness.  Did

19   Mr. and Mrs. Jinwright knowingly and voluntarily omit income

20   which they knew they had the obligation to report on their

21   tax returns?  Did they omit that from those tax returns with

22   the intent to evade their taxes?  And we submit to you that

23   they did, and the evidence that they knew they had an

24   obligation to report more than they did came from an variety

25   of sources.  Let me quickly go through them.

We provided you with an expenditures analysis. If you recall the summary sheet that we did, it showed that Mr. and Mrs. Jinwright were consistently spending far more amounts of money than they put on their tax returns. It's not even just a matter of common sense. It's just one of those physical facts of life. You can't spend more, folks, than you've got.

They were putting on their tax returns the amounts reflected on that chart but they were spending the amounts reflected on that chart as well. That told them that their tax returns were false. It would be one thing, ladies and gentlemen, if Mr. and Mrs. Jinwright were living hand-to-mouth, if they were just struggling to put food on the table, then maybe -- and if we were talking about a couple of thousand dollars in omitted income, then maybe there would some rationality to the claim that, "We just didn't know that all this income didn't get reported. We just assumed our return preparer was taking care of all this."

Folks, they weren't living hand-to-mouth. They were living high on the hog. They were buying luxury cars. They were living in the fast lane. They were living in the big houses. In fact, they have two big houses on Lake Norman, as hard as that was to get that out of Mr. Jinwright on the first night of his testimony. Two houses on Lake

Norman.

They knew you can't live like that on the income that they were reporting. And that's why we introduced that evidence, folks. That evidence wasn't introduced to embarrass Mr. and Mrs. Jinwright. The government has no concern at all about how much money they make or how they live their lives. The United States has a right, however, that they pay their taxes; and when you're living like this and looking at their tax returns, they knew those tax returns were false.

Do you remember we also introduced their deposit analysis that showed that they were depositing more than $7 million into their bank accounts. So they have firsthand knowledge of what's going into that bank account, and yet they reported around $3 million, I think it was, over that period of time.

Jim Walsh, I think it was, a retired FBI agent, came in here and what he told you is, "Well, I've looked at these real hard, Mr. Brown, and I have found that you guys didn't completely do all your numbers right. There's about $650,000 that Agent Walsh would say were transfers.

But did you hear Agent Walsh? Agent Walsh said he realized that a deposit analysis can show you or at least provide an inference of unreported income. Similarly, an expenditures analysis; if you're spending more than you got,

1  spending more than you report, that puts you on notice

2  you're -- if you deposited more in your account than you

3  reported on your tax return, that's evidence of unreported

4  income.

5      What Agent Walsh candidly said was that at the end

6  of day, based on my careful analysis of your deposit

7  analysis, Mr. Brown, the best I can do is reduce it by

8  $650,000.  If you remember -- I won't bother to show you --

9  it still left us with $3 million more in deposits than what

10  the defendants were putting on their tax returns.  That's

11  evidence they knew their tax returns were false.

12      Let me tell you very quickly about the direct

13  evidence of willfulness in this case.  Again, Judge Whitney

14  has already told you circumstantial proof is sufficient.

15  But sometimes, sometimes you wind up with a case where the

16  evidence is direct and forceful.

17      Donald Kellerman way back in 2001 told Mr. and

18  Mrs. Jinwright in that November of 2001 letter that they had

19  income which they were not reporting on their tax returns.

20  Do you remember Mr. Kellerman, one of the very first

21  witnesses we introduced in this trial?  He was only a

22  bookkeeper but he was smart enough and experienced enough to

23  know that Mr. and Mrs. Jinwright were receiving income which

24  they were not putting on their tax returns.

25      Now, he didn't call up the IRS and he didn't call

1  the U. S. Attorney's Office and say, "These folks aren't

2  reporting all of their income." He told them, "Put this

3  stuff on a 1099 and get it on your tax returns. It should

4  be on your W-2; but if you don' t get it on your W-2, if you

5  don't run it through payroll, at least get it on a 1099 and

6  get it on your tax return because this is all income." He

7  told them payment of their taxes was income; the payments of

8  their daughter's tuition was income; the payments of their

9  salaries was income; the payments on the leases of the

10  Mercedes was income; the payments of their car allowance was

11  income; the payments for their vacations were income.

12  Everything he identified he told them was income.

13       Which I guess is the explanation for why poor

14  Mr. Kellerman got beat up so badly when he came in here for

15  not being a CPA or an accountant, because he told them way

16  back in November of 2001, before the first year charged in

17  the indictment, that they had unreported income. He put

18  them on notice way back then, and so he took a -- he took a

19  pretty bad beating in this courtroom, folks.

20       Jacqueline Joyner-Jones came in here and testified

21  to you. Remember her? She was of the loyal servant who was

22  so willing and so adoring of them that she was willing to

23  forge her name to check after check after check for years.

24  She did it, she said, with a good conscience. Not because

25  she had any authority to do it from the Board of Directors.

Not because of she had any authorization from the membership
of the Greater Salem Church Women of Faith ministry.  Not
because anybody at the bank told her it was okay to put her
name on those checks without an appropriate signature card
on file.  She forged those checks, she told you, because
Mr. and Mrs. Jinwright asked her to.  They came to her and
they said, Cut me a check for whatever.  She never thought
any more about it.  It was their church; they were in
charge; and if they told her to do it, she was going to do
it.

Jacqueline Joyner told you that she routinely sent
out those letters with the Forms W-9 to both Mr. and Mrs.
Jinwright putting them both on notice that they were
receiving unreported income.

Jacqueline Joyner, who even testified that she
wrote that check for taxes for Mr. Jinwright even though
there was no money in the general operating account of the
church.  Mr. Jinwright came to her and said, "Well, there's
money in this pot.  The church is insolvent but I want my
taxes paid, so go ahead and write me the check out of this
account."  That's what she told you.  That's what she did.
There is the check.

What did Mr. Jinwright say about her?  Jacqueline
Joyner, good and faithful servant, was a liar.

Darlene Perkins.  Let me remind you of some of

these witnesses.

Darlene Perkins.  She is the lady that came in here, honorably served her country in the U.S. Air Force. She gets a ten percent disability payment and she got beat up about that.  She took care of the dying father of her ex-husband.  She took in her elderly mother and apparently got to share the Social Security benefits with her.  She has a disabled child, and so she apparently gets another government benefit.  Maybe those are the reasons that Darlene Perkins got so beat up here.

She was a member of the Greater Salem Church.  She got appointed to be the finance administrator.  She took over that job in July of 2003 and she quickly identified that Mr. and Mrs. Jinwright were receiving substantial amounts of income which they weren't reporting.  She told them both, "This should go on a W-2."

Mrs. Jinwright said, "Well, we don't do it that way."

She said, "Well, then you need a 1099."

"No, we don't want a 1099 either."

She told them repeatedly, "This is income."  She might have stayed there longer.  That was their responsibility, she said.  It should have been on a W-2, they should have gotten a 1099; but ultimately it was Mr. and Mrs. Jinwright's responsibility to report their own

1   income.

2           That didn't trouble Darlene Perkins whether they

3   did or didn't report their income, but something did.

4   Mr. and Mrs. Jinwright again sat on the budget committee

5   with Darlene and they knew the church was in financial

6   distress.  They sat on the Board of Directors and Darlene

7   Perkins reported to them that the church was in financial

8   distress.

9           They made Darlene Perkins when they -- they made

10  Darlene Perkins at least go to the December 2003

11  congregational meeting with a false and fraudulent financial

12  report which deceived the congregants of that church.  That

13  cut Darlene Perkins to her soul.  The next month, she left.

14          They accused her of stealing from the church.

15  Remember what they accused of her stealing?  The true

16  financial report.  Would that she could have produced that

17  for you.  She said she looked for it; because what was

18  produced to the congregation was false, and the one that she

19  produced was true and correct and showed the church was in

20  financial disarray.

21          But the corroborating evidence for her testimony

22  were all the financial records that we brought in here, all

23  of the Board of Directors meetings that say we've got a

24  financial crisis on our hands.  Yet Darlene Perkins said

25  when they got to the congregation in assembly, she sat there

1    and watched while the congregation, her fellow parishioners,

2    were lied to.  She couldn't take that anymore and she left.

3            She was followed by Nelson Adesegha, whose only

4    sin was, best I can tell, was he has an accent and comes

5    from Nigeria.  He surely cannot be faulted for doing the

6    best he could with unwilling bosses.

7            He told them early on, "You all are going to have

8    your cut your expenses."  Remember what happened to him?

9    Within two weeks he went to the first Board of Directors

10   meeting and said, "This church is bankrupt."

11           He got yelled at by Mr. Jinwright.  "You don't

12   tell the Board of Directors those kinds of things.  You tell

13   me and I'll decide whether the board even needs to know

14   about it."  That rubber-stamped board.

15           Well, Mr. Adesegha did his best to try to get

16   financial control of that church.  It couldn't be done

17   because when he recommended that Mr. and Mrs. Jinwright take

18   a salary cut, they laughed at him and said he was crazy.  He

19   said Mrs. Jinwright said, "There's no way I'm going to work

20   for less than the amount of money that I make."

21           They let the church go into financial ruin while

22   they continued to take money out of it.  And then what made

23   it worse, Mr. Adesegha said, "And you all need to report

24   this.  You need to get a 1099 for it.  Really, it needs to

25   go on the W-2."

1          Mrs. Jinwright said, "No, we're not sending it

2     over to payroll."  So he said, "Well, I'm going to issue

3     1099s; and by the way, I'm going to issue a 1099 for your

4     mother, Addie Porter."  Mr. Adesegha said there was friction

5     as a result of that.

6          Mr. Howze told you he saw the friction as a result

7     of that.  Well, that friction evolved until the following

8     year when Mr. Adesegha finally put his foot down and said,

9     "I don't care what you say, I'm issuing 1099s at the end of

10    this year to you two and I'm issuing one to Addie Porter."

11         He got fired.  He didn't get to issue any 1099s at

12    all.

13         Remember Regina Chiles?  Regina Chiles was a meek

14    and mild lady with 35 years of experience with Wachovia who

15    came in here and said that she sat on the Board of Directors

16    for the better part of four years, and she knew her church

17    was in financial disarray.  And yet, year after year, she

18    went to the meetings at the end of the year and she allowed

19    Mr. and Mrs. Jinwright to tell the congregation that the

20    church was in the black.

21         She did it year after year until the year when

22    things got so bad the Sheriff's Department came out to seize

23    the vans.  That's when the Board of Directors met

24    independent of Mr. and Mrs. Jinwright.  Because as Ms.

25    Chiles said, if they were there, nobody had the guts to say

1    anything to them.  They were a rubber stamp.  They weren't

2    allowed to speak.

3           Or, as Mr. Jinwright said, they were allowed to

4    discuss and recommend.  They could not decide.  This

5    decision-making body of the Greater Salem Church, according

6    to Mr. Jinwright and what he told the congregation, was only

7    allowed to discuss.  They couldn't decide.

8           So when it became clear to Ms. Chiles nothing was

9    going to change, the church was going to go further in the

10   hole and the congregation was going to be lied to year after

11   year after year, she said, her words were, "I was in

12   spiritual warfare.  I loved my pastors, I respected them

13   spiritually, but I can no longer stay in that church and

14   allow this to continue."  And so she just left.

15          She didn't resign.  She didn't tell anybody what

16   she was doing.  She just walked out of the door of the

17   church she had been part of for years and never went back.

18          Larry Gandy, the same thing.  When it became clear

19   to him that they wouldn't change, that they were going to

20   run that church into the ground for their own personal

21   inurement, and they were going to continue to lie to their

22   congregation year after year after year to conceal what they

23   were doing, when they were continuing to cheat the

24   government.  Despite the fact that, as Mr. Gandy said, they

25   had met with Robert Howze; they had been told, just like

1    Mr. Kellerman told them, they were told by Robert Howze,

2    "You've got all this income.  These love offerings, you're

3    calling them, that's income.  These anniversary gifts that

4    you're calling them, that's income.  This is all unreported

5    income."  Mr. Howze is telling them that in '04 and '05.

6    Three years after Mr. Kellerman's told them, a year after

7    Darlene Perkins has told them.

8          When it became clear to Mr. Gandy they were not

9    going to change, that they were going to continue to deceive

10   the congregation and cheat on their taxes, he left too.

11         People left because they knew too much and their

12   consciences finally forced them to do the right thing.

13         My time has just about expired here, folks.  I

14   want to leave you with two things before my colleagues come

15   up to speak.  I want to leave you with Robert Howze.

16         Robert Howze went out there and he did an audit

17   for two straight years.  All the very same things that

18   Donald Kellerman told them in 2001, Robert Howze -- who was

19   a CPA, who is a minister, and who is very knowledgeable

20   about the obligations of churches and ministers to report

21   their income -- he went out there as a ministry to help

22   Mr. and Mrs. Jinwright.  He went out there a second time to

23   help them.  He didn't go back.

24         You are the final arbiters of credibility.  But I

25   want you to remember the pain and the agony on Mr. Howze's

face.  You don't get to experience this very often in a tax
case, folks, I can tell you that.  But when I asked
Mr. Howze as the final question, "Mr. Howze, why didn't you
go back?"

        "I wasn't effective."

        "Why didn't you go back, Mr. Howze?"

        There was silence in the courtroom which was
deafening as he looked at me, and the pain in his face was,
"Oh, Mr. Brown, I don't want to answer you that question."
He tried not to answer it.  He tried to find a way to answer
it that wouldn't be completely untruthful, and he couldn't
even do that.

        He drank the water.  He looked at you.  He looked
up and finally just said, "They didn't have the will to get
it right."

        What he meant, folks, is they were going to
continue doing exactly what they had been doing from '01 to
'03 when he got there.  He was right.  What they continued
to do all the way to 2007, shortly before they were indicted
in this case.

        They didn't want to get it right.

        Yet what did Mr. Jinwright say when he took the
witness stand?  He looked at Robert Howze.  He's a liar.
Mr. Jinwright in the course of his testimony called the
three gentlemen that came here from Hendrick, Mr. Johnson,

1  Mr. Howell, Mr. Gallagher, liars.  He called Jacqueline

2  Joyner, the woman who forged checks for them, a liar.

3  Darlene Perkins, a liar.  Larry Gandy, a liar.

4         Mr. Lancaster.  Mr. Lancaster said, "I had no

5  conversations with him at all about taxes.  None at all.  I

6  didn't talk to him about truing it up.  I didn't talk to him

7  at all about quarterly payments."  Mr. Lancaster is a liar.

8  Mr. Mauney is a liar.

9         But the last straw, folks, Robert Howze is a liar.

10        And so I submit to you this case is now easy.  You

11 don't have to spend hours pursing the evidence, looking at

12 the documents.  If you believe the testimony of Anthony

13 Jinwright that every one of those folks came into this

14 courtroom, looked you in the eye, put their hand on the

15 Bible and lied, then I submit to you, ladies and gentlemen,

16 you should acquit Mr. and Mrs. Jinwright and let's all go

17 home.

18        But if you believe that those people didn't lie,

19 that they came in here and they told you the truth,

20 sometimes as painful as it was, and Mr. Jinwright lied to

21 you, that's reason enough to convict.

22        THE COURT:  All right.  Ladies and gentlemen,

23 we're going to take lunch, but it's going to be a short

24 lunch, 30 minutes; and you will find lunch back in the jury

25 room for you, so you don't have the leave the jury room.

1    Obviously, all 13 of you will be together for the next 30

2    minutes; you still can't talk about the case.

3              So you've got oral argument and some final

4    instructions; and until all that's done, then you can start

5    discussing the case.  Enjoy your lunch we'll see you at

6    22 -- maybe it's 20 after, 28 minutes.  Let's have lunch.

7              (Jury leaves courtroom at 12:50 p.m.)

8              THE COURT:  Mr. Brown, you have 23 minutes

9    remaining.

10             MR. BROWN:  Thank you, sir.

11             THE COURT:  Who's starting?

12             MR. HINSON:  Mr. Tate.

13             THE COURT:  You all divide it up however you want,

14   and I'll just tell you when you are nearing the two-hour

15   limit.  Is that all right?

16             MR. HINSON:  Yes, sir.

17             THE COURT:  Okay.  Then I will see you at 1:20.

18             (Lunch recess taken.)

19             THE COURT:  Anything before we bring the jurors

20   in?

21             MR. BROWN:  No, Your Honor.

22             THE COURT:  Are they ready?

23             MR. TATE:  We're missing Mr. Jinwright.

24             THE COURT:  We'll just sit down then.

25             (Defendants now present.  Jury enters courtroom at

1       1:24 p.m.)

2                   THE COURT:  Mr. Tate.

3                   MR. TATE:  May it please the Court?  Counsel,

4       ladies and gentlemen of the jury.

5                   It's my honor and privilege to represent Pastor

6       Harriet Jinwright, a woman that was presumed not guilty and

7       is fact not guilty.

8                   Just about four weeks ago, Ms. Parrott, when she

9       gave her opening presentation, she was right when she said

10      that Pastor Harriet was here because she's the wife of the

11      Bishop.  She was right when she said that you would have to

12      consider the evidence against them separately.  So what that

13      means is, the importance of that is now is that they can't

14      convicted by just saying "they" and "them."

15                  You heard that a lot of times and I tried to stop

16      them every time they did it.  You can't convict they and

17      them, and saying they and them is not evidence.  I don't

18      care how many times you say "income," that's not evidence.

19      You've got to prove that.

20                  You know, we want to thank you on behalf of

21      Ms. Parrott and I, who have done the very best we could to

22      show you a true -- with the assistance of our staff who has

23      worked tirelessly to prepare this matter for trial.  But the

24      most important job in here is yours.

25                  I know some of you have had important positions in

your life, some not so important.  But today you are at this
time the most powerful people in this courtroom.  You have
the power, a power that you may never again see in your
lifetime, to stand in judgment of another human being.  Like
the defense attorney, you are the check and balance in our
system of jurisprudence; and after I get done walking
through the evidence with you, I'm confident that you will
check them by finding our client not guilty.

If this case were a towel, a wet towel wrung out,
every drop would read lifestyle.  Wrung out it could not
even spell the word "tax evasion," and wrung out ultimately
will have to read not guilty.  Now, I'm going to prove what
I just said.

Have they proven tax evasion?  As an attorney and
former investigator, I haven't seen a tax evasion case where
nothing was hidden.  Nothing was hidden.  Everything is wide
open here.  There's no double set of books.  You've even
seen in the Judge's instructions they talk about the type of
things you look for in tax evasion.  I ask you to look at
that during your deliberations and you won't find it here.

There were no double books.  No hidden accounts.
No accounts in nominee's names.  But most important is the
evidence that you saw which was the paper trail.

People evading taxes, folks, don't leave a paper
trail.  Tax evaders don't do that.  They don't write "Taxes"

on the check.  We haven't heard about sacks of cash or
anything hidden here.

It defies logic and common sense.  You don't
normally and willfully seek to evade taxes by leaving a
paper trail that's easily gathered up as they have done
here.  But as you watched this case hopefully you saw we
didn't call a lot of witnesses; we didn't have to.  We used
their own evidence to disprove their case with every witness
that they put on the stand.

They only called -- now this is a tax case.  They
only called three witnesses from the IRS; and all of the
witnesses that they called from the IRS didn't do anything.
They didn't investigate the case.  They couldn't tell you
anything about the case at all.  Let's talk about it.

Well, they focused on the Greater Salem records
and the records of contributions but they didn't talk about
the fact that, in their evidence, in the paper trail that
was left, showed donations to various churches that are also
contributions.  They didn't want to talk about the records
and ledgers held by Mr. -- What is it, Kellerman? -- back in
2001.

Well, what about all the other checks?  They
didn't talk about that because it proves the truth.

Now, who did they call from the IRS?  Mr. DePowell
was the first one.  You recall Mr. DePowell; he was a

1　gentleman early on in the trial.  An older gentleman who

2　came up here and said that he had worked in the records

3　center I believe for some 20 years.  He was not an IRS

4　agent.  All he really did was gather up records and bring

5　them in here from the IRS.

6　　　　　　What was interesting about what he said was is

7　that when you pressed him for information, he really didn't

8　know anything.

9　　　　　　That document that Mr. Brown showed you was one of

10　the first impeached documents in this case.  It had a

11　purported salary of the Bishop and Pastor Harriet on there;

12　but when I ask Mr. DePowell, who knew so much about the

13　records on direct, "What year does this document relate to?"

14　He couldn't tell you.  That tells you a truth.  He didn't

15　know anything more about this case than we did.

16　　　　　　Now, the 1040X, you would come to learn about --

17　more about that document as the trial progressed.  But you

18　remember it was Mr. DePowell that introduced that 1040X or

19　that amended return, that fraudulent amended return.

20　　　　　　I think I heard Mr. Brown say in his closing

21　argument that it was signed by them.  Well, look at that and

22　see if it was signed by them.  Pastor Harriet Jinwright

23　didn't sign that document, and not a single witness -- I'm

24　talking about the 501(c)(3) application -- not a single

25　witness that entered this courtroom said she signed that

document.  Not one.  But yet Mr. Brown -- that shows you how

easy it is -- said they signed it.

Well, we learned a lot about how that document got

submitted.  And it still isn't clear.  We know that it was

submitted by Robert Howze.  I'm going to come back to that

in a little bit.

Now, that 1040X they made such a big deal about,

we attacked it initially on the signatures.  But then if you

recall, Mr. Hinson introduced the record from the Judge here

that said that people who were involved with Tiari-El were

victims.  She was running a fraud scheme.  And our

investigator came in here -- just to show you how easy it

was -- to show you that the P. O. Box only there had no

connection whatsoever to the Jinwrights.  It went squarely

to the Tiari-El.

Surely, the government knew about that.  But in

desperation they put that document in anyway.  It tells you

a truth; what happened.

Do you remember Agent West that came in?  The

tall, good-looking guy that came in and testified for the

IRS?  Mr. West, according to his testimony, Agent West, was

brought in just some three weeks before this trial.  Why?

Why was he brought in at the last minute?  If you had been

investigating all these things for all these years, why is

it that he's coming in three weeks before the trial?  Well,

1    it shows what happened.

2          His haste to get it together resulted in fuzzy

3    math and really uninvestigated conclusions.  I spent some

4    time with him asking, "Well, how do you determine whether

5    this is a personal expenditure or a business expenditure?"

6    He couldn't.  Because all he did was look at records that

7    were compiled by somebody else.

8          Then we had Ms. Polk.  And I'm going to have to

9    correct Mr. Brown.  Ms. Polk's findings were indeed

10   challenged and challenged vigorously.  You remember we had

11   to bring her back the next day to talk about it.  So you can

12   listen to that, but remember what you saw on the witness

13   stand.

14         I asked her, I said, "Ma'am, the results" --

15   remember how she talked about she plugged some figures into

16   a computer and then the computer did all the -- all the work

17   and arrived at these astronomical figures that they now they

18   owe in taxes?

19         Well, we know all of the computers are not

20   infallible and neither is Ms. Polk.  Because I clearly

21   showed her some checks that you heard -- she said she was

22   here -- by the way, you remember she testified that she was

23   basing this on what she heard in the courtroom.  But every

24   time I asked her, "Well, who said that?"

25         "Well, my notes are at home."

1          More importantly, we showed her a series of

2  checks, one written by I believe it's Bishop McCullough.

3  That he cleared testified that if I issued a 1099, which he

4  did, it was in error because that was a gift.  His testimony

5  was unequivocal:  That church, Friendship Baptist, is not

6  her employer.  So I don't understand how they can say that

7  her testimony was not challenged.

8          But most importantly about Ms. Polk was that I

9  asked her, Ma'am, the results that you come up with are only

10  as good as the data you put in.  And if the data that you

11  put it is indeed wrong, the result is wrong.  You can trust

12  that fuzzy math if you want to but you'd be trusting it with

13  somebody's life.

14          We concede they've changed their numbers a couple

15  times during the course of this trial.  Sometimes after

16  cross-examination; most of the time, I would say.  But yet

17  they want to use those same kind of mathematical errors and

18  say somebody knowingly and willfully committed a criminal

19  violation.

20          Well, were their mistakes knowing and willful?

21  Were they criminal?  I don't think so.  But the same

22  standard should be applied to a defendant that's on trial.

23          After the end of the day, and I'll show it to you

24  later when I brought her back, I went through a series of

25  ledgers that she prepared.  He didn't show them in his

1    closing, I'm going to show them to you later, where it was

2    determined that Pastor Harriet, for several of those years,

3    claimed exactly what was filed on the 1099.  1099s that were

4    provided to the IRS were filed on her Schedule C.

5         I went through them and she had to say yes because

6    it was true.  It told the truth.  There was some mistakes

7    made; but remember, she was a W-2 employee so her salary is

8    on the W-2.  And you have to consider separately -- if you

9    believe that perhaps the returns were filed in error or

10   filed intentionally for a crime, you have to consider her

11   separately.

12        And I suggest to you the fact that she was a W-2

13   employee, her income was reported, several years when she

14   received 1099s they were reported properly on her Schedule

15   C, that suggests a person who did not have the prerequisite

16   mental status to commit a criminal tax evasion.

17        Mr. Brown made references to Agent Nixon but we

18   never heard from her.  Why?  He talked about her in closing,

19   what all she did.  Well, you didn't hear nothing about what

20   she did.  Why?  You've got to answer that perplexing

21   question before you find anybody guilty in this case.

22        Now, I'm going to come back to Ms. Polk.

23        I would say that when we began our defense case we

24   called Special Agent Walsh, retired, to the stand, and I

25   would suggest that he perhaps was the most credible witness

to enter this courtroom.

Mr. Walsh had worked with Mr. Brown he -- in the FBI, has analyzed financial documents. We reached out to him and said, "Can you take a look at this?" And after all the fuzzy math and writing on the Elmo and crossing things out, at the end of the day their figures, introduced through Rodg West, relied on by Ms. Polk, turned out to be in error by some $652,000. That's more than the taxes they say they owe. That's all right. Now, back to Ms. Polk.

If those figures were wrong, if the figures from Darlene Perkins were not right -- she had to come back and correct her several times. Remember that? She had to come back the next day. If they are wrong, how can the results be right?

If you can tell a tree by the fruit it bears, then if the fruit is rotten then the tree is rotten at the core. I'm saying you cannot trust those figures, period. I don't know what the figures are at this point other than they can't be trusted.

They talked about these charts and summaries. And the Court has instructed you that they are only as good as what you recall. If you don't agree with them or can't reconcile them, you can freely disregard them and that's what I'm asking you to do. Based on everything that you've seen in this courtroom, what we do know is that last chart

1    he showed saying how much they deposited?  We know they had

2    those numbers scrambled up.  And then comparing them to tax

3    returns, that was comparing apples to oranges, folks, if you

4    haven't figured that out yet.

5         In a tax return you're not reporting what you get

6    in.  You're reporting your taxable income.  If it's nothing,

7    it's nothing.  If the accountant says the taxable income is

8    zero, it is zero.

9         The most glaring defect in that whole argument is

10   the fact that they don't discount the housing allowance,

11   which you should know by now is a tax -- nontaxable benefit

12   for the clergy.  That's the biggest hole in their argument.

13        Now, what else did Mr. Walsh say?  And I'm going

14   to have to correct Mr. Brown again, because maybe we're in

15   two different courtrooms, but I recall the last questions I

16   asked to retired Special Agent Walsh, "Is our inferences

17   evidence?"  His answer was unequivocal, "No."

18        I said, "Can you tell whether a transaction is a

19   taxable income based on looking at a check or a

20   transaction?"  His answer was an unequivocal, "No."

21        So all they have done here is given you a bunch of

22   fuzzy figures and math and point the finger and say "them"

23   and "they" and ask you to infer someone's guilty, but they

24   haven't proven it.  We're going to talk about what they have

25   proven in a minute.

1          I submit there's no evidence to the contrary that

2     Pastor Harriett didn't sign those returns to the best of her

3     knowledge and belief.  See, they keep talking about

4     certification; I want you to not pay so much attention to

5     what they are saying; pay attention to what they are not

6     saying.

7          Why did he skip that word, "best of her knowledge

8     and belief"?  He didn't talk about that.  He talked about

9     under penalties of perjury.  It doesn't say that.  Look at

10    them if you want to.  It says "best of their knowledge and

11    belief."  And you have no evidence to the contrary.  Since

12    she is presumed innocent under the law, they failed to prove

13    that, you must acquit her.

14         Another thing that was omitted if you recall was

15    when Agent West was testifying, I asked him about one of

16    those summaries.  That summary has since disappeared, but

17    there was a summary that he had and it showed tax paid zero.

18    I said, "Agent West, if you're summarizing the evidence, why

19    did you leave out a column with the taxable income?"

20         It's not so much what they say, it's what they

21    don't say.  It tells a truth.

22         Now, I haven't heard a scintilla of evidence in

23    this courtroom of a conspiracy to commit a crime against the

24    United States to defraud the Internal Revenue Service.

25    None.  Where is the criminal agreement?

1          Heard none against Bishop Anthony Jinwright.  He's

2   on trial.  He's my client's co-defendant.  Because they're

3   married, you've got a jury instruction just because they are

4   related, it doesn't mean they conspired.  Most of us don't

5   know what's going on day to day with our spouses anyway.

6   Talk to people you're working with more, you spend more time

7   with the people you work with.

8          So show me instead of tell me.  That's what you

9   ought to be asking.  They can't talk somebody into a guilt.

10  It requires proof.  And they haven't proven anything.  They

11  are putting in a lot of documents that do not create any

12  inference of guilt and that you can't tell nothing about the

13  transaction because it's all fact-based.

14         You haven't looked at anything but a check.  I

15  believe the evidence is sufficient that they relied on Terry

16  Lancaster, who did their taxes for a number of years.

17         Terry Lancaster is not, you know, somebody sitting

18  over at Rapid Tax.  This is a guy whose practice specializes

19  in the church and the ministry.  You would think that he

20  would be able to spot issues and advise and counsel his

21  clients; and he has, in fact, consulted with them about

22  their taxes.

23         He talked to them about the housing allowance, I

24  believe it was at one point, the taxability of that, and

25  that's what he did.  But at the end of the day, the very

1    last question I posed to Terry Lancaster was, "Sir, do you

2    see your signature on these tax returns?  Do you believe

3    those returns you signed were accurate?"  And his answer

4    was, "Yes."  Tells you the truth.  And that answer that was

5    left unchallenged by the government.

6            Now, let me go back to this 501(c)(3) application.

7    First of all, I think I said it earlier; if I didn't, I'm

8    going to say it again:  That Pastor Harriet had nothing to

9    do with that application.  There's been no evidence that she

10   did and she did not sign it.  But more importantly, it is

11   not something that you can consider as evidence.  You're

12   going to hear instruction or you should have heard it

13   already that says the defendants are not on trial for

14   anything not charged in the indictment.  It's not in there.

15           Now, let me -- we'll see if I'm telling the truth.

16   Before I do that, they also made a big deal with this

17   so-called taxability of Addie Porter, the woman -- Pastor

18   Harriet's elderly mother who worked as a seasonal employee

19   who in part-time was the testimony of Varnell Gray at a day

20   camp affiliated with the church.

21           She was not an employee of the church.  They

22   haven't shown where she should have received a W-2 from the

23   church.  She's not an employee.  But most importantly, even

24   if you wanted to consider that, you can't because it's not

25   in the indictment.

1          You're going to have a copy of this -- you're

2    going to have a copy of this in the jury room.  And when you

3    look at this, I want you to remember that instruction that

4    if it is not charged in the indictment you can't convict

5    them for that.  This is the first page.

6          It goes through various compensation the Bishop

7    and Pastor received.  It goes on to page 3.  I'm not going

8    to read this to you.  Then it goes into the tax payment

9    history which you heard all about.  Then it goes into

10   knowledge of unreported income.

11         Under knowledge, although Mr. Brown says there's

12   proof of that, he didn't charge it that way in the

13   indictment.  It's because his -- his -- it's because his

14   case changed; as the witnesses he put on and the evidence he

15   thought would come out started crumbling, his theory changed

16   and shifted.  But it's not in the indictment.  It's not

17   there.

18         They go on and talk about all the cars.  I told

19   you the case was about lifestyle.  They go ahead and put the

20   values of the cars.  Don't talk about the -- when you lease

21   a car, you're not -- you're not buying that at that value,

22   you're leasing a portion of it.  And they were at different

23   times.

24         They go on and talk about the various expenses.

25   You learned from the jury instructions that most of these,

1    if not all, are properly figured into the clergy's housing

2    allowance.

3           I don't see it.  Maybe they will show you it to

4    you when they get back up.  Something about the

5    victimization of GSC.  We're going to talk about that too.

6           Here we go, all the way through.  No mention of

7    Addie Porter.  No mention of the 501(c)(3) application; it's

8    not there.  If it's not there you can't consider it.  You

9    can consider it but you can't convict somebody of something

10   they are not charged with.

11          Mr. Brown suggested under Count One you could

12   convict them if you concluded that they conspired to keep

13   Addie Porter from getting a W-2.  You can convict them if

14   you agree that they signed the 501(c)(3) application.  I

15   don't have to worry about that.  It's not here.

16          This goes on to the mail fraud accounts.  You can

17   look at it.  Then they go on to Count One, conspiracy.  You

18   can see here nothing about Addie Porter, nothing about a

19   501(c)(3).  It's not there.

20          Why is he talking about it then?  Because he

21   doesn't have any other evidence to talk about.  Got to talk

22   about something.  Got to do more than throw figures out

23   there.

24          All they really proved at the end of the day is

25   that they lived well.  Apparently lived too well that

1    somebody didn't like it.  Little small church on the west

2    side driving them kind of cars, living in them kind of

3    houses.

4         Last time I checked, living well wasn't a crime.

5    You see it on television.  They've got Lifestyle of the Rich

6    and Famous.  They got cribs.  If living well was a crime,

7    the jails would be filled with people and pastors.  It's

8    just not a crime.

9         The evidence is that they were loved by their

10   congregation; and when they heard the word of God coming out

11   of their mouth, they felt that it was nothing too good for

12   them.  And that's their right.

13        You haven't heard one person come in here from

14   that church and say, "I'm a victim."  I asked Mother -- what

15   is it?  Mother Anderson, is it?  One of the ladies been

16   there some 38 years, I said, "Ma'am, do you need some third

17   party to come in and intervene and protect you all from the

18   Jinwrights?"  She said, "No."  At the end of the day she was

19   there when they were hired.  She said, "We hired them, we

20   can fire them."  That's their right.

21        People who don't like the church, they left.  From

22   my vantage point it was only a few.

23        Now, what was the evidence that you heard in this

24   case when it's wrung out?

25        They spent three weeks talking about what kind of

cars they drove, what kind of house they lived in, how much
money they were getting from the church. Well, then, you
mean to tell me that they who built the church, they who
bled, sweat and fought to maintain the church, they who gave
it art and culture and seasoned it and they are not supposed
to get nothing out of it lest it be a crime? I don't see
the crime.

Somewhere along the line the church went from
saving souls in a barn to become big business. Preaching
Jesus has become big business. They fly in jet planes
today. In their own jet planes. And then these preachers
on the west side are shocked. But does it make it a crime?
When the church got bigger, the practices of the old days
didn't go along with it.

So the question you have to ask is: Have they
been walking amongst us as imposters for some 30 years
preaching Jesus to bilk people in the name of the Lord?
Have they been doing that?

If so, I'm afraid that -- and I can't look into
their eyes and neither can you. And I was raised that when
a man or woman says they are of God they were called by God,
you don't question that because you can't tell. If they are
imposters, even if you believe that, I'm afraid that upon
His return, they are going to be some of those saying,
"Lord, Lord," he's going to say, "Depart from me. Your work

```
1    is an inequity because I know you not."
2            Scripture says that when He comes back He don't
3    come back with an olive branch.  The Book says He comes back
4    with a sword in His hand and it was dripping with blood.
5    Isaiah the prophet saw him treading the wine press alone,
6    and if you've ever seen a wine press, it's a big huge vat
7    that in the old days you wash your legs and feet and get in
8    and tread the grapes down unless your garments were soaked
9    with the juice of the grapes.
10           He saw Him treading the wine press alone.
11   Treading down the wicked and false prophets under His foot.
12   I wouldn't want to be in that shape because He intends to
13   destroy that kind of person.
14           That's a judgment by a Higher Being.  I can't make
15   that call and neither can you.  You shouldn't try to assess
16   that in determining whether they committed the crimes they
17   are charged with.
18           I want to show you an instruction that you should
19   follow -- in fact, you're required to follow.  And I want to
20   highlight some things on here; because everything that this
21   instruction says you can't do in his closing arguments
22   Mr. Brown said you could do.  So look at it.  Can everybody
23   see that?  It's an instruction.  If I have to hold it up, I
24   can.  I promise I didn't break anything.  (Laughter)
25           Let me do this, let me hold it here.
```

1          I want you to follow me here.  It says -- the

2    Judge instructed during the trial evidence was introduced

3    concerning the mortgage application, tax returns filed by

4    the defendants in the years outside the dates charged in the

5    indictment.  Additionally, you have heard and received

6    evidence regarding the internal business governance of

7    Greater Salem Church and/or Salem Baptist Church, including

8    the manner and presentation of its annual budgets --

9    remember that now -- to its congregation.  Its preparation

10   of budgets, its record makings and bookkeeping, the manner

11   in which it collected offerings, how it expends its funds as

12   well as evidence regarding how the church determines the

13   salaries of the -- of the -- of the pastors.

14          Then it goes on to say that:  "I hereby instruct

15   you that defendants are not on trial with respect to that

16   identified evidence introduced either through documents

17   and/or testimony, or for any other act -- "  I'm talking

18   about the Addie Porter, the 501(c)(3) application -- "any

19   other act, conduct or offenses not alleged," where?  "In the

20   indictment."  I didn't say it.  He said it.

21          "You may consider this evidence only for the

22   limited purposes:  Whether the defendants had the state of

23   mind or intent necessary to commit the crimes charged."

24          I want haven't heard any nexus or correlation

25   between any of that stuff.

1          Whether the defendants had a motive of opportunity

2   to commit a crime.  Charged where?  In the indictment.

3          Whether the defendants acted according to a plan

4   or preparation for the commission of crimes.  The word is

5   missing, but the word "crimes" should follow that.

6          And whether the defendants committed the acts he

7   or she is on trial for by accident or mistake.

8          Then he goes on to tell you:  Remember, this is

9   the only purpose for the identified evidence.  Even if you

10  find the defendants have committed the acts identified by

11  the evidence, this is not to be considered as evidence of

12  character to support an inference that the defendants

13  committed the acts charged in this case.

14          It's the law.  It's not argument.  It's the law.

15  I'm asking you to follow it.

16          Now, let me talk with you about some of the

17  witnesses that testified in this trial.  And if I offended

18  anyone, I apologize.  But I'm dealing with the life of a

19  human being.  And if a person gets on the stand and

20  testifies and I don't believe they are testifying

21  truthfully, it's my job to bring out the truth and that's

22  what I tried to do.

23          Let's start talking about I think it was

24  Kellerman, Mr. Kellerman from Chitwood & Chitwood.

25          Now, one, as far as I can recall, Mr. Kellerman

1    did not conduct what's called an audit.  Remember we

2    asked -- I believe it was Ms. Parrott asked Mr. Howze, "Can

3    a bookkeeper do an audit?"  He said, "No."

4              Now, what we do know about that time frame of 2001

5    Mr. Brown wants to relate it to some compliance with

6    501(c)(3).  Well, there wasn't even a 501(c)(3) yet, so what

7    were they complying with?  Mr. Chitwood or Mr. Kellerman at

8    the end of the day had to admit, just like the others, that

9    if they don't find anything wrong, there's nothing to sell

10   them.  They are always going to find something wrong;

11   because if there's nothing wrong, there's no products to

12   sell the church.  And, indeed, he sold them some products.

13             You have to look at their motives and the

14   purpose -- now, they're flashing these different documents

15   up, portions of certain documents.  But if you look at the

16   501(c)(3) application, then go over what Mr. Chitwood &

17   Chitwood wrote, most importantly, folks, it had absolutely

18   nothing to do with their personal taxes.  Couldn't put them

19   on notice if it wanted to.  And even if he tried, I'm very

20   sorry, but Mr. Kellerman just wasn't -- you know, he didn't

21   have the credentials.  He might have the knowledge.  I'm not

22   going to denigrate that.  But the bottom line, if you're

23   going around selling a product and you're telling the people

24   they ought to rely on you, you ought to be credentialed.

25             Mr. Howze, who they put some much stock in, agreed

with us.

Then we had Mrs. Perkins who only lasted a few months.  What we do know about her is that it appears she has a hard time following the chain of command.  That's evidenced by the fact that she apparently hasn't stayed on the job more than a year.  When Mr. Hinson pressed her, she always -- one time she had a heart attack but then she got out and didn't go back.  Another time she left for another reason.  And then she left the church because she didn't agree with the way it was run and so she should leave.  That was her right.

But when she left, she stole the documents from 2003.  And I say "steal" because it wasn't hers.  It belonged to the church.  And that's why, if you have been wondering, you haven't seen no records from 2003 because she took them.

Mr. Brown, they kept putting up something, a budget from 2005.  We had to point that out at one point.  Because they can't put up 2003 because she stole it.  She gave it to some guy and he ran off somewhere in 2005; she hadn't seen him.  You know, I'm not even going to swallow that garbage.  What does it have to do with tax evasion anyway?  Nothing.

It's to make you dislike the defendants so that you might find them guilty based on the dislike versus

evidence that they don't have.

Then we had Mr. Adesegha. Well, I'm not going to spend much time on Mr. Adesegha. He's clearly a person that has a subjective memory. Initially they were telling you how you should rely on Mr. Adesegha.

Mr. Adesegha turned out to be a complete fraud and con man. He sat right here on this witness stand. I said, "Sir, you say you did 500 personal tax and business returns. Have you ever been certified by the IRS?" And instead of answering the question he started coming up with what he was preparing for. Well, I said, "Hold on. We're not asking you what you're preparing for. Have you taken the exam?"

"Yes."

"Did you pass it?"

"Yes."

That was a lie. I'm gonna call it what it is. That was a lie.

It was a lie when he said he worked for -- that he did 500 personal tax returns. We pressed him on that, and then all of a sudden he waffled around and he, "Oh, I was just volunteering for friends and family."

The I pressed him a little more and he said he was an apprentice. Then that degree that nobody heard of, MGA.

See, he speaks good words. And even Mr. Mauney confirmed it; he thought he was a CPA. Bishop thought he

1    was a CPA because, if you recall, we finally learned out why

2    Mr. Howze left.

3           Why did he leave?  One, most important, they

4    weren't paying him no more.  Mr. Howze wasn't coming in and

5    they were posturing him like he doing some benevolent acts.

6    No, he's there because he's getting paid.  And when they met

7    him, he was selling his services.

8           But what came out was it was Mr. Adesegha that

9    said, "Fire Howze.  Bishop, you don't need him.  You got me.

10   I'm a CPA."  And he did.  And at the end of the day

11   Mr. Adesegha was not that.  They wrapped Mr. Adesegha around

12   the case and you ought to consider that.

13          Ms. Chiles, bless her heart, she came in here.

14   And I didn't have a problem with Ms. Hiles -- I mean Ms.

15   Chiles.

16          She goes to a church.  She didn't like the way it

17   was running.  She left.  Found her another church.  But what

18   she did say was that everything they did she approved.  She

19   was -- she was -- she was unwavering on that.  She approved

20   it.

21          She talked about love gifts.  She talked about her

22   intent and the intent of the congregation was that it was a

23   gift.  There's nothing to refute that.

24          Mr. Gandy, do you recall him?  He came.  Mr. Gandy

25   was instrumental in the church giving that leased Mercedes

as a gift.  He would stand up every Sunday and collect $3.

Do you recall that?  He testified to that.  He was on the

budget committee; he was on the board.  And at the end of

the day, "Mr. Gandy, did you approve the housing allowance?"

          "Yes."

          "Did you approve the travel allowance?"

          "Yes."

          "Did you approve the salary?"

          "Yes."

          "Was it after deliberation?"

          "Yes."

          Then we went to lunch and when we came back they

didn't have no more questions of Mr. Gandy.  Why?  Testimony

didn't go the way they thought it was going to go.  Tells

you a truth.

          Mr. Mauney came in.  Mr. Mauney, I don't have any

problem with Mr. Mauney but what he did confirm is that it

was no "they" and "them."  He said he never issued a travel

reimbursement for Pastor Harriet.

          They tried to get him to confirm that she had some

something to do with a -- a -- a bonus or -- or -- or a gift

or something for the Bishop.  Remember that $50,000 document

or check?  And then when we looked at the -- at the

requisition, because they had started doing requisitions by

then, he had to say he had never spoke to Pastor Harriet

1    either before doing it or after.

2         They kept saying "they approved it" and "them."

3    His conversations were with Pastor Joseph, if you recall.

4    He called it hearsay.  And it was.

5         Mrs. Joyner, best thing I can say about Jackie

6    Joyner is that she clearly was scared to testify.  And I

7    objected at one point because I thought that they were being

8    a little rough with her on the stand.  She, at the end of

9    the day, confirmed that the reimbursements that she wrote --

10   or that were forged -- during that, I suggest that she just

11   agreed with anything.  You look at those signatures; she

12   didn't sign all that stuff.

13        Unless she's an expert handwriting member, she

14   admitted that certain checks were presigned for expediency

15   and she couldn't remember which were which at this point.

16   She was scared to death.  But what she really said is that

17   Pastor Harriet always provided receipts.  In fact, I was

18   with her several times when she bought -- I know she bought

19   it.  She don't need to substantiate it, she was there.  The

20   church can pick anybody they want to substantiate it.

21   That's their right.

22        And we finally dispelled this notion that you

23   have -- remember how they were making a big deal about no

24   receipts?  He didn't mention that in his closing because we

25   dispelled that.  It don't require receipts, it's not in the

1    code.  It's substantiation.

2         Somebody saying, "Well, Kevin Tate, what about --

3    what about those love gifts and honorariums that they

4    received?"  Well, we're going to talk about that.

5         She didn't -- she didn't receive very many at all

6    anyway; and the year she did, for the most part she reported

7    them.  Don't mean that she knew she had to report them.  It

8    was a tax document, take it down to the accountant and let

9    him sort it out.  And that's what they did.

10        I believe it was during the testimony of -- what

11   was the man's name?  Was it a Reverend Sanders from Gaffney?

12   Remember an affable old man, a light-skinned man?  He came

13   in here early on.  Said he had been in the pulpit some 61

14   years.  Do you recall him?

15        And he came and explained to us the history of --

16   of love offerings and gifts.  He talked about how in the old

17   days he would -- he would -- they would bring him a ham or

18   bring him something else.

19        And I suspect -- we didn't ask him, we didn't want

20   to embarrass him.  We suspect that Reverend Sanders if asked

21   would say he's still getting love gifts, he's getting

22   anniversary gifts and all that.  We didn't want to ask him

23   that.  It's part of the fabric of the church.  And unless

24   the whole church community for all these years have said,

25   We're going to walk in the name of God to defraud the United

States Government's treasury, you would have to believe that to convict him.

It was during the testimony of Reverend Sanders that I -- I thought about my time as -- as a child when back at that time with my grandmother, she don't use big words like "convocation"; it was called revivals back then. Revivals would bo a couple days and you would be in there all night.

And I didn't want to go. But she would make me go because there was no opt-out provision. You had to go. And I recall how she would -- was on the mother board with making these peach pies, small fried pies and cakes that they would give to the pastor that was visiting to present to him and his family.

And then inevitably they would have a love offering, and the plate would be passed, and she would take a few coins she may have had out of her pocket, put it in, give me something to put in when the plate would go by, usually a couple nickels as I recall. And as the plate went by, even in the times we didn't have anything, she'd explain to me how you'd just pass your hand over the plate as you pass it by where you would, everybody was looking --

MR. BROWN: I'm sorry, Mr. Tate. This is all very interesting. I don't remember you testifying in this trial.

MR. TATE: My word are stinging. They hurt.

1   Because it tells the truth.

2           And people would be looking and pass your hand

3   over --

4           MR. BROWN:  At this time I'm going to object,

5   Judge.  I mean, since I've already offered him the

6   opportunity to withdraw his testimony.

7           THE COURT:  Testify from the evidence in the

8   record.

9           MR. TATE:  Now, let's see if I'm lying or telling

10  the truth about that.

11          The point I'm trying to make is this ain't just

12  started in 2000.  This is engrained.  This is part of the

13  fabric of the church, and Mr. Howze confirmed such.  Our

14  witness, do you remember Mr. Howze?  Where is he?  Do we

15  have that -- well, I'm not going to pull it out.  It's in

16  evidence.  I believe it's Defendant's Exhibit 6.

17          Mr. Howze on his website explains the history of

18  love offerings.  Explains how he has determined that they

19  can be legal.  If he hadn't determined that, and it's been

20  going on since the beginning of time, and we know that the

21  tax regulations are ever-evolving, then that means there

22  must be some confusion out there.

23          And I suspect that most of the pastors, the ones

24  that did come in, a lot of the old -- the old pastors, the

25  ones from a big church, they didn't come in themselves.

1    They sent the church accountant to come in now to say how

2    they are doing everything right.  They come in and use these

3    politically correct terms, like "for services rendered."

4    But what did the check say?  And the pastors that did come

5    in, what did they say?

6            I remember the testimony of Reverend Malone from

7    Florida.  He said that love offerings have been going on

8    forever.  He said that there have been some confusion.  He

9    said that when they didn't issue 1099s it was because they

10   were unaware.

11           I remember Arnetta from -- what's her last name?

12   Arnetta from AG ministries, she came in here.  She said very

13   straightforward, "This has been going on forever."  And I

14   asked, "So how in the world can somebody knowingly and

15   willfully attempt to evade taxes?"  First of all, they don't

16   hide it.  It's in checks.  If they wanted to hide it and

17   evade taxes, say, "Oh, well, give me a check.  Give me a

18   sack of cash."  Can't trace that.

19           We know that the IRS never conducted an audit of

20   them.  It went straight to the office in question.  Never

21   gave them a chance to correct anything.  And it's very

22   important for Pastor Harriet because one of the few 1099s --

23   first of all, when she got one, she reported it.  And the

24   times that she didn't, 2001, 2003, "Hey, it was kind of

25   gray.  They are calling it a love gift.  It's been this way

1    for the last -- as long as I have been living."

2          How is that knowingly and intentionally?  You saw

3    the instruction about mistake and accident.  You know, I

4    just don't believe that they have -- have shown that.

5          Let me show you a couple documents here.  Now,

6    they didn't show -- they showed you one but they didn't show

7    you these.  These were prepared, if you don't recall, these

8    were prepared by Ms. Polk as well.  When we called her back

9    to the stand I asked her about these.  And what it shows,

10   beginning in 2002, it shows that the IRS received no 1099s

11   for her.

12         Now, she got some checks; but I highlighted the

13   ones where the testimony was from the people that they were

14   intending to be gifts.  These other ones, you wouldn't issue

15   a 1099 anyway because they are under $600.  It's not proved

16   knowing and willful tax evasion.

17         2003.  Again, she's got $6,500 in 1099s reported.

18   One of them -- this is interesting because this is the one

19   Pastor McCullough testified the $500 was really supposed to

20   be a gift but she reported it anyway right there on her

21   Schedule C.  It's not knowing and willful tax evasion.

22         Now, there are some on here, and I don't want to

23   skip over those, but let me -- let me talk about that one

24   first.

25         Now, do you remember what I said about you had to

pay attention to who came in?  Well, Brentwood Baptist

Church, I believe that's the Reverend Ratliff down in

Houston, a megachurch.  And he sent his accountant.  He

didn't even show up.  And the accountant came in and said

the magic words.

But I said, "Sir, where is your 1099?  You have

been doing this all these years like you said, where is the

1099?"  Couldn't produce it.  Why?  Because it wasn't clear,

that's why.  At least in their mind; otherwise, they would

have done it.  You see New Beginnings $300, they wouldn't

report that.

And the ones that were filed shows that they were

taking these things to the accountant.  They were acting in

good faith, relying on the accountant to get it right, and

it shows that through this document.

2004, do you see there's a $1,000 check and she

reported $1,000.  There is some smaller ones her from

Greater Paradise.  Now I asked her to -- and Friendship.

And we know what Friendship was about.  That one was from

2004.  That was a gift.  That's what I showed Ms. Polk.

They should have took it off and they didn't.

Same with New Beginnings.  It was a gift to

Pastor.  It wasn't for services rendered.  Wasn't no

evidence that she spoke.  It wasn't her church.

Then we've got Carlos Malone.  We talked about

1    Reverend Malone already.  We talked about his personal

2    confusion.

3            Then Macedonia, we don't know what that was for.

4    There's no testimony on that and wouldn't file a 1099

5    anyway.

6            Let me stop there at Greater Paradise.  Remember

7    Elder Sean Bell was the pastor there and he didn't come

8    either.  He sent his accountant.  And I asked her very

9    straight forward, I said, "Ma'am, I asked you" -- because

10   you remember her?  She said magic words, services rendered.

11   She said, "We always issue a 1099."

12           I said, "Ma'am, I asked you specifically to search

13   your files for a 1099," and she didn't have one.  Why?

14   Because they weren't issuing them because it was a gray

15   area, it was not clear.  Of course, they are going in here

16   with the IRS sitting right there and say, "We all did it

17   right."

18           Now, 2005.  Union Baptist.  No discussion about

19   that.  That very clearly could be.  I don't recall

20   Elevation, so I won't comment on that.  Even if she did

21   leave that off, that could be a genuine mistake.  What we do

22   know is that none were reported to the IRS and she did not

23   report any on their Schedule C.

24           2006 tax return.  Remember now when you look at

25   this that she is a W-2 employee.  That means that her income

1    is already reported.  And as a clergy she didn't have to

2    have FICA taken out but she did.  That's not a tax evader.

3             A tax evader is going to take care -- going to

4    take advantage of every tax benefit that they can, then

5    cheat.  They're not going to forego some benefits in the

6    name of evasion of taxes.  That I suggest is circumstantial

7    evidence that it's no intent by Pastor Harriet Jinwright to

8    evade taxes.

9             But let's look at this.  They made a big deal

10   about 2006.  I made a note there; I think Mr. Brown said

11   they had 197,000 in unreported income.  Well, it wasn't

12   hers.  She got two 9s -- two 1099s, and she turned them in

13   to the accountant and it was figured into her Schedule C.

14   That's not tax evasion.

15            THE COURT:  Mr. Tate, you've used one hour.

16            MR. TATE:  Okay.  I'm almost finished.

17            Let's look at 2007.  As Mr. Malone, again, we know

18   what.  His thoughts are.  But again, the 1099 that was

19   received by the IRS was filed on her Schedule C.  That is

20   not tax evasion.

21            I don't want to eat up too much of Mr. Hinson's

22   time or preempt him.  I think I've just about said enough.

23   But If you consider the evidence in this case as a whole,

24   you heard a lot about the way the church was ran.  But

25   that's not your concern.  Those folks over at Greater Salem

1   Church don't need nobody, don't need you or nobody else, to

2   come in and protect them.  Those who want to leave have left

3   and those who want to stay are happy to be there.  And many

4   of them are in this courtroom today.  That shows you a

5   truth:  These folks, these beautiful people of God, are not

6   following around no criminals.  Mother Anderson was right

7   when she said that they could fire them, and they can.

8           This is the last opportunity you will have to hear

9   my voice.  I will not be allowed to address you again.

10  Mr. Hinson is going to come up and present his closing

11  arguments and Mr. Brown is getting ready as I speak.  But

12  when he's done, when he gets done saying things like "they"

13  and "them" -- and I ask you to pay careful attention to him.

14  And at the end of the day, when he's done talking, I ask

15  that you ask one question:  Did he prove that?

16          (Counsel draws on paper.)

17          MR. BROWN:  Unbelievable, Judge.  That's a

18  personal attestation, Your Honor.  I object.

19          THE COURT:  All right.  Thank you.

20          Ladies and gentlemen of the jury, we'll take a

21  ten-minute recess and we'll hear from Mr. Hinson.

22          (Jury leaves courtroom at 2:30 p.m.)

23          THE COURT:  It's written argument, isn't it?  I

24  mean, it might -- it might be.

25          MR. BROWN:  That's beyond written argument.

```
1    That's a personal attestation by Mr. Tate.  He's vouching

2    for the innocence of his client, then I'm going to put one

3    up there for the government and I'll hear him scream all the

4    way to Richmond.

5            MR. TATE:  He already did it.

6            THE COURT:  Well --

7            MR. TATE:  He wrote on that diagram.

8            THE COURT:  No, his wasn't Mr. Brown's initials

9    like yours are your initials.

10           MR. TATE:  Well, mine, I put my initials because I

11   wrote it.  He put other people's initials on it.

12           THE COURT:  Because they testified to it.

13           MR. BROWN:  As long as he's not going to object to

14   when I do it, Judge, I'm fine with his.

15           THE COURT:  It is -- I mean, it is not evidence

16   but it is argument.  But the initials come very close to

17   vouching, but it's not -- I'm just going to leave it because

18   the jurors know that it's Mr. Tate's initials.

19           Mr. Hinson, you have 56 minutes.

20           MR. HINSON:  Thank you.

21           THE COURT:  We'll be back at 2:40 p.m.

22           (Recess taken.)

23           THE COURT:  All right.  Anything before we bring

24   the jurors back in?

25           MR. BROWN:  No, sir.
```

1           THE COURT:  Mr. Hinson, do you want to come out

2   front?

3           All right.  Let's bring the jurors in.

4           (Jury enters courtroom at 2:42 p.m.)

5           THE COURT:  Mr. Hinson?

6           MR. HINSON:  Thank you, Your Honor.  May it please

7   the Court.  Members of the prosecution, ladies and gentlemen

8   of the jury.

9           It's been a long hard slide and we're about to the

10  end of it.  This is my one chance to talk to you; and as you

11  know Mr. Tate has taken up a little of my time so I'm going

12  to try to talk as fast as I can but I want to begin by

13  saying thank you.

14          We've worked hard.  You all have worked hard.

15  You've put in long hours.  You have been attentive, you've

16  been contientous, and I think I speak for all us in this

17  courtroom that we appreciate what you've done, the time

18  you've given.

19          You are the jury in this case and it's such an

20  important function, such an integral part of our

21  constitutional rights that when someone is accused of a

22  crime they are not taken before a magistrate or a king or a

23  judge or somebody like that, they go before a jury.  And you

24  fulfill that role and you've fulfilled it well and we

25  understand and respect your power of authority here.

1          You know, I grew up in a small town in South

2   Carolina and my grandfather ran a little country store out

3   in the country and he was full of a lot of wisdom.  He used

4   to say to me when I was a young man growing up, "Son, don't

5   talk to other people about their money and don't talk to

6   other people about their religious beliefs."  And I thought

7   about that and I thought, "Well, here I am."

8          So much of this trial is about other people's

9   money and it's about, you know, there's an undercurrent in

10  this thing about religion, how other people run their

11  churches, how other people feel about things, you know, what

12  their convictions are about such concepts of faith, seeds,

13  love seeds, so forth.  And I've got to talk to you about

14  some of that.

15         I want to start by saying it's important to me not

16  to offend you.  And if I do that, if I say something that

17  offends you or if I misstate the evidence in some way,

18  that's not what I'm trying to do here.  Hold that against me

19  and not against Bishop Jinwright.  I'm going to do my best;

20  and I'm going to do my best not to offend you but I have

21  some things I need to say.

22         Now, when we first began this thing, you all will

23  remember -- it's about a month ago now -- we got to get up

24  and we got about ten or 15 minutes to make what's called an

25  opening statement.  I made my opening statement and I told

1  you that it might be a while before I got to talk to you

2  again because, from what we were hearing, the government

3  might be at this a while.

4  Well, I think I fulfilled that promise to you.  I

5  think that it was a while.  And in saying what I said to you

6  at that time, I wanted to tell you what we expected to

7  happen and I don't think that we have been surprised by

8  much.

9  We told you that we did not expect to contest the

10 ultimate principle that Bishop Jinwright's taxes were not

11 well prepared, that they were not accurate in all respects,

12 that he owed some more taxes that -- probably a lot of

13 additional taxes.

14 Taxation of ministers, as hopefully you understand

15 now, is not quite as straightforward as taxation of the rest

16 of you.  They have things like housing allowance and other

17 things that factor in.

18 He did not attend to tax matters as he should have

19 and he's gotten on that witness stand -- even though he did

20 not have to, even though it was his constitutional right not

21 to, he's gotten on that witness stand, and he's admitted to

22 you that he did not attend to his taxes as he should.  And

23 he says to you that he wants to remedy that; he wants to

24 understand and pay the taxes that he owes.  Everything he's

25 got is for sale.

1          We told you that we expected a lot of this case to

2     be about Bishop Jinwright's lifestyle.  And you've probably

3     already heard enough about that and I probably don't need to

4     say a whole lot more.  But Judge Whitney has explained to

5     you that lifestyle is not at issue in this case, that that

6     is not the question.

7          You know A lot of us might look at the Pope of the

8     Catholic Church, who lives in the Vatican.  That's a nice

9     house.  He has to Popemobile.  His own jet.  You know, he's

10    got a lot.  He's got the most incredible and expensive art

11    collection in the world; and a lot of people would say that

12    should all be sold and given to the poor, you know, he

13    doesn't need to live so lavishly.

14         But that really is not, you know, the issue here.

15    There are a lot of prominent ministers in the United States

16    who live well.  And perhaps many of you believe ministers

17    should live more modestly but, you know, that's not the

18    government's business.

19         You know, Bishop Jinwright has gotten on the

20    witness stand and he's admitted that he was not always the

21    best steward of his church.  And as Mr. Tate said to you so

22    eloquently, questions about that are going to be judged in a

23    higher court.  It's really not for us to decide here.

24         You know, we -- we talk a lot about separation of

25    church and state in this country and it's usually the church

1    can't do this, the church can't do that -- can't put up a

2    cross here, can't have a manger scene there.

3            But it goes both ways, you know.  The church --

4    the government is supposed to stay out of the church.

5            So what are the -- what's the real question in

6    this case?  And I -- I think that lawyers are kind of

7    getting around to it.  The real question in this case for

8    Bishop Jinwright is did he knowingly and intentionally with

9    intent to defraud the government evade income tax and file

10   intentionally fraudulent tax returns, and did he seek to

11   defraud these financial institutions in his getting car

12   leases?  In essence, did he, understanding the law, did he

13   deliberately set about to knowingly break the law?

14   That's -- that's really the ultimate question.

15           You've heard a long description of what's at issue

16   here from the Judge and I ask you to take those instructions

17   and take them seriously.  I'm going to highlight a few of

18   them here in just a minute.

19           Well, how do you -- how did you decide?  You

20   remember when I talked to you at the very beginning, I said

21   what's going to be for you to decide is what's in his heart.

22   You know, how do we -- mortal as we are, with the inability

23   to see as God sees, you know, what's in somebody's heart --

24   how do we make that kind of discernment?  How do we make

25   that kind of decision?

1    Well, unfortunately I'm here to tell you it's your

2  job.

3    You know, as I said a minute ago, Mr. Brown is a

4  powerful man.  He has a lot of power at his disposal.  This

5  young lady over here is an IRS agent; they give her a gun

6  and a badge; she has a lot of power.  Judge Whitney is a

7  judge.  He has got a whole lot of power.

8    But in this situation the power is yours.  It's

9  really in your hands.  You are the ones who have

10  Bishop Jinwright in your hands at this point and you're the

11  ones that have to decide about this.

12    Now, how do you do it?  Well, I'm not going to

13  presume to tell you.  I'm not going to presume to answer

14  that question.  I'm just going to give you some suggestions.

15    One place is to go back to those instructions that

16  the Judge gave you.  And he talked for a good while, more

17  time than I have got left this afternoon, so I don't have

18  time to go over all those instructions.  I just ask you to

19  consider them very carefully as you work through this.

20    I want to highlight a few things I think it's

21  important for you to remember.

22    The first one is, as the Judge has told you

23  repeatedly, the burden is upon the government.  The burden

24  is upon the government.  The defendants do not have to prove

25  their innocence.  The government has to prove their guilt.

1          Now, how do they have to do that?  They have to do
2   it by proving all of these elements that the Judge went over
3   with you.  And you need to consider these elements carefully
4   one at a time.  If they fail on any element, then that's not
5   your problem.  That's their problem.  They didn't meet the
6   burden of proof, then you should find Bishop Jinwright or
7   Pastor Harriet not guilty as you consider each and every one
8   of these off offenses.
9          What is the burden?  Well, the burden, as the
10  Judge told you, is beyond a reasonable doubt.  And he said,
11  "I'm not going to try to define this any more for you; it's
12  a doubt based upon reason and common sense."
13         What we do know is it's the highest burden imposed
14  by the law.  Sometimes I've heard it described as if the
15  scales of justice are like this (indicating).  Somebody's
16  got to put them on the floor to prove beyond a reasonable
17  doubt.  So that's the standard.
18         The Judge went through all the elements in
19  painstaking detail.  You have to do that.  You have to go
20  through each element and consider each element and be
21  satisfied whether or not the government's has proved every
22  one of them and every one of them beyond a reasonable doubt.
23         Over and over again Judge Whitney talked about the
24  need for the government to prove that these actions were
25  knowingly and deliberately done.  There's a concept in the

1    law called mens rea.  That's a Latin term.  It has to do

2    with bad intent, evil intent, sometimes called felonious

3    intent.  It all gets back down to what was in his heart.

4           And you've, you've heard -- and I'm going to

5    highlight here in just a moment the pages I think you need

6    to pay careful attention to.  But when the Judge told you

7    about knowingly, he said they must show that he acted

8    voluntarily purposefully and not because of mistake or

9    accident.  Which is another way of saying, and he uses the

10   words, negligently, grossly negligent, carelessly.  You

11   know, that's not enough.

12          And you might say, well, he sure was careless

13   about the way he got his taxes done.  He sure was negligent

14   about the way he kinda got his taxes done.  But that doesn't

15   meet the standard.

16          Now, on all of these tax counts, Two through

17   Thirteen, charging evasion and fraudulent returns, there are

18   two critical points.  You know, many of us have heard this,

19   us lawyers are very fond of quoting it, you've heard it

20   probably before:  Ignorance is no excuse for the law.

21          Well, you know, there's an exception in a crime

22   tax prosecution.  Ignorance can be an excuse for a law.  And

23   why is that?

24          Well, there's a case that -- that is -- underlies

25   some of these instructions called *United States v. Cheek*

where the United States Supreme Court was considering a tax prosecution. What the Supreme Court said in reversing that criminal tax case is the proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws.

They also quoted and approved what was said in another case, and this is what was said: Congress did not intend a person by reason of a bona fide misunderstanding as to his liability for the tax, to his duty to make a return, or as to the adequacy of the records he maintained should become a criminal by his mere failure to measure up to the prescribed standards of conduct.

Now, I don't know whether that meant anything to you. But I think what the Court is trying to say is tax law is complicated and so people get the benefit -- the extra benefit of the doubt in a tax case.

And, you know, these -- these instructions are going to be sent back to you. I'm going to encourage you -- I don't have the time now because I need to make my points -- but go back and read pages 24 and 25 of Judge Whitney's jury instructions on this question. Because he addresses the issue of knowledge at some length; and he talks about, you know, what standard you're to use.

While I'm at it, he also at page 17, I think,

1  talks about gifts and how you're to determine whether or not

2  something is a gift.  And he talks about the intent of the

3  donor; there's another case that underlies that.

4          And gift is a complicated question.  You know,

5  most us think we understand what a gift is; but when it

6  comes to tax law, your ordinary understanding is out the

7  window.  You know, it's a -- it's a very technical

8  definition.

9          So, you know, you can ask the question is it

10  reasonable for people in making mistakes about gifts, you

11  know, to understand that complexity of the tax law?  Because

12  in essence what I think the Court is -- is telling you in

13  these instructions is that people have to understand the tax

14  law.  And if they are mistaken about it, you know, or if

15  they are careless about it, or if they are negligent about

16  it, then that doesn't make them criminals.

17          You know, that may mean that they owe some taxes

18  and some penalties.  It may mean that the government can

19  make out a fearsome civil case against them but it does not

20  make them criminals.

21          So I've tried to skip through these instructions

22  quickly because I have got little time.  But, you know,

23  you've got to look at these instructions and apply these

24  instructions to decide the ultimate question of what was in

25  the heart, what was motivating Bishop Jinwright.

I want to -- I want to just highlight for you --
you know, we have been at this for a month now.  And for me
to begin to talk about all the evidence in this case in the
time available to me is just a challenge I can't meet.  I'd
have to talk 90 miles an hour like that guy on the Federal
Express commercial, blah, blah, blah.  You wouldn't even
understand what I'm saying.

So what do we know?  Let's hit the high points.

You know, you can make fun of it but the truth is
Bishop Jinwright is a very, very busy man.  During this
entire period of time he was a very, very busy man.  You
know, he makes me tired just thinking about what he does,
all the things that he does.

You saw him on the witness stand.  And, you know,
Mr. Brown says, Well, he called people a liar.  Well, I
submit to you he was forced into an improper choice.  You
know, he was put in a position where he was asked a
question, "Well, if he said that would he be lying?"  You
know, you either have to say he's lying or what he says was
the truth.

Well, is that a fair construct?  I mean, in our
everyday lives, you know, we disagree with people.  We have
different memories, particularly if we're talking about
things that happened ten years ago or nine years ago, or, in
some cases in this case 14, 15 years ago.  You know, if you

1   disagree in the memory of what happened in the past, is the

2   other people lying?

3          Well, you know, there's another explanation.  You

4   know, he wasn't given the opportunity to say that.  Remember

5   he was forced into making a choice, either he's telling the

6   truth or he's lying.

7          Well, he said it a time or two.  He said he could

8   be mistaken.  You know, we could remember things

9   differently.  And you think about that for a minute.

10          The setup here is, well, if all these witnesses

11   are lying then, if that's what he says, then you should find

12   him guilty because he's lying.  Well, I submit to you that

13   as a practical matter, that's really not what he was saying.

14   He was saying, "I remember it differently."

15          You know, when you push me and shove me against

16   the wall -- and you saw how he reacted.  None of us would

17   like to have Mr. Brown cross-examine us for a day and a

18   half.  He is a tiger.  And Bishop Jinwright perhaps at times

19   got things confused.  One thing is clear: He's not real

20   clear to this day on tax principles.

21          But I submit to you he got up there when he didn't

22   have to, when the law protects him from having to do it and

23   he did the best he could.

24          What do we know about this man?  Well, we know he

25   graduated from high school down in Wilmington, North

1    Carolina.  While he was in school, he went to Bishop --

2    Pastor Sutton's church.  Do you remember Pastor Sutton?

3    What a nice gentleman.  And he -- and he had a conversion

4    experience when he was in high school.  And he -- he was

5    moved to participate in church services; and he participated

6    in Sutton's church services and played music.  And he also

7    worked part-time in a funeral home.

8           He was an ambitious, hard-working young man.  And

9    he had to -- he had to find a way to make a living.  He was

10   knowledgeable about mortuary science from the experience he

11   had, and so he went to school for a year in New York to

12   study mortuary science.

13          And the government wants to make that out that's

14   where he learned the tax law; you know, that's where he

15   studied the tax law, studied accounting.  I would submit to

16   you in 1974, you know, getting the training he needed for

17   all of the issues involved in mortuary science for one year,

18   how much of an education did he get about that?

19          Well, we know about -- about Pastor Sutton.  You

20   know, he came up here and he says, "I've known this man all

21   my life."  The government was nice enough to call him so

22   they could get into evidence that in 2001 and 2004

23   Bishop Jinwright was asked to go back to that little church

24   where he -- where he came out of and preach.  So he went all

25   the way down to Wilmington to preach.  And each time he

1    went, he got $300.

2          I mean, and that's -- and that's what -- we got

3    that man in here to establish that in 2001 and 2004 he got

4    $300 each time and he didn't pay taxes on it.

5          Well, what else did he tell you?  He says, "I know

6    this man.  He feeds people.  He pays their hospital bills

7    out of his pocket.  You know, he is a compassionate person

8    who takes care of people's needs out of his own pocket."

9          Now, you know, maybe -- maybe that's a -- maybe

10   that's a bad heart.  But I submit to you there's evidence

11   that's -- that's what kind of person you're dealing with.

12          The government called a lot of preachers and

13   teachers.  Remember that?  They flew them in here from all

14   over the dadgum country.  Imagine the expense involved in

15   doing that.  They flew people in here from Texas, New

16   Jersey, from Maryland, you know, I think Florida.

17          What does that tell you?  Well, Bishop Jinwright

18   was out preaching the Word all over the place.  He was

19   constantly going.  And you heard about some of these

20   revivals that went on for three, four nights.  You know, he

21   goes to some small town in South Carolina and preaches for

22   four nights.

23          Maybe he didn't keep very good records while he

24   was out there doing that.  Maybe he owes some taxes because

25   of it.  But is that criminal?

1          You know, they established through all these
2    witnesses that they called -- you know, sometimes I remember
3    the term "cloud witnesses."  Well, they called a cloud of
4    witnesses.  And what did those people tell you?  Well, they
5    said he's a very active and busy preacher; he's always on
6    the road.  When we ask him to come, he comes.  He brings an
7    inspirational message and we appreciate it, what he does.
8    We appreciate the message he brings.

9          The other thing I think came out of that was
10   there's still a lot of confusion, a lot of confusion about
11   this whole this issue of what's a love gift, what's income,
12   when do you get a 1099, when do you not get a 1099?  And
13   some of these people issued 1099s and some didn't.  You've
14   seen the evidence, some of these 1099s -- you know, the
15   1099s that came, many of them found their way to the tax
16   return.  But I submit to you there are plenty of them that
17   didn't send 1099s.

18         And was Bishop going around trying to make a list
19   to make sure he got them all?

20         You know, we know that Bishop Jinwright started in
21   this community.  He came back to Charlotte and he went to
22   work in a mortuary business.  You know, he felt this call to
23   the ministry and so he went to this college, Livingston
24   College, to study, to educate himself to be an educated
25   person, and he met his wife.  He got married.  Blessed with

a child.

          And he's called to this little rural small church
and he goes to work.  He and his wife, they roll up their
sleeves and they work hard.  And don't you know those were
some early tough years where there probably wasn't a whole
lot.  You know, probably didn't get paid a whole lot.
Probably weren't thinking about his retirement back at that
time.  And he built the church and worked hard in the
church.  And you heard about you know, the loyalty of a lot
of his parishioners.

          What else do we know?  We know -- this is
undisputed -- that he always paid somebody to prepare his
tax returns, you know, even when he was getting started out,
because taxes are not his specialty.  That's not what he
studied in seminary.  That's what he focuses on.  So he paid
a professional to prepare his taxes.

          We also know that while he was working to build
this church that he thought he should get more education.
And he didn't go to some Jake Leg Seminary; he went to the
Gordon-Conwell Theological Seminary where Billy Graham is on
the Board of Directors.  And he studied hard and got a
doctorate awarded to him.

          They asked him to be on their board and he was on
their board until this matter came up.  Then what did he
do -- this person, this evil man over here?  He resigned

quietly so that it'd bring no embarrassment to that fine seminary.

You know, when you think about all he had going on, he was leading his own church, running his own funeral business, and the other -- he had another line of work; and that was leading other pastors, organizing other pastors, organizing enrichment programs for them.  And -- and that was, you know, from the sounds of it, that's a big job.

And a lot of these pastors came in here and said, "He's somebody I can call on.  He's somebody I could look to."  And that was a time-consuming, busy activity that generated a whole set of different records.

We know that he led pastor convocations, assemblies.  We know that he led foreign mission trips.  He was busy.

We know he's been the generous man.  And I'm sorry if I offended people by putting some of these checks on; I thought you should see them.  You -- you -- the government put on checks for two or three weeks.  They never put any of those checks I put on, so I thought you should see a few of them.

You know, it all wasn't a one-way street with him. He gave back.  You know, when people asked, he gave.  He was solicited for gifts, and -- and for, you know, contributions and he gave.  And, of course, the government's going to say,

1  "Well, he got a tax deduction for that.  You shouldn't give

2  him any credit for that."

3         But you heard what he had to say.  You know, you

4  heard what some of those pastors had to say about that; that

5  he wanted respond to the call, to the need.

6         You know, you heard from Pastor Sutton about that.

7  You heard from Travant Richardson about that.  You know, I

8  heard from Travant Richardson and it was -- it -- it took me

9  a moment to compose myself and carry on the examination of

10 Travant Richardson.

11        There's a young man whose life -- who sits -- who

12 came into this courtroom in a nice suit and talked to you

13 about the business he's got going on, the fact that he's

14 married, he's got a family.  He's got it going on because

15 Bishop Jinwright took an interest in him.  Because

16 Bishop Jinwright took care with him.  How many more Travant

17 Richardsons are out there?  You've heard the suggestion that

18 there are others.  So people benefited from his generosity.

19        You heard some of them from the church.  And the

20 Judge will tell you you can consider character evidence.

21 You saw those people come in here; they didn't seem -- they

22 didn't act like they had been hoodwinked or deceived.

23        You know, Bishop Jinwright, the other thing the

24 government established is he is not savvy at tax planning.

25 You know, neither he nor his accountant with very smart

about the way things went. You know, you heard that getting

money from the church and then giving it back to the church

is not a tax advantaged transaction because you don't get a

dollar-for-dollar credit for the money you give back. You

get a chartable deduction when you give it back; it's income

when you get it.

And you saw the government didn't even try to

gloss this over. They might quarrel about how much they

gave to the church, but you saw those giving records. They

were the top givers. Bishop Jinwright was the top giver,

Pastor Harriet was the second top giver. They gave a lot of

money to this church. Bishop Jinwright said that he tithed

all the money that he got paid out on the road; and the

numbers he gave would suggest that that's true. You know,

whether he thought it was a gift or what he thought it was,

he was tithing it back to the church.

You know, we -- we -- he gave out of his pocket in

a nontax-deductible way. You've heard a little bit of talk

at some point about how you've got to give to a charitable

institution to be able to deduct -- deduct -- deduct the

gift? Well, you know, there were times he didn't think

about that. Somebody in his church was in a tough way and

he gave them a seed, he called it, a love seed out of his

pocket.

You know, A. L. Jinwright Ministries was set up as

a for-profit business.  That makes no sense.  That makes no

tax sense.  And we heard over and over again from the

government about, you know, you didn't follow the

technicalities.  You know, if you had done this, if you had

a qualified reimbursement plan, you could deduct this.  When

you use your car to go out to visit the sick or you use your

car to go out and, you know, represent Greater Salem Church

for an assembly or a convocation or something, you could

deduct that if you did it right.  But you didn't do it

right.  You didn't have a qualified plan.

And, you know, you can deduction your retirement.

Your retirement is excluded from income if you do it right.

Instead of getting the church to cut a check to you, if they

cut it straight to the retirement place, no income.  And so,

you know, things could have been done right and it would

have been nontaxable.

In fact, you know, if you had a qualified

scholarship program, you're gonna -- you've heard from the

Judge about scholarships.  And read through that.  Read

through it carefully.  Because I submit to you there's a way

to get a scholarship that would be -- that would not be

taxable.

Certainly the money could have been straight to

the daughter, it wouldn't have gone through Bishop's hands.

Nobody could argue it was taxable if it wasn't coming to him

and if it was a qualified scholarship program.  Somebody

could have gone to a little trouble.

Neither Bishop nor the church, despite whoever

consulted them, you know, got this kind of technical stuff

right.  But I submit to you that that does not make him a

criminal.  It may mean he owes some more tax.  It may that

he owes some penalties and interest.  But because of these

technical arcane IRS rules were not complied with, that does

not show an evil heart.

The other thing that bothers me here is that he

didn't get good tax advice.  I mean, whatever else you think

about Mr. Lancaster and what was going on there, you know,

Bishop Jinwright did not get good tax advice.

He went to DeWitt Foard and Company and he went to

Mr. Lancaster because he thought Mr. Lancaster was

knowledgeable about taxation matters involving ministers.

And how was that done?  You know, he -- he -- he

paid good money to have his tax returns prepared, his

business returns, his ministry returns, personal returns and

so forth.  And -- and I -- and I would submit to you it was

slipshod.  It was not carefully done.  Didn't get the

attention it should have.  And why?

You know, why would a -- if a man like this comes

to a professional, why would he not take the time and sit

down with him and go over this stuff?

1          You know, the government says he intentionally

2    withheld key information from his accountant, but I think

3    the evidence shows that he -- that the accountant totally

4    failed at any kind of -- you know, "Here's a questionnaire.

5    Fill this out.  What kind of income are you getting?  Do you

6    have a qualified reimbursement plan?  How's your retirement

7    handled?"  None of that.

8          You know, you heard the undisputed evidence from

9    Mr. Lancaster that they would for many years bring him a

10   sack full of stuff.  And I can imagine Pastor Harriet and

11   all she's doing, and running around like she does, that

12   that's about the way it happened.  That, you know they just

13   threw this stuff in a bag and carried it down to the

14   accountant and it was a mess.

15         And the accountant said, "I don't want this.  I

16   don't want to sort through this stuff.  I don't want to do

17   the work.  You organize it.  Here's a list of things you

18   want."  And there's not even a template; there's not even a

19   written out list of what the accountant wanted.  You'd think

20   there would be but there's not.

21         And how did Mr. Lancaster do the tax return?  He

22   didn't do it himself.  He got one of the underlings in his

23   office to it.  And that person input all the data.  And

24   then -- and then he would take the little summary sheet and

25   just do checks and Xs and he'd make the decisions without

even calling them.

And the government wants to say, "Well, Bishop Jinwright should have known when the Reverend Walker situation came up," because it was highly publicized that he had a problem.

And what did Bishop Jinwright say? He said, "I thought I was okay. I had a professional handling my work." Well, that professional was in town. He was in Charlotte. Certainly he saw the publicity related to Walker. Certainly he should have said, "Well, gosh, you know, there might be some issues here. We need to be a little more vigilant for the next year." And he wasn't.

Same pattern. You know, we get the form prepared, we get the tax return prepared, we give you the tax return. We don't even sit down with you and go over it. You know, just stop by the office, pick it up. It's got a little red sticker on it -- or a yellow sticker. You all have probably seen those things if you've ever had to sign anything. Little sticker, "Sign Here." And he signed it.

Now, maybe you can say, "Well, they were in too big a hurry; they should have taken their time; they should have made this man sit down with them and explain what's on these complicated tax returns and have all the schedules so they understand, make sure everything is on it."

But the evidence from accountant is he didn't do

1    that.  He just said here's -- you know, he didn't even meet

2    with them many of the years to talk at all.  He just, "Your

3    returns are prepared, sign here.  This is how much money you

4    owe."

5             You know, the Judge gave you an instruction about

6    how you can draw the inference that by signing that the

7    person had the knowledge of the content of the return; and

8    you can draw that inference, but he told you you don't have

9    to draw that inference.  Because somebody signed the return

10   you can draw the inference that they know what's in the

11   return but you don't have to draw that inference.

12            I submit to you that on the undisputed evidence in

13   this courtroom, the evidence is clear they didn't know what

14   was on the return because Lancaster didn't explain it to

15   them.  He didn't go over it with them.  He just put a

16   sticker on there and said, "Sign here."

17            So you don't have to make that assumption.  In

18   fact, you shouldn't make that assumption.  In fact, I would

19   submit to you that's a basis right there for not guilty

20   because he didn't know what was on the return.  I mean,

21   that's the -- that's the clear evidence in this case they

22   didn't know what was on the return.

23            And Mr. Lancaster, one of the questions I asked

24   him that's an important -- a real important question in this

25   case is, "Did you understand or believe that the Jinwrights

1    were relying upon you to get their returns right?"  And the

2    answer was, "Yes."

3            In these jury instruction you have what's called a

4    reliance defense.  The government's gonna say, well, you've

5    got to tell them everything to be able to give a reliance

6    defense.  Well, I submit to you they did tell them

7    everything.  They brought him a sack full of stuff.  They

8    brought him a sack full of stuff that the government later

9    got the same kind of sack full of stuff and just hounded

10   them in this case.

11           You know, they brought -- they said they took

12   their bank statements, their cancelled checks and so forth.

13   They took all that to their accountant.  And he didn't even

14   look at it.  He didn't even pay any attention to it.

15           You know, the questioning of Bishop Jinwright

16   started off about, "How close do you live to the lake?  You

17   live in a really fancy house out at the lake."  Like it's

18   some kind of offense for a guy like Bishop Jinwright to live

19   in a nice neighborhood out at the lake.

20           Well, you know, the times have changed.  A guy

21   like Bishop Jinwright can live in a nice neighborhood out at

22   the lake.  You ought to be incensed that somebody like

23   Mr. Lancaster would do the kind of job he did that he would

24   expose these people as he exposed them.  That he would take

25   good money to prepare their returns and do the kind of

sloppy job he did.

I want to talk about the mail fraud counts.  They
apply just to Bishop Jinwright.  Counts Fifteen through
Nineteen.  And they are all pretty much basically the same.

The allegation is that Bishop Jinwright used the
mail to defraud the financial institutions who provided the
money for these cars to be bought and leased to
Bishop Jinwright.  And you've heard and it's true that, you
know, the government doesn't have to prove anybody lost any
money for a felonious fraud crime to occur.  But the Judge
also told you that you can consider whether or not any money
was taken or defrauded.

You know, the fact that money is defrauded out of
somebody is a suggestion there was some fraud; and here the
evidence is clear no money was defrauded out of anybody.
The lease payments were made.  Most of these cars have been
turned in.  There may be one or two are still out there.
But the evidence is clear:  Nobody's lost a dime.

You know, does any of this make sense as a fraud
case?  As something that ought to be brought in here as
several counts of mail fraud, serious felonies?  Or was this
just a way to whipsaw Bishop Jinwright, claiming he said one
thing to the leasing company and another on his tax return?

Well, you heard the car people and I think you
understand where they're coming from, what their motives

are.  They want to lease cars.  And we didn't know how these

numbers got on these tax returns -- I mean on these -- on

these lease applications.  I mean, we say that he said it to

them; it must have come from Bishop Jinwright.

Well, you know, you saw that return that dealt

with the funeral business.

In the first block -- I invite you to go back and

look at it -- the first block deals with income.  And, you

know, their number was over $400,000 of, quote, "income" or

receipts; it's all in that block.  So the number has to come

down.

Well, who knows how that conversation went.  You

know, "How much do you make in your funeral business?"

"Well, we make about $4- or $500,000 a year."

"We talking about net income?  We talking about

gross income?  We talking about adjusted gross income?  What

are we talking about?"

Well, listen.  If the -- if the lenders need to

know the answer to that question -- to those questions, they

know how to do it.  People in the bank, they understand that

if you really want to know what somebody makes, if the

taxable income is important to you, just ask them for a copy

of the tax return.  They want to borrow money, they'll give

it to you; ask them for a copy of the W-2.

You know, if you've ever borrowed any money?

1    Maybe you've had to do that.  If those were important

2    issues, you know, "What is your taxable income?  That's how

3    we're deciding whether or not you're getting a car."  Well,

4    ask.  They didn't.

5           Why didn't they?  Because the man had good credit

6    because he'd been dealing with them for years, because it

7    was a matter of routine.  You heard how it was done.  In

8    some instances, like with his daughter, they took the car

9    out there and gave her the keys before they ever had any

10   papers signed.  Is that defrauding somebody to get a car?

11          The car business brings you the car, gives you the

12   keys, and says "We'll sign later"?  That's got the -- the

13   horse and the cart are not in the right sequence there.

14   That's what this -- all these cases, all these mail fraud

15   cases, are built on that kind of flimsy stuff.

16          You know, Mr. Brown wants to laser in on the

17   number.  They relied on that number.  Well, what was that

18   number?  I don't think it says -- I don't recall it saying.

19   If you look it -- it's up to you to remember the evidence

20   that it ever said taxable income.  And if it did say taxable

21   income, is that what Bishop Jinwright was thinking if

22   somebody asked him a question offhand?  He says, "I don't

23   remember how this happened."

24          "Well, you must be accusing these people of being

25   liars.  They're liars if you -- if you don't agree with

them."

Well, that's not what he was trying to say. He's trying to say, "I don't remember."

You know, the first lease we talked about was in 2001. It's 2010. That's nine years ago. And the -- and the -- and the car man came in here and said, "I remember that conversation we had nine years ago. I remember I wouldn't put that number on there."

Well, ask yourself, is that credible or is that somebody who's worried that maybe he didn't do something right himself? And I'm not accusing him of being a liar. I'm just saying that, you know, it's -- it's unlikely he remembered exactly how that number got on the return or how important it was.

And I'll tell you how important it was: It wasn't important. They wanted to lease cars. Banks wanted to lend money. You know, that -- that's part of the trouble that we got ourselves into in 2008, the banks did want to lend money. Shoveling it out of the door, shoveling it out to a lot of people, not paying much attention. But that's not the crime of mail fraud.

I don't have much time to talk about the government's case. But, you know, I was struck by Kellerman and Howze. You know, the government says to you, "Well, these people, they were reliable people; they were giving

good reliable advice." Well, let's examine that. What kind of reliable advice were they giving?

They got to this courtroom, this courtroom, and the two of them were still disagreeing about whether or not you could give a love gift -- whether a church can give a love gift to a pastor of the church that is excludable from income, that could be treated as a gift. Do you remember that?

Mr. Kellerman says you can't ever do that. If it's the church, if they are the employer, they cannot give a love gift. It will not be excluded from income.

What did Mr. Howze say? The expert, the CPA, the guy that Mr. Brown admired so much and had such pleasant conversations with before he got -- you know, before he got here testifying. What did he say?

He said, "Well, if you use my little -- my little envelope that says 'Given out of disinterested love and affection' and you take up that collection and give it straight to the preacher, you know, it's tax-free. It's a love gift." That's what he said in this courtroom.

After all the preparation, after meeting with the IRS, after knowing he's going to be on the witness stand, he comes in here and gives what I think the government would have to admit is bad advice according to them. You know, because as far as the government is concerned, everything is

taxable.  Every time you take a dollar out of one pocket and stick it in the other, it's taxable.  That's the government's view of the world.

A lot of these people that got on this witness stand weren't so sure about that; but one thing they were sure, of these people got a lot of power.  They can hurt you.  And so I better say, "Yes, sir, we always think about 1099s; whether we send them or not, we all understand 1099s."

And Mr. Brown had his note that he was so proud of, love gift, compensation, income.  And there were 47 people from churches that were called to the witness stand and three of them signed on to that.  Well, that's an interesting vote.

The government gets into the people who used to be on the board of the church, and they went this way.  Remember that?  You know, Ms. Chiles, very nice lady.  Ms. Chiles said, "We weren't fools.  We voted -- you know, we voted for these things.  We might not have liked them.  We might -- it might not have been a good idea, we probably shouldn't have done it, but we voted for all these things."

Mr. Gandy, you know, he was clueless.  You know, "We didn't know about this stuff."

Ms. Chiles and Mr. Gandy both agreed that Mr. Howze never sat down with them and went over that

1   management letter.  That management letter that Mr. Brown

2   kept calling a certified audit.  You know, he couldn't keep

3   straight what a management letter and a certified audit was.

4   Those are two different things we've heard.  But he called

5   them -- you know, he conflated them, put them together.

6          Ms. Chiles said, "I don't remember meeting with

7   that Howze guy."

8          Mr. Gandy said, "I don't remember meeting with

9   that Howze guy.

10         Mr. Howze said, "Oh, I sat down and went over this

11  at great length with the board with the Jinwrights there."

12         Well, is somebody lying?  I mean, if they're

13  disagreeing with each other?  Or maybe they are just

14  mistaken.  Or maybe when they get worked over and asked

15  about this stuff years later, you know, things get suggested

16  to them and they think about them and they say, "Oh, yeah.

17  We must have done that."

18         Ms. Chiles told you that they had this

19  confrontational meeting around Labor Day and the board met

20  without the Jinwrights.  Bishop Jinwright, you know, Let

21  them go meet.  You all go meet with each other.  You know,

22  don't worry about me dominating things.  You all go meet,

23  solve this problem.  You know, we -- we do have a problem

24  because the church is -- you know, people around here are

25  trying to repossess our air conditioner.  You all go meet.

And they met and they talked.  And Mr. Brown says those minutes indicate that they decided things, that they resolved things and so forth.

What did Ms. Chiles tell you?  She said, "We chickened out.  You know, we had a big meeting, we decided we were going to do all these things and confront Bishop with all this stuff; and when we saw him, we loved him, you know, we didn't.  We didn't."

What was Mr. Gandy all fired up about?  It was that 501(c)(3) thing.  And -- and, you know, does he -- does it add up in that 501(c)(3) story?  I mean, think about it a minute.

Mr. Howze, who says that he did a certified audit for the church, he put in that 501(c)(3) application that Pastor Harriet wasn't getting any money.  He had to know otherwise.  He was in there auditing, he says.

What was that all about?  I don't know.  I can't quite figure that out.

Howze admitted that he had somebody back in his office in Chicago putting together this 501(c)(3) application.  He was probably out on the road marketing his services to other churches, out trying to make a living.  He had somebody at his office talking to somebody in the Greater Salem office, we think that's Jenell Barnett that you never heard from, and the story is, well, she must, you

know, she -- Bishop would have to talk about how much he's making for his funeral home.

Well, maybe the question might have been asked, How much did the funeral home make?  Well, $4-, $500,000.  We didn't know how that change -- that exchange went on.

The one thing we do know is that Howze is the one who filled out that application.  Howze is the one who sent it in.  Howze is the one who made the representations to the IRS.  And maybe it is that Mr. Gandy had a discussion with Mr. Howze and was alarmed that Mr. Howze wasn't as alarmed as he was; because Mr. Howze, who then had this correspondence with the IRS, he never said, "Whoa, wait a minute.  Time out.  Got a problem here.  We might have given you wrong information."

You know, financial terms were thrown about so carelessly in this courtroom:  Management letters.  Certified audit.  Terms that are important to this case.  Compensation.  Gross income.  Net taxable income.  Gross revenue.  Net profits.  Those are all important tax terms that can be confusing.

You know, the Kingdom of God is not run on generally accepted accounting principles.  Thank goodness.  Because all of us might be in a whole lot of trouble if it was.

You know, if -- if -- if the ultimate judgment is

1   run on generally accepted accounting principles, we all

2   might be in trouble.  And, you know, if it's a crime to be

3   less than careful about your spending, if it's a crime to be

4   more optimistic about where the money is going to come from,

5   if it's a crime to think that money -- you know, God will

6   provide, then probably most of us need to be in jail.

7   Because in 2008 we all got our financial comeuppance.

8           There was a big financial institution in this town

9   that went under, basically got taken over by another big

10  financial institution because they were overextended.  And,

11  you know, probably the Congress of the United States needs

12  to be in jail because are they balancing the books?  You

13  know, are they spending more than they take in?

14          The government relied on Nelson Adesegha and

15  Darlene Perkins, and you've already heard some about them.

16          You've heard that Adesegha was a Muslim.  Well,

17  don't you remember that Adesegha is the guy who started

18  putting the housing allowance, auto allowance and the

19  retirement income on the W-2?  And Bishop Jinwright went

20  along with that.  You know, "Nelson, if that's what you

21  think needs to be done, do it."  That reform, that change

22  was made during Nelson Adesegha's time.

23          Mistakes.  You know, the government made a lot of

24  them, ladies and gentlemen of the jury.  And they are going

25  to tell you, "Well, they're not that important.  You know,

1   we fixed them, et cetera"  but think about that.

2          This man -- they -- they want to convict this man

3   of crimes for mistakes when they've got a couple of years to

4   get their case together and they come in this courtroom and

5   they are double-counting deposits, not taking out transfers

6   from one account to another.

7          You know, they've got -- they've got Darlene

8   Perkins -- or the lady that -- yeah, I think that's her

9   name -- who is doing their charts for them.  And she says

10  she is a disinterested witness.  She -- she doesn't have any

11  axe to grind.  But she comes in as a volunteer to work for

12  the government to prepare these charts that turned out to be

13  wrong; they had to come in and change them.

14         They made mistakes.  We all make mistakes.  Every

15  one of us makes mistakes.

16         And then the Tiari-El situation.  I'm running out

17  of time.  But think about the Tiari-El situation.  What does

18  it prove to you?  What it proves to you is when the

19  Jinwrights for one time in their lives hears from the United

20  States Government, from the IRS, "You have -- you've got a

21  problem."

22         Now, they told you that they went into that

23  Tiari-El situation and got snookered.  And a judge entered

24  an order that people like them got snookered.  We had to

25  bring that to your attention.  The government did not bring

1    to your attention.

2           What is going on there?  What is going on that the

3    government would not tell you about the fact that those

4    returns were withdrawn by the Jinwrights?  Well, I'll tell

5    you what's go on.  The Jinwrights, when they were confronted

6    by the IRS, the one time they are ever confronted by the

7    IRS, they obediently signed the forms and sent them back.

8           You know, when I was a kid growing up, I admired

9    cowboys.  I admired people like Marshal Matt Dillon.  You

10   know, they would -- they would make it clear that you --

11   that what the intent was.  They fired a warning shot.

12          Well, there wasn't any warning shot here.  This

13   went straight to criminal; never was in civil.

14          I've got so much to say and so little time to say

15   it.  How much time do I have left?

16          MR. DAVIS:  Five minutes.

17          MR. HINSON:  Five minutes.  All comes down to that

18   five minutes.

19          Well, members of the jury, you know, the economics

20   in Bishop Jinwright's world doesn't match up with the

21   Internal Revenue Code.  Anybody who's spent any time with

22   the Bible understands that.  Gifts are given freely,

23   undeserved gifts.  People get things that they don't

24   deserve.  And it's full of references like sowing seeds, and

25   you know them all.  Some of you on this jury know what I'm

talking about.

When those worlds collide, when the Internal Revenue Code that is filled with arcane language and so forth -- when those worlds collide, you know, there can be some mistakes made. You've heard a lot of testimony; you've got some difficult legal principles to apply, and if you're struggling and you don't know what to do, then the answer is clear: You have a reasonable doubt. Allow that reasonable doubt.

You know, it's -- it's -- there are plenty of reasons to give him the benefit of the doubt. One of the more propelling ones to me is a guy like Travant Richardson. You know, there are a lot of people out on the west side of Charlotte who need a leg up. They need somebody to be a minister to them. There are a lot of people all over Charlotte who need that; you know, in all parts of Charlotte. But especially people who come down here like Travant Richardson. Who comes out of a neighborhood where 95 percent of the people are in jail or dead, as he said. They need -- they need somebody who's got a positive approach; somebody to lead them.

If that's the kind of heart we're dealing with her, you know, you can consider his character. The Judge says you can consider his character. And so consider it, you know, and give him the benefit of the doubt. Tell the

1  government, "You know, you folks need to just collect the

2  taxes.  You can do that.  You can have a civil audit.  You,

3  know, you can assess penalties, interest, you know, you can

4  collect the money."

5          Goodness knows, the United States Government needs

6  the money, so collect the money.  Audit.  You know, they

7  have already done the audit.  That lady, she's an auditor

8  usually; she does civil cases.  Ms. Polk.  They've got the

9  audit, just collect the taxes.

10          That's what you ought to tell them:  Get this out

11  of here.  Just collect the taxes.  Impose some penalties if

12  you want, collect some interest.  But we're not convicting

13  them of any crime because that's not what's in their heart.

14          Thank you.

15          THE COURT:  Thank you, Mr. Hinson.  Ladies and

16  gentlemen do we need a break?  We continue?

17          All right.  Mr. Brown.

18          MR. BROWN:  I'm ready to go, Judge, but I thought

19  I saw some of the jurors answer your question in the

20  affirmative.

21          THE COURT:  Well, okay.  You do need a break.  All

22  right.  Can we limit it to a five-minute break?  Is that

23  enough?  Five minutes.

24          (Jury leaves courtroom at 3:37 p.m.)

25          THE COURT:  All right.  Let's take a five-minute

```
 1   recess.
 2               (Recess taken.)
 3               THE COURT:  All right.  Mr. Brown, are you ready?
 4   Mr. Randall?
 5               MR. BROWN:  Yes, sir.
 6               THE COURT:  Let's bring the jurors in.
 7               (Jury enters courtroom at 3:43 p.m.)
 8               THE COURT:  Mr. Brown.
 9               MR. BROWN:  Thank you, Judge.
10               Folks, I'm going to start off with a little
11   unfinished business here.  Remember Mr. Tate when he
12   finished up, where he ended up with his initials on that
13   piece of paper?  I want you to remember something else:  My
14   colleague, Mr. Hinson -- who is as tough as nails, we
15   haven't always agreed, we certainly fought during this
16   trial -- he didn't do that.
17               I can walk over here and I can put my initials on
18   that document too.  But that would be wrong.  That's not how
19   we do business in the United States government and good
20   lawyers don't practice that way.
21               Now, let me tell you a couple other things
22   Mr. Tate did.  He wanted to talk to you about Harriet
23   Jinwright's 1099s.  He wanted to tell you that most of her
24   income but not all of it, most of her income got reported
25   when she went out there on those speaking engagements.
```

1          But you know what he didn't do?  He didn't want to

2    talk about all the money she got from Greater Salem Church.

3    You know why?  Because she got almost $1 million from

4    Greater Salem Church.  He didn't want to talk about that.

5    He wanted to talk about the mistakes in the government's

6    evidence.

7          Here's the vicious attack that Mr. Tate laid on

8    poor Linda Polk.  At the end of her excruciating

9    cross-examination, she conceded there was about $442 worth

10   of errors in 2003, $4,000 worth of errors in 2004.

11          And if you remember, we didn't worry about whether

12   they were in the 35 percent tax bracket, we gave them

13   dollar-for-dollar those excruciating painful errors; and the

14   end result was that Mr. and Ms. Jinwright still had tax

15   liability of over $122,000, $147,000, $58,000, $117,000,

16   $157,000, almost $700,000 between Harriett and Anthony

17   Jinwright in taxes.  In taxes that they owed the United

18   States government.  And a big bunch of that belongs to

19   Harriett Jinwright.

20          Mr. Tate said where in the indictment, where in

21   the indictment is there any mention about not giving out

22   1099s to his family members?  All the conversations we had

23   about that in this courtroom.  Well, let me read it so

24   Mr. Tate can see it too.

25          It says in paragraph 23 on page 8 of the

1    indictment: "In addition, A. Jinwright" -- that would be

2    Mr. Jinwright -- "and H. Jinwright" -- that would be

3    Mrs. Jinwright -- "took affirmative steps to prevent the

4    issuance of Forms 1099 for themselves" -- which we've heard

5    repeatedly throughout this trial -- "and others as a means

6    of concealing the receipt of taxable income. In fact, when

7    a finance minister of Greater Salem Church insisted on

8    issuing a form 1099" -- that would be Mr. Adesegha, in case

9    you need reminding -- "over the strenuous objections of

10   Anthony Jinwright and Harriett Jinwright to reflect the

11   taxable income received by a family member" -- that would be

12   Addie Porter -- "Anthony Jinwright and Harriett Jinwright,

13   the finance minister was fired."

14          That's where it is in the indictment, folks. And

15   that's why on that paragraph alone you can convict both

16   Mrs. Jinwright and Mr. Jinwright on Count One of the

17   indictment.

18          We didn't hear, notwithstanding all of the

19   argument, we didn't hear again or yet any serious challenge

20   to the numbers that Ms. Polk provided, page 1 of the

21   evidence here. As a revenue agent of 35 years, what she

22   told you she did. She looked at the paper, she added up the

23   numbers and she came up with these tax liabilities. This

24   one document alone satisfies two of the elements of both the

25   false return charges and the tax evasion charges. That is,

both Mr. and Mrs. Jinwright, during the years charged in the
indictment, had unreported income as reflected on Ms. Polk's
schedule and they owed taxes.

So what I've said to you again, an awful lot of
time -- mostly yours -- and an awful lot of energy has been
wasted in this courtroom arguing about whether there was
unreported income, because at the end of the day, the
evidence established it without contradiction.

There was no defense expert who said those numbers
are wrong.  Mr. Walsh, all he could say is, with all due
respect to Mr. Walsh, "Well, maybe if you took out the
transfers, the amount of deposits in excess of reported
income would be lower."

"How much lower, Agent Walsh?"

"Well, there'd still be about $3 million worth of
unreported income based on the deposit analysis."  And he
didn't find any fault with the expenditures analysis.

Now, what we didn't hear through two hours of
argument from my colleagues is any discussion about the
false financial reports that were submitted year after year
after year after year to the Greater Salem Church
congregation.  As I told you in the opening portion of my
argument, that's important because once Greater Salem Church
became a 501(c)(3) organization, the Internal Revenue
Service had the right to require Greater Salem Church to

1   keep accurate books and records.  But they didn't.

2          And they didn't not because the congregation,

3   which loyally follows Mr. and Mrs. Jinwright to this day,

4   were falsifying the records, they didn't even know the

5   records were false.  The records were falsified because

6   Harriett Jinwright falsified them in '03 when Darlene

7   Perkins was the finance administrator; Anthony Jinwright

8   made them false in '04; and Harriett and Anthony Jinwright

9   made them false in '05.

10          We showed you the '05 budget repeatedly because

11  Travis Mauney came in here -- apparently not like

12  Mr. Adesegha with an accent and some baggage -- he came in

13  here and he said, "Yeah, the church has always been upside

14  down financially and yet the financial reports we always

15  gave to the congregation falsely stated that the church was

16  in the black."

17          Perkins, Adesegha and Mauney agreed on that fact.

18  And what they also agreed -- and, more importantly, what

19  Mr. Gandy and Ms. Chiles also agreed is the members of the

20  finance committee knew it, the members of the Board of

21  Directors knew it.

22          Who sat on the finance committee?  Harriet

23  Jinwright, and Anthony Jinwright.  Who sat on the Board of

24  Directors?  Harriet Jinwright, and Anthony Jinwright.  And

25  Harriet Jinwright, Anthony Jinwright, and the other people

1   that unknown to the grand jury but unnamed in the

2   indictment, you heard from them too.

3          Regina Chiles told you, "I knew every year that we

4   were lying to the congregation.  I knew every year that we

5   were providing false financial information to the

6   congregation.  I knew until the spiritual warfare in my

7   heart caused me to walk out of that church and not look

8   back."

9          Larry Gandy told you the same thing.  He thought

10   maybe he could salve his conscience if he just left the

11   Board of Directors.  He confronted Mr. and Mrs. Jinwright

12   with the obvious facts that they already knew.  He said he

13   didn't know it.  He confronted them with the fact that

14   Anthony Jinwright signed that false 501(c)(3) application

15   which falsely stated that Mrs. Jinwright didn't have any

16   income.

17          Now I want to correct something Mr. Hinson said.

18   Your recollection of the evidence controls.  But do you

19   remember Mr. Howze saying twice, and he said it to

20   Mr. Hinson, "I didn't send that 501(c)(3) application in.

21   My office prepared it.  We sent it back to the Greater Salem

22   Church.  Anthony Jinwright signed it.  Anthony Jinwright

23   sent that false document to the Internal Revenue Service

24   knowing it contained false information."

25          But Mr. Gandy didn't know about that 501(c)(3)

application; he got it from Mr. Howze in September 2004.
More importantly, Mr. Gandy didn't even know about the Howze
audit report.

Now, Mr. Hinson wants to quibble with whether
we're talking about the audit report or the financial
statements or the management letter.  If you look at the
management letter, the first line is:  As a result of our
audit we're giving you in plain English, folks, what we
found.

It is the thing that was designed to be a tool for
management to correct the deficiencies found by Mr. Howze's
audit report.  Not complicated financial information, not
CPA-speak, not lawyer talk in there.  It says here's what
we're finding.  You all are giving what you call gifts to
Mr. and Mrs. Jinwright.  That's illegal.  There's no such
thing as a gift from employer to an employee.  Stop it.  If
you're gonna do it, you'd better report it as income because
it is.

Mr. Gandy hadn't seen that management letter
before that audit came in.  And I submit to you folks the
reason why he didn't see it:  While Mr. Howze thought he was
meeting with the Board of Directors, if you remember, when I
asked him the last time, "Tell us who you met with," what he
said is, "Well, I know I met with Anthony Jinwright twice.
I know I met with Harriet Jinwright at least once.  I'm not

sure who else I met with.  I can't give you any other
names."

We know it wasn't Larry Gandy because he said he
didn't see the audit report.  He never met with Howze.  We
know it wasn't Regina Chiles.  She said she never saw the
audit report; she never met with Mr. Howze.  We know it was
not two other members of the Board of Directors, who were so
incensed when they saw the audit report they sent in letters
of resignation and would not even go to the meetings.

There are four members of the Board of Directors
who weren't there.  I submit to you what the evidence shows
is Mr. Jinwright, Mrs. Jinwright, their good friend Varnell
Gray -- who came in here and did everything in his power to
try to explain all of their missteps -- he was there,
because he produced the audit report to Mr. Gandy when he
asked for it.  He have didn't have call Howze to get it.  He
had a copy.  He was there.  And maybe Jenell Barnett.

Maybe those were the Board of Directors that
Mr. Howze thought he met with.  But regardless, the two
people he knew he met with were the defendants in this case.

Mr. Gandy was so incensed when he got the audit
report that he marched into that meeting with a letter of
resignation which laid out the factual findings that he had
just recently from the audit report, put those on the cover
sheet of his resignation letter, and said, "I will no longer

1    serve on this Board of Directors and you all on this Board
2    of Directors need to think about what you're doing because
3    we are liable for their misconduct."
4          Now, Mr. Gandy told you, his family was plugged
5    in.  He had salved his conscience; he had washed his hands.
6    And like Pontius Pilate, he was going to leave the Board of
7    Directors and what they did after that was up to them.  But
8    he was going to stay in the church.  But he didn't make it
9    any further than the sanctuary on Sunday morning when, just
10   like Ms. Chiles told you, just like Ms. Perkins suffered, he
11   got into the sanctuary and what did he hear?  He heard
12   Mr. Jinwright already on the pulpit saying, "Ain't nobody
13   studying the IRS."
14         Gandy said, "He isn't going to learn.  He isn't
15   going to listen.  He's going to drag those members of the
16   Board of Directors down with him.  This is a crime in
17   progress and I'm outta here.  And he took his family and he
18   left that church.
19         Regina Chiles left her church.  Darlene Perkins
20   left her church.  Travis Mauney, the loyal man, last man
21   standing, stayed there and year after year he pled with
22   them, "Let me give you a 1099.  Let's make this right.
23   Everybody knows this is income.  Let's report it."  They
24   wouldn't do it.  Travis Mauney left his church.
25         Neither -- neither counsel for the defendants

wanted to talk about those false financial reports.  But if

you look in paragraph 28, page 9, of Bill of Indictment, it

says, the grand jury charged:  "A. Jinwright and H.

Jinwright took affirmative steps to conceal the financial

condition of Greater Salem Church.  For example, Harriett

Jinwright and Anthony Jinwright instructed a number of

members of the Greater Salem finance committee that in

preparing the annual financial report to the congregation

they should compute the annual expenses using only the first

11 months of the year, while showing contributions to

Greater Salem Church for the entire 12-month period.  Yet

another finance administrator was told to create financial

reports that made it appear that Greater Salem Church was in

the black when, in fact, it was in the red."

And every one of those financial reports that were

submitted from 2004 forward were submitted after the IRS had

granted tax exempt status to Greater Salem Church; and every

time a financial report was submitted to the congregation

which was false, that impeded the Internal Revenue Service's

ability to do its functions, to carry out its legal

obligations, and that makes Mr. Jinwright and Mrs. Jinwright

guilty of the conspiracy as charged in Count One.

Now, Mr. Hinson talked to you about, "Why don't

you just let them pay the taxes?"  Remember when we started

out I told you this is a criminal case.  It's not a civil

case.

This case is not about tax collection. You don't have the authority to impose taxes and that's not my job.

I'm not a tax collector. I'm a prosecutor. I prosecute people based on the evidence of criminal activity; and God knows, you've seen enough of that in this courtroom.

Don't be mislead by Mr. Hinson invitation for you to let the IRS handle this in some civil fashion. That's like bringing the bag of money back to the bank after you've stolen it, walked out and got caught. You can't make it all right by putting the money back on the teller table.

This is a crime, ladies and gentlemen, and the evidence establishes that they are guilty. Your job is not to worry about the tax payment; your job is to determine whether or not they should be held accountable for seven years of criminal activity.

Mr. Hinson says, "Where is the evidence they knew?" My gosh, what a question.

Here is the time line of the defendants' knowledge, folks. This isn't about a good faith misunderstanding of the law; this is about a willful refusal to comply with the law despite being told time and time and time again what the law requires.

Mr. Kellerman, the bookkeeper, told both Mr. and Mr. Jinwright back in November of 2001, "All of these

payments that you're getting from the church, the tax
payments, the so-called scholarship payments for your
daughter when there's no scholarship program at all at the
church -- the tuition payments is more accurate -- the
vacations that you're getting, the car allowance, the lease
of the Mercedes Benz, Mr. Jinwright, all of those payments
that you're getting from the church are income to you.  And
if you don't want to have it run through payroll, which is
what you should do, if you don't want to have it run through
payroll so it ends up on your W-2, then you should get a
1099 because it's income which you're obligated to report on
your tax return."

Mr. Kellerman told them before any of the crimes
charged in this indictment.  That alone, that alone is
sufficient evidence that they knew that they were
underreporting their income but it doesn't stop there.

Darlene Perkins, as the finance administrative in
July of '03 through January '04 when she was sick in her
heart and walked out of the church, told them the same thing
Kellerman told them, "These payments are all income.  You
have to report this.  It should go through payroll."

Mrs. Jinwright said, "No, I don't want it to go
through payroll."  Of course not.  If it goes through
payroll, Lancaster is going to see it and it's going to go
on the tax return.  They don't want it on the tax return.

So Perkins said, "Then we ought to issue a 1099."

"No. We don't want a 1099."

Perkins' response was, "That's not my problem. My problem is the financial disarray of the church. But if it doesn't go through payroll, it doesn't get on the W-2. If you don't let me issue a 1099, then it's up to you, Mr. Jinwright, and up to you, Mrs. Jinwright, to make sure that you properly and truthfully account for the income that I'm telling you is reportable." But they didn't do it.

Mr. Howze came in in January of '04 with his audit report and his management letter and he told them again, in writing -- Exhibit 17A if you're inclined to look at it -- he told them, "All those things that you're getting are income. If you don't run it through payroll and you don't get it on a W-2, you need to get a 1099."

Mr. Gandy told them the same thing in September of '04 after the emergency meeting when he got ahold of Howze's management letter and audit report. He stormed into that meeting and he said, "You all need to report this. Your compensation is not getting picked up. You need to get 1099s. And you're making -- you're putting the board at risk." He told them.

They were told again when Mr. Howze did the second audit. In a letter in December of '05 Mr. Howze told them exactly what he had told them the previous year. You can

match up line by line Exhibits 17A and 17B.  Mr. Howze told them twice, "All of this stuff is income."

Now, something else.  I just want to pause for moment.  Mr. Tate wants to explain away why Mr. Howze didn't come back; and his explanation to you, based on I'm not sure what, is that Nelson Adesegha had him fired.  Well, that's not accurate.

Nelson Adesegha came on in September of '04.  He got fired in October of '05.  Mr. Howze's second report is dated December of '05.  Mr. Howze was still there after Adesegha had already been fired.

So the explanation that Mr. Tate wants you to believe about why Mr. Howze didn't come back isn't proven by any of the evidence in this courtroom and is disproved by the chronology of events.  You heard why Mr. Howze didn't come back; because Mr. and Mrs. Jinwright didn't want to get it right.  They didn't want to follow the law.  They wanted to evade their taxes.  They wanted to avoid the very knowledge that they get from Kellerman, Perkins, Howze the first time, Gandy, Adesegha in the middle, Mr. Howze the second time.

Then we have something neither defense lawyer wanted to talk about.  In April of 2006 one of the spiritual sons of Mr. and Mrs. Jinwright, Pastor John Walker from Macedonia Baptist Church -- and I want to recall your

1    attention to one thing.  When Mr. Hinson was going through

2    that eight hours of looking at checks, every time he came

3    across one from Macedonia Baptist Church, he sort of got

4    past it a little quicker.  Any time he saw a check to John

5    Walker, he went very quick.

6          John Walker is not somebody they wanted to talk

7    about.  Because John Walker was a friend his; John Walker

8    was his spiritual son.  And John Walker was indicted in

9    Federal District Court for doing exactly what Mr. Jinwright

10   and Mrs. Jinwright are accused of doing in this courtroom.

11         That's personal knowledge, folks.  When your best

12   buddy gets charged with doing what you're doing, you know at

13   that point -- if you didn't know it from Kellerman, Perkins,

14   Howze and Gandy, you know at that point -- that what you're

15   doing is not just wrong, it's just not a matter of

16   confusion.  It's a crime.

17         But what's important about that is that was April

18   of 2006.  They are charged with evading their taxes in 2006

19   and 2007, two tax returns that they filed after John Walker

20   was indicted for the very things that they are charged with,

21   for the very things that give them notice of criminality of

22   their conduct, they filed two more false tax returns doing

23   the same ole same ole.

24         THE COURT:  Two minutes.

25         MR. BROWN:  Yes, sir.  Thank you.

John Walker pled guilty in this courtroom in December of 2006. Any question about the criminality of their conduct at that point in time was over. They knew at that point in time what they were doing was illegal, and yet they filed their 2007 tax return after that which willfully omitted income yet again.

And I want to talk to you about the confusion, folks. There was no confusion in John McCullough's mind, their other spiritual son, from January -- I mean from '01 through '07 because he issued 1099s to both of these defendants. There was no confusion in the mind of their spiritual father, Ralph Metz (ph) --

THE COURT: One minute.

MR. BROWN: -- who provided them with 1099s. And again, in the words of Pastor Mickens, there hasn't been any confusion on this area -- in this area for 20 years.

In my 30 seconds remaining let me just remind you about Mr. Lancaster.

He was called a liar by Mr. Jinwright as well, but that's because he said all that stuff that Mr. Jinwright told you about talking to Lancaster about taxes was just a lie. And so the only way Mr. Jinwright could cover that lie is to call Mr. Lancaster a liar.

Ladies and gentlemen, this case now is very real. I submit you should find both defendants guilty of all

1    counts in the indictment.

2              THE COURT:  Thank you.

3              We have the final instructions up on the screen

4    now.

5              Now, members of the jury, you have heard the

6    evidence and the arguments of counsel for the government and

7    for the defendants.  It is your duty to remember the

8    evidence, whether it has been called to your attention or

9    not; and if your recollection of evidence differs from that

10   of the attorneys, you are to rely solely upon your

11   recollection of the evidence in your deliberations.

12             It is our duty to not only consider all the

13   evidence but also to consider all the arguments, the

14   contentions and positions urged by attorneys, and any other

15   contention that arises from the evidence and to weigh them

16   all in the light of your common sense and, as best you can,

17   to determine the truth of this matter.

18             The law, as indeed it should, requires the

19   presiding judge to be impartial.  Therefore, do not assume

20   from anything I may have done or said during the trial that

21   I have any opinion concerning any of the issues in this

22   case.

23             I instruct you that a verdict is not a verdict

24   until all 12 jurors agree unanimously as to what your

25   decision shall be.  You may not render a verdict by a

1  majority vote or any other voting mechanism aside from a

2  unanimous verdict of 12.

3  　　　　The Court suggests that as soon as you reach the

4  jury before beginning deliberations you select one of your

5  members to serve as foreperson.  This individual has the

6  same vote as the rest of the jurors but simply serves to

7  preside over the discussions.  Once you begin deliberating,

8  if you need to communicate with me, the foreperson will send

9  a written message to me by knocking on the door or ringing

10 the buzzer and handing it to the marshal.

11 　　　　However, you are not to tell me how you stand

12 numerically as to your verdict.  For instance, should you be

13 split in your voting at any particular time, you would not

14 tell me the specific numbers of division in your note.

15 　　　　We use a verdict sheet.  In this case, we use two

16 verdict sheets because there are two defendants.  There's a

17 separate verdict sheet for each defendant in this case.

18 This is simply the written notice of the decision that you

19 reach in this case.

20 　　　　As soon as you have reached a verdict as to the

21 counts alleged in the Bill of Indictment, you will return to

22 the courtroom and your foreperson will, on request, hand the

23 verdict sheets to the clerk.  There are places on the

24 verdict sheet for the foreperson to enter the verdict by

25 placing a checkmark beside the jury's decision, sign it and

1    date it.

2           During the trial several items were received into

3    evidence as exhibits.  You will not be taking exhibits into

4    the jury room with you at the start.  If after you have

5    begun your discussions of the case you think it would be

6    helpful to see any of the exhibits, have the foreperson send

7    me a note asking to see them.

8           If you need a break during deliberations, you may

9    do so in the jury room; or if you need a break outside the

10   jury room, a marshal will escort you.  But you must not

11   deliberate during a break unless all 12 of you are together.

12   If you are not together, then do not talk about the case

13   until all of you are back together.

14          You may take the case and see how you find.  And I

15   ask Ms. Nall to remain in her seat.  The clerk of court will

16   bring back the two verdict sheets, the indictment and the

17   jury instructions.

18          (Jury leaves courtroom at 4:10 p.m.)

19          THE COURT:  Mrs. Nall, thank you very much for

20   your perseverance through your illness.  I am not excusing

21   you as a juror because there's a possibility one of the 12

22   jurors can become sick during the course of the

23   deliberations.  So you are released to go home this evening;

24   but you can't talk to anyone, just as my earlier

25   instructions applied, about this case until you have heard

on the news that there is a verdict.  If there's -- if you

hear on the news there is no verdict, then, of course, you

need to continue to not discuss anything with anyone.

Thank you for your patience, your perseverance.  I

saw how, you know, several days how you sat here very, very

patiently.  You paid attention to the evidence even though

you were not feeling well.  There's not much I can do for

you other than give you a little certificate of thanks from

the Court.  Thank you very much and you are released.

(Ms. Nall leaves the courtroom.)

THE COURT:  Any questions from counsel?

MR. HINSON:  No, sir.

MR. BROWN:  Judge, I just wanted to be clear on

the Court's instruction to Ms. Nall.  If she's likely to be

called back, I have some concerns about her waiting to hear

anything on the news.

THE COURT:  Well, that's the only way she knows --

I guess we could call her.

MR. BROWN:  I would prefer if there's any

probability she would have to be recalled that the Court

remind her of the previous instructions that she refrain

from considering -- from listening to the news until she's

either fully released by the Court.

THE COURT:  Well, there's no evidence.  The only

thing that the news will be reporting -- they could report

argument again, I guess.  Could you grab her?  She's gone

out the door?  I was thinking because all the evidence is

in.

          MR. BROWN:  Hopefully, she won't have to be

recalled.  If she is, Your Honor, I would prefer not to have

a problem.

          (Mrs. Nall returns to courtroom).

          THE COURT:  Ms. Nall, I apologize.  After you

left, counsel suggested to me, and I think it's very

prudent, that you actually should continue not follow the

media in any way.  So what will happen is we will have

someone from the Court call you, Ms. Cochran or someone else

in the clerk of court's office, when there is a verdict.

          JUROR NALL:  Okay.

          THE COURT:  So until you get a message from the

Court, just avoid the media.

          JUROR NALL:  All right.

          THE COURT:  Thank you very much, ma'am.

          Ms. Cochran has now delivered the indictment, the

instructions and the two verdict forms.  Can we be in

recess?  Anything from counsel?

          MR. BROWN:  Nothing from the government, Your

Honor.

          THE COURT:  All right.  We will be in recess in

this case until we hear from the verdict of the jurors.  I

1    have another hearing at 4:30, 15 minutes, in here.

2        So if counsel can just step away from their desk,

3    but I think you could leave the things on your desk.

4        (Court in recess pending word from the jury.)

5        THE COURT:  All right.  Very quickly and the

6    defendants actually don't need to be in here but I'm glad

7    they are.

8        Let me read to you to the request of the jurors.

9    I think it's very straight forward.  "We need at least an

10   electronic copy of 23-page document and the 35-page

11   document.  If this is not possible, we need 11 more paper

12   copies for each jury."  It says "jury" but I think they are

13   mean juror.  23-page document we presuming is the Bill of

14   Indictment.  The 35-page document is the jury instructions.

15   Does everybody agree?

16       MR. BROWN:  Yes, sir.

17       MR. HINSON:  Yes, sir.

18       MS. PARROTT:  Yes, sir.

19       THE COURT:  The 35 are electronically on the JERS

20   system, so they have access to that.  We just need --

21   Ms. Cochran has to give them access; hit the right button in

22   here so they have access to it in the jury room.

23       The 23-page reacted Indictment is not on JERS yet,

24   but Mrs. Magee has scanned it in back in our chambers and

25   has e-mailed it to Ms. Cochran, so it will be added to the

1   JERS system.  And it will be made available electronically

2   also.  Any questions on that?

3          MR. BROWN:  No, sir.

4          THE COURT:  Any objections to that?

5          MR. TATE:  No, sir.

6          MR. HINSON:  No, sir.

7          MR. BROWN:  No, sir.

8          MR. HINSON:  Just to be clear about this, our

9   clients didn't get a chance to get anything to eat at lunch

10  time.  Can they go down the street to --

11         THE COURT:  Sure.  Absolutely.  That's absolutely

12  fine with the Court.

13         MR. HINSON:  We can waive their being here for

14  further questions.

15         THE COURT:  I anticipate questions, and as long as

16  you do not believe they need to be here for questions.

17         MR. HINSON:  I think we can pass --

18         MR. TATE:  If she's here; if she's not here we

19  would waive her appearance here in court.

20         THE COURT:  That's fine.  All right.  Thank you.

21  We'll be in recess for five minutes.

22          (Recess taken in Jinwright case pending return of

23  a verdict.)

24          (Thereupon, the Court heard motions in a different

25  case.)

1          (Jury question at 5:54 p.m.)

2          THE COURT:  We have two routine questions.

3          The first one is, "We need to have a copy of the

4    government's closing arguments.  None of the jurors took

5    enough notes to remember all the points made."

6          That one is easy:  The answer is no.

7          Now, we have a third question.

8          The second question is, "We need to have a

9    ten-minute break for fresh air (smoke break.)"

10         We'll just give them the instruction that they

11   determine their own breaks.  They just need to read the last

12   page of the instruction.

13         Now we finally have a request.  Third question:

14   "We need the management letter from Legacy 17A and 17B."

15   17A and 17B.  Is that the right exhibit numbers?

16         MR. BROWN:  Yes, sir.

17         THE COURT:  Any objection to 17A and 17B going

18   back to the jury?

19         MR. TATE:  No objection.

20         MR. HINSON:  No objection.

21         THE COURT:  All right.  Mrs. Cochran, if you could

22   give them electronic access to 17A and 17B.  And then if you

23   could go back there and tell them they can take a break.

24   They just need to read the last page of the instructions so

25   they know not to deliberate while they are on a break.

1          Any questions for the Court?  All right.  We'll be

2    in recess.  Thank you.

3          (Court in recess pending the jury verdict.)

4          (Jury question at 7:08 p.m.)

5          THE COURT:  All right.  We have a jury request for

6    documents.  The request is, it says, "We need documents that

7    list 60.1, 60.2, 60.3, 60.4, 60.5, 60.6, 60.7, 6.8, 60.9 and

8    61."  Any questions about that?  I believe that's Revenue

9    Agent Polk's charts and 61 is her revenue agent report.  Do

10   the parties agree those are requested documents?

11         MR. TATE:  Yes.

12         MR. BROWN:  Yes.

13         THE COURT:  Oh, Ms. Cochran reminded me, 60.7 was

14   never admitted.  It's a duplicate.

15         MR. BROWN:  That was just a duplicate, Your Honor,

16   that's correct.

17         THE COURT:  They requested it so they will not get

18   60.7 since it wasn't admitted.

19         So any problem with Ms. Cochran giving the jurors

20   electronic access to those documents except for 60.7?

21         MR. TATE:  No objection.

22         MR. HINSON:  No objection.

23         MR. BROWN:  No, sir.

24         THE COURT:  Then it will be done.  We'll await

25   word from the jury.

1          (Recess pending the jury's verdict.)

2          (Jury verdict at 8:10 p.m.)

3          THE COURT:  All right.  It's my understanding from

4     the clerk of court we have a verdict.

5          Before we bring the jurors into the courtroom, I

6     want to ask that the court security officers, once everyone

7     is in, the Marshal Service closes the courtroom so that

8     there's no more entry or exit after the jurors come in.

9          When the verdict is read, I ask that no one show

10    any emotions.  Everyone remain silent.  We are in a

11    courtroom.  Whenever there's a reading of a verdict, it is a

12    very emotional time, but we still have to pay respect to the

13    courtroom and recognize the importance of maintaining our

14    decorum through the process.

15          Also, after the verdict is read, I will excuse the

16    jurors.  I'll give them a short thank you for their jury

17    service.  As you all said during your arguments today, they

18    were very attentive and very patient through the last four

19    weeks.  They will be excused, of course, through the jury

20    room, and I'm going to order the Marshal Service and the

21    court security officers to keep this courtroom closed and no

22    one will exist this courtroom until the jurors are outside

23    the building and escorted to their vehicles.

24          Ms. Blackmon, do you have those certificates?

25          MR. BLACKWOOD:  They are on their seats.

```
 1              THE COURT:  Anything before we bring the jurors
 2    in?
 3              MR. BROWN:  No.
 4              MR. HINSON:  No, sir.
 5              MR. TATE:  No, sir.
 6              (Jury enters courtroom at 8:14 p.m.)
 7              THE COURT:  Mr. Foreperson, I understand you've
 8    reached a verdict.
 9              THE FOREPERSON:  We have.
10              THE COURT:  Was the verdict unanimous?
11              THE FOREPERSON:  It was.
12              THE COURT:  Would you please hand up the two
13    verdict sheets to the clerk of the court.
14              (Hands document to clerk.)
15              THE COURT:  I ask the clerk of court to please
16    publish the verdict.
17              THE CLERK:  Ladies and gentlemen of the jury:
18              In the matter of United States of America v.
19    Anthony L. Jinwright, case No. 3:09CR67-1, you returned the
20    following verdict:
21              As to the charge in Count One in the Bill of
22    Indictment, do you find the defendant, Anthony L.
23    Jinwright, guilty.
24              As to the charge in Count Two of the Bill of
25    Indictment, do you find the defendant, Anthony L. Jinwright,
```

1    guilty.

2              As to the charge in Count Three of the Bill of

3    Indictment, do you find the defendant, Anthony L. Jinwright,

4    guilty.

5              As to the jury in Count Four of the Bill of

6    Indictment, do you find the defendant, Anthony L. Jinwright,

7    guilty.

8              As to the charge in Count Five of the Bill of

9    Indictment, do you find the defendant, Anthony L. Jinwright,

10   guilty.

11             As to the charge in Count Six of the Bill of

12   Indictment, do you find the defendant, Anthony L. Jinwright,

13   guilty.

14             As to the charge in Count Seven of the Bill of

15   Indictment, do you find the defendant, Anthony L. Jinwright

16   guilty.

17             As to the charge in Count Eight of the Bill of

18   Indictment, do you find the defendant, Anthony L. Jinwright,

19   guilty.

20             As to the charge in Count Nine of the Bill of

21   Indictment, do you find the defendant, Anthony L. Jinwright,

22   guilty.

23             As to the charge in Count Ten of the Bill of

24   Indictment, do you find defendant, Anthony L. Jinwright,

25   guilty.

As to charge Eleven in the Bill of Indictment, do you find the defendant, Anthony L. Jinwright, guilty.

As to charge Twelve of the Bill of Indictment, do you find the defendant, Anthony L. Jinwright, guilty.

As to charge Thirteen in the Bill of Indictment, do you find the defendant, Anthony L. Jinwright, guilty.

As to Count Fifteen in the Bill of Indictment, do you find the defendant, Anthony L. Jinwright, not guilty.

As to Count Sixteen in the Bill of Indictment, do you find, Anthony L. Jinwright, not guilty.

As to the charge in Count Seventeen of the Bill of Indictment, do you find the defendant, Anthony L. Jinwright, not guilty.

As to the charge in Count Eighteen of the Bill of Indictment, do you find the defendant, Anthony L. Jinwright, not guilty.

As to the charge in Count Nineteen of the Bill of Indictment, do you find defendant, Anthony L. Jinwright, not guilty.

So say you all the 3rd day of May, signed by the foreperson.

In the matter of United States of America v. Harriett P. Jinwright, docket number 3:09CR67-2, you returned the following verdict:

As to the charge in Count One of the Bill of

1   Indictment, do you find the defendant, Harriet P. Jinwright,

2   guilty.

3           As to the charge in Count Two of the Bill of

4   Indictment, do you find defendant, Harriet P. Jinwright, not

5   guilty.

6           As to the charge in Count Three of the Bill of

7   Indictment, do you find defendant, Harriet P. Jinwright, not

8   guilty.

9           As to the charge in Count Four of the Bill of

10  Indictment, do you find the defendant, Harriet P. Jinwright,

11  not guilty.

12          As to the charge in Count Five of the Bill of

13  Indictment, do you find the defendant, Harriet P. Jinwright,

14  guilty.

15          As to the charge in Count Six of the Bill of

16  Indictment, do you find the defendant, Harriet P. Jinwright,

17  guilty.

18          As to the charge in Count Seven of the Bill of

19  Indictment, do you find the defendant, Harriet P. P.

20  Jinwright, guilty.

21          As to the charge in Count Eight of the Bill of

22  Indictment, do you find the defendant, Harriet P. Jinwright,

23  not guilty.

24          As to the charge in Count Nine of the Bill of

25  Indictment, do you find the defendant, Harriet P. Jinwright,

1    not guilty.

2           As to the charge in Count Ten of the Bill of

3    Indictment, do you find the defendant, Harriet P. Jinwright,

4    not guilty.

5           As to the charge in Count Eleven of the Bill of

6    Indictment, do you find Harriet P. Jinwright, not guilty.

7           As to the charge in Count Twelve of the Bill of

8    Indictment, do you find the defendant, Harriet P. Jinwright,

9    not guilty.

10          As to charge in Count Thirteen of the Bill of

11   Indictment, do you find the defendant, Harriet P. Jinwright,

12   not guilty.

13          So say you all the 3rd day of May, signed by the

14   foreperson.

15          THE COURT:  Would the defense like the jurors

16   polled?

17          MR. HINSON:  Yes.

18          MR. TATE:  Please.

19          THE COURT:  I ask the clerk of court to poll the

20   jurors.

21          THE CLERK:  Ladies and gentlemen of the jury, you

22   heard the verdict as published.

23          Juror No. 1:  Were those your verdicts?  Are those

24   still your verdicts?

25          JUROR 1:  Yes.

```
 1              THE CLERK:  Juror No. 2:  Were those your
 2    verdicts?  Are those still your verdicts?
 3              JUROR NO. 2:  Yes.
 4              THE CLERK:  Juror No. 3:  Were those your
 5    verdicts?  Are those still your verdicts?
 6              JUROR NO. 3:  Yes.
 7              THE CLERK:  Juror No. 4:  Were those your
 8    verdicts?  Are those still your verdicts?
 9              JUROR NO. 4:  Yes.
10              THE CLERK:  Juror No. 5:  Were those your
11    verdicts?  Are those still your verdicts?
12              JUROR NO. 5:  Yes, they are.
13              THE CLERK:  Juror No. 6:  Were those your
14    verdicts?  Are those still your verdicts?
15              JUROR NO. 6:  Yes.
16              THE CLERK:  Juror No. 7:  Were those your
17    verdicts?  Are those still your verdicts?
18              JUROR NO. 7:  Yes.
19              THE CLERK:  Juror No. 8:  Were those your
20    verdicts?  Are those still your verdicts?
21              JUROR NO. 8:  Yes.
22              THE CLERK:  Juror No. 9:  Were those your
23    verdicts?  Are those still your verdicts?
24              JUROR NO. 9:  Yes.
25              THE CLERK:  Juror No. 10:  Were those your
```

verdicts?  Are those still your verdicts?

JUROR NO. 10:  Yes.

THE CLERK:  Juror No. 11:  Were those your verdicts?  Are those still your verdicts?

JUROR NO. 11:  Yes.

THE CLERK:  Juror No. 12:  Were those your verdicts?  Are those still your verdicts?

JUROR NO. 12:  Yes.

THE CLERK:  Thank you.

THE COURT:  Ladies and gentlemen of the jury, it's been a long four weeks.  You have been very patient.  You have been very deliberate.  You have been very attentive.

My duty as judge was to preside over the presentation of evidence and allow you the opportunity to hear the evidence and to observe and to look at the documents and make a decision, and the decision you needed to agree on had to be unanimous.

As a judge I never comment on the verdict.  I shouldn't comment on the verdict because that's not my job.  Your job, though, is to tell us unanimously the truth of this matter and you have.

I think you understand how hard it is to be a juror.  I think the last several hours have been extremely stressful for you, but you have done your duty.  And as a judicial officer and a representative in the Western

1  District of North Carolina I thank you for doing that.

2           Now, you have a small certificate thanking you for

3  your jury service.  It's the least we can do.  We've taken

4  you from your family and friends, from your employment for

5  the last four weeks.

6           You now are released from your jury service.  You

7  have the right, if you choose, to talk to your family or

8  friends, to talk to counsel, to talk to the agents.  You

9  might be contacted by the media.  It's entirely up to you if

10 you want to talk to anyone.  But it is your right.

11          You're now released and you can talk about what

12 affected you the most in this trial, what you found

13 convincing, what you found unconvincing.  But I ask you one

14 really important thing:  I ask you if you talk to your

15 family, friends, counsel or the media, that you talk about

16 your thoughts, your deliberations, what convinced you, what

17 you found unconvincing.  Do not, I ask you, talk about what

18 your fellow jurors said.  One of the great things about our

19 system is the jury room is a private, secret room where you

20 come together to share your thoughts about what is important

21 in this case.

22          So you can share your reflections but I ask you

23 not to pass on what some other juror said.  That's that

24 juror's right if he or she would like to share their

25 thoughts.

So you are now excused for your jury service.  I thank you very, very much.

You will escorted to your vehicles.  If you just go through the jury room, collect your personal effects. U. S. Marshal Service, court security officers will take you to your vehicles so you can go home this evening.

Thank you and good evening.

(Jury leaves courtroom at 8:24 p.m.)

THE COURT:  All right.  Bishop Jinwright and Pastor Jinwright, please rise.

Bishop and Pastor, you both have been convicted by a jury of your peers of numerous counts of tax evasion and conspiracy, and also in the case of the Bishop Jinwright, falsifying returns.  As you are aware, these are very serious felony convictions.

The next step in this process will be the preparation of a Presentence Report by the United States probation officer.  The probation officer will contact your counsel to set up meetings with you so you will be interviewed about your personal affairs, your family history and other matters that are used to put together a Presentence Report.  That process takes several months.

At the end of that process, part of the Presentence Report will include a calculation under the U. S. Sentencing Guidelines as to the appropriate sentencing

1    range which this Court must analyze in determining the

2    appropriate sentence it ultimately hands down based on these

3    convictions.

4           That sentence or sentencing range as proposed in

5    the Presentence Report is just an advisory range.  This

6    Court is not bound by that advisory range but it's a very

7    critical first step in determining the sentence in each of

8    your cases.

9           Because it's a critical first step, you and your

10   counsel will have the right to object to those, the

11   presentence calculations.  After you filed your objections,

12   the U. S. Government will have the opportunity to respond to

13   your objections.  If the Probation Office accepts your

14   objections, then there will be no pending objections before

15   this Court.  But if the Probation Office rejects your

16   objections, then they -- you will have the opportunity to

17   argue those objections before this Court at your sentencing

18   hearing.

19          I estimate it will be three to six months, maybe

20   longer, before we have your sentencing hearing.

21          Now, do you have any questions for me as to the

22   next step in this process?  Either one of you?

23          DEFENDANT BISHOP JINWRIGHT:  No, sir.

24          DEFENDANT PASTOR JINWRIGHT:  No, sir.

25          THE COURT:  Any questions from counsel?

1          MR. TATE:  Not at this time.

2          MR. HINSON:  No, sir, not at this time.

3          THE CLERK:  What's the United States position on

4     bond?

5          MR. BROWN:  The government would request that

6     Mr. Jinwright be taken into custody.  We believe, at least

7     based on the information the our disposal, that he is still

8     in violation of the conditions of his bond.

9          We believe that on the basis of the evidence in

10    this courtroom, he faces a lengthy period of incarceration,

11    and while Mrs. -- we're not asking for detention for

12    Mrs. Jinwright.  We do so primarily because we understand

13    based on information she provided to the Court that she

14    doesn't have the financial wherewithal to flee.  Also, quite

15    candidly, we think it is less likely that she would flee if

16    her husband is incarcerated.

17         Based on the evidence in this courtroom, we

18    believe that Mr. Jinwright is engaged in obstructive

19    conduct.  We think his testimony, which the Court heard as

20    well as the jury, speaks volumes about his willingness to

21    comply with any order of this Court.  For those reasons, we

22    believe detention is appropriate.

23         THE COURT:  Pastor Jinwright, would you please sit

24    down.

25         Mr. Hinson, the government would request that the

1    court to take your client into custody.  What's your

2    position on that?

3              MR. HINSON:  Your Honor, we're, of course, are

4    opposed to that.

5              He's been here throughout the trial.  He's come

6    here every day.  We would suggest there's no indication

7    whatsoever of him being a flight risk.

8              As I represented to the Court before, he's been

9    engaged in activities to try to be in a position to pay the

10   considerable taxes that the jury has found that he owes, and

11   it would seem to us that it would be a burden to the

12   taxpayers, number one, to put him in jail because the

13   taxpayers would have to start paying for his upkeep.

14             Number two, it would deprive him of the

15   opportunity to work on the business matters that have to be

16   worked on to try to enhance his opportunity to make a

17   substantial reduction in these taxes.

18             You know, Your Honor, we think that the question

19   of whether or not he could pay these taxes or pay a

20   substantial part of these taxes by the time of sentencing

21   could be relevant on the issue of sentencing, and to put him

22   in jail would impair his ability to try to address that

23   issue.

24             You know, it seems to us that there are

25   alternatives to actually putting him in jail.  You know, one

1 would be to have some kind of electronic monitoring, to

2 restrict to the degree that the government is concerned

3 about a flight risk, certainly there are measures that could

4 be taken short of imprisoning him that would address those

5 concerns.

6         THE COURT:  Thank you, Mr. Hinson.

7         First as to the issue of his ability to repay

8 taxes that he presumptively will be held accountable for

9 because of the jury's verdict, I believe recently the Fourth

10 Circuit said in a published opinion that allowing a

11 defendant to have either a reduced sentence or to be at

12 liberty so that he or she can repay taxes for which they

13 have been found guilty of criminal evasion is really not a

14 proper factor in the calculation of a defendant's liberty.

15         More importantly, while I do agree with you, I do

16 not believe the defendant is a risk of flight.  From the

17 evidence at this trial, I'm concerned about the economic

18 risk to public safety and the community by allowing the

19 defendant to remain on bond.

20         The evidence was quite clear, and apparently the

21 jury was convinced beyond a reasonable doubt and this

22 Court's standard for detention is much lower than that, that

23 defendant was part of a conspiracy to not only evade taxes

24 and impede the lawful operation of the Internal Revenue

25 Service, but did that partly through manipulating the

1   financial operations of his church.  And that is a very

2   important factor this Court is concerned about with regard

3   to his liberty.  And because of that, the Court does believe

4   he is a risk to the economic safety of the community, and

5   the Court is going to order the U. S. Marshal Service to

6   take him into custody this evening for purposes of the

7   presentence detention since he's now been convicted of 13

8   counts of federal felonies.

9           Anything else from counsel?

10          MR. HINSON:  Not at this time.

11          THE COURT:  Anything else from the United States?

12          MR. BROWN:  No, Your Honor.  Thank you.

13          THE COURT:  Mr. Tate and Ms. Parrot?  I ask --

14          (Audience reacts.)

15          THE MARSHAL:  Come back together.  Don't lose it.

16  Just relax.  Keep it down so he can continue with court.

17          THE COURT:  Thank you.

18          With the defendant being taken into the custody of

19  the U. S. Marshal Service, nothing else from counsel, we'll

20  be in recess.

21          (Court recessed 8:32 p.m.)

22                      - - - - -

23

24

25

1

**UNITED STATES DISTRICT COURT**
2   **WESTERN DISTRICT OF NORTH CAROLINA**

3

4

5                        **CERTIFICATE OF REPORTER**

6              I, JOY KELLY, RPR, CRR, certify that the foregoing

7   is a correct transcript from the record of proceedings in

8   the above-entitled matter.

9

10

11

12   S/JOY KELLY

13   **JOY KELLY, RPR, CRR**                    **Date** _____
     **U.S. Official Court Reporter**
14   **Charlotte, North Carolina**

15

16

17

18

19

20

21

22

23

24

25